IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| JANE DOE 1, | * | |
| | * | |
| Plaintiff, | * | |
| | * | CIVIL ACTION FILE |
| v. | * | |
| | * | NO. |
| RED ROOF INNS, INC.; VARAHI | * | |
| HOTEL, LLC; FMW RRI NC, LLC; | * | |
| WESTMONT HOSPITALITY | * | |
| GROUP, INC.; WHG SU | * | |
| ATLANTA LP; SUB-SU HOTEL GP, | * | |
| LLC; CHOICE HOTELS | * | |
| INTERNATIONAL, INC.; LQ | * | |
| PROPERTIES, LLC; CPLG | * | |
| PROPERTIES, LLC; BRE/LQ | * | |
| PROPERTIES, LLC; LA QUINTA | * | |
| WORLDWIDE, LLC; | * | |
| EXTENDED STAY AMERICA, | * | |
| INC.; ESA MANAGEMENT, | * | |
| LLC; ESA P PORTFOLIO, LLC; | * | |
| ESA P PORTFOLIO OPERATING | * | |
| LESSEE, LLC; JOHN DOES 1-10, | * | |
| | * | |
| Defendants. | * | |

## COMPLAINT FOR DAMAGES

COMES NOW Plaintiff Jane Doe 1, by and through the undersigned

counsel, and files this, her Complaint for Damages against Defendants,

alleging as follows:

*"You may choose to look the other way, but you can never say again that you did not know." — William Wilberforce[1]*

## I.    INTRODUCTION

1.

Sex trafficking is the total dehumanization of a person for the profit and pleasure of others. It is an evil venture that requires the complicity of three groups to exist: buyers, sellers, and a venue.

2.

Without buyers, the sex trafficking venture ceases to exist. Without sellers, the sex trafficking venture ceases to exist. Without a venue, or crime scene, the sex trafficking venture ceases to exist.

3.

Defendants, for a fee, provided the crime scene, a private and anonymous venue at Defendants' hotels for buyers to obtain commercial sex

---

[1] In 2008, the Trafficking Victims Protection Act was renamed the William Wilberforce Trafficking Victims Protection Act of 2008 ("TVPRA") in honor of Wilberforce, "an English politician and social reformer whose campaign to suppress the slave trade led to the passage by Parliament of the Slavery Abolition Act of 1833, ending the institution of slavery in the British Empire." *Am. Civil Liberties Union of Massachusetts v. Sebelius*, 697 F. Supp. 2d 200, 201 n.3 (D. Mass. 2010).

acts from Plaintiff after the sellers had brutally beaten, tortured, raped, physically and mentally abused, exploited, psychologically tormented, coerced through controlled drug use, kidnapped, and falsely imprisoned her at Defendants' hotels. This is the transactional cycle that defines "hotel sex trafficking."

4.

Hotel sex trafficking is the most common sex trafficking venture, particularly in Atlanta.[2] Sellers pay the venue for a location, the crime scene, to offer up a human being for sale; buyers pay the sellers to use that human being for their pleasure; sellers pay the venue with the money from the buyers; and the cycle repeats.

5.

Defendants were knowingly complicit in the sex trafficking of Plaintiff. Defendants' agents, employees, and representatives did not just look the other way—though they did that, too—Defendants' agents, employees, and representatives were paid *for years* by Plaintiff's traffickers to act as lookouts, evade the police, and ensure that Plaintiff could not escape from Defendants' hotels.

---

[2] *See* paragraphs 49–56, supra, showing a majority of sex trafficking incidents studied occurred at or involved hotels.

6.

For that kind of repetitive, longstanding, endemic, and pervasive hotel sex trafficking venture to exist, the companies and people who benefit financially from the hotel or the venture must also be complicit.

7.

At the bottom of the venture, sex traffickers force a woman, man, or child to engage in commercial sex acts by violence, threats, fraud, or other coercion. For example, in this case sex acts were procured by violent and frequent beatings, psychological threats, abuse, torture, financial servitude, and tightly controlled drug use.

8.

Above the sex trafficker, hotel employees must ignore, condone, facilitate, or participate in the endemic sex trafficking ventures at the hotel, as Defendants did in this case.

9.

Above the hotel employees, hotel management must ignore, condone, facilitate, or participate in the endemic sex trafficking ventures at the hotel, as Defendants did in this case.

10.

Above hotel management, the hotel's owner must ignore, condone, facilitate, or participate in the endemic sex trafficking ventures at the hotel, as Defendants did in this case.

11.

Above the hotel owner, a hotel brand must ignore, condone, facilitate or participate in the endemic sex trafficking ventures at the hotel, as Defendants did in this case.

12.

Any single person or entity above could have stopped the endemic hotel sex trafficking ventures that exploited Plaintiff, at least at Defendants' own hotels. But no one did.

13.

If the Defendant hotel brands instituted and required basic training and enforced a meaningful policy against sex trafficking, including pulling the brand from repeat problem hotels, sex trafficking would not have been pervasive at Defendants' hotels in this lawsuit.

14.

If the Defendant hotel owners supervised their managers, employees, agents, and properties, instituted and required basic training, and enforced a

meaningful policy against sex trafficking, sex trafficking would no longer be pervasive at Defendants' hotels in this lawsuit.

15.

If the Defendants' hotel managers reasonably supervised their employees and properties, reported conduct that was readily apparent or actually known to the police, and enforced a meaningful policy against sex trafficking, sex trafficking would no longer be pervasive at Defendants' hotels in this lawsuit.

16.

If Defendants' hotel employees were properly trained and reported conduct that was readily apparent or actually known to the police and enforced a meaningful policy against sex trafficking, sex trafficking would no longer be pervasive at Defendants' hotels in this lawsuit.

17.

Finally, and obviously, if Defendants' agents and employees did not actively participate in sex trafficking, sex trafficking would not be pervasive at Defendants' hotels in this lawsuit.

18.

The hotel sex trafficking of Plaintiff relied upon the near-total alignment of every link in that chain to exist, particularly in the longstanding

6

and pervasive manner in which it existed while Plaintiff was trafficked at Defendants' hotels in this lawsuit.

19.

At every level, Defendants participated in the sex trafficking venture by renting the room, received a benefit from the room rental, developed and maintained business models that attracted and fostered sex trafficking, all while Defendants knew or should have known sex trafficking was occurring at their hotels. In fact, Defendants often willingly chose to ignore or participate in the sex trafficking of Plaintiff at their hotels, rather than do anything about it. The reason is simple: Defendants calculated it was more profitable to facilitate, or at best turn a blind eye to, rampant sex trafficking at their hotels, than to try and stop it.

20.

Plaintiff was trafficked from 2011–2016 at Defendants' hotels. She was trafficked by different traffickers, affiliated with each other, and with many other trafficking victims. Some of those victims have also filed cases against Defendants. Those victims, and others, are witnesses to the sex trafficking of Plaintiff at Defendants' hotels and the complicity of Defendants in that sex trafficking venture.

## II.    JURISDICTION, PARTIES, AND VENUE

21.

The Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. §§ 1331 and 1367 because this action arises under 18 U.S.C. §§ 1589, 1591 and 1595(a).

22.

Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in the judicial district where this action is brought.

23.

Plaintiff, having moved to proceed anonymously,[3] is a citizen of the United States of America and a resident of the State of Georgia.  She is a "victim" of sex trafficking within the meaning of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 22 U.S.C. § 7102(15), 18 U.S.C. § 1591(a), and is "victim" of a "severe form of trafficking." 22 U.S.C. § 7102(14).

---

[3] Contemporaneously with her complaint, Plaintiff filed a Motion for Protective Order and Leave to Proceed Anonymously based on the nature of the allegations in the complaint, which are intimate and personal in nature, as well as for her own personal safety. That motion is pending. Jane Doe 1 will provide her identity to counsel for Defendants upon the resolution of that motion and agreement upon a protective order.

24.

At all times relevant to this Complaint, Defendants Varahi Hotel, LLC, FMW RRI NC, LLC, Westmont Hospitality Group, Inc., Red Roof Inns, Inc. and John Does Nos. 1-10 (collectively, the "Red Roof Defendants") owned, managed, supervised, operated, oversaw, controlled the operation of, and were inextricably connected to the renting of rooms at the Red Roof Inn located at 2200 Corporate Plaza, Smyrna, Georgia, 30080 ("Smyrna Red Roof Inn"), from which they benefited financially.

25.

Varahi Hotel, LLC ("Varahi") owns, manages, supervises, operates, and controls the Smyrna Red Roof Inn under the Red Roof Inn brand. Varahi is a Georgia limited liability company with its principle place of business at 2200 Corporate Plaza, Smyrna, Georgia, 30080. Varahi may be served with service of process by serving its registered agent Jaymen Chavda at 8800 Roswell Road, Building C, Suite 230, Atlanta, Georgia, 30350.

a)  Varahi controls and oversees the training, policies, supervision, operation, management, security, and employees at the Smyrna Red Roof Inn.

b)  Varahi participated in Plaintiff's sex trafficking and knowingly benefitted by receiving money from Plaintiff's trafficker for

lookout work and other illegal services provided to Plaintiff's trafficker, and by receiving money from Plaintiff's trafficker for the rental of hotel rooms in which Plaintiff was subsequently and openly sold for sex as many as 20 times per day. Through these and other actions, Varahi participated in a venture it knew or should have known engaged in the sex trafficking of Plaintiff.

26.

FMW RRI NC, LLC ("FMW") owned, managed, supervised, operated, and controlled the Smyrna Red Roof Inn under the Red Roof Inn brand. FMW is a Delaware limited liability company with its principle place of business in Houston, Texas. FMW may be served with service of process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

a) FMW controlled and oversaw the training, policies, supervision, operation, management, security, and employees at the Smyrna Red Roof Inn.

b) FMW participated in Plaintiff's sex trafficking and knowingly benefitted by receiving money from Plaintiff's trafficker for lookout work and other illegal services provided to Plaintiff's trafficker, and by receiving money from Plaintiff's trafficker for

the rental of hotel rooms in which Plaintiff was subsequently and openly sold for sex as many as 20 times per day. Through these and other actions, FMW participated in a venture it knew or should have known engaged in the sex trafficking of Plaintiff.

27.

Westmont Hospitality Group, Inc. ("Westmont") owned, managed, supervised, operated, and controlled the Smyrna Red Roof Inn under the Red Roof Inn brand. Westmont also owns, manages, supervises, operates, and controls HomeTown Studios,[4] f/k/a Suburban Extended Stay at 2050 Peachtree Industrial Court, Chamblee, Georgia, 30341 (the "Suburban Extended Stay).[5]  Westmont is a Texas corporation with its principle place of business in Houston, Texas.  Westmont may be served with service of process by serving its registered agent Capitol Corporate Services, Inc. at 206 E. 9th Street, Suite 1300, Austin, Texas, 78701.

---

[4] The Suburban Extended Stay where Plaintiff was trafficked is currently a HomeTown Studios hotel, a brand of Red Roof Inns, Inc. However, during the time of Plaintiff's trafficking, the hotel was a Suburban Extended Stay, a brand of Choice Hotels.

a) Westmont owned, operated, managed, supervised, and controlled the Smyrna Red Roof Inn and the Suburban Extended Stay while Plaintiff was trafficked at both hotels.

b) Westmont operates the hotels it has an ownership interest in, including the Smyrna Red Roof Inn and the Suburban Extended Stay. Westmont's business strategy is to align its ownership and management of its properties, with Westmont controlling the operation of the properties, including the Smyrna Red Roof Inn and the Suburban Extended Stay.[6]

c) Westmont developed and implemented unique business models for both the Smyrna Red Roof Inn and the Suburban Extended Stay, in order "to ensure the best returns."[7]

d) According to Westmont, "Westmont takes responsibility for overseeing the asset management of the hotels, including financial accounting, sales and marketing, IT and human resources."[8]

---

[6] *See* Westmont Hospitality Group website, Exhibit 1.
[7] *Id.*
[8] *Id.*

12

e)  Westmont controlled and oversaw the training, policies, supervision, operation, management, security, and employees at the Smyrna Red Roof Inn and the Suburban Extended Stay.

f)  Westmont participated in Plaintiff's sex trafficking and knowingly benefitted by receiving money from Plaintiff's trafficker for lookout work and other illegal services provided to Plaintiff's trafficker, and by receiving money from Plaintiff's trafficker for the rental of hotel rooms in which Plaintiff was subsequently and openly sold for sex as many as 20 times per day. Through these and other actions, Westmont participated in a venture it knew or should have known engaged in the sex trafficking of Plaintiff.

28.

Red Roof Inns, Inc. ("RRI") manages, supervises, operates, and controls the Smyrna Red Roof Inn. RRI is a Delaware corporation with its principle place of business in New Albany, Ohio. RRI may be served with service of process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

13

a)      RRI controlled and oversaw the training, policies, supervision, operation, management, security, and employees at the Smyrna Red Roof Inn.

b)      RRI maintains integral involvement in each of the franchise locations bearing the Red Roof Inn brand. In a recent article, RRI president Andrew Alexander noted, "Our relationship with our franchisees is as close as you can get." Alexander further stated in the article that franchisees have "direct access to him and other leaders at the company, something that's unheard of at larger franchising companies."[9]

c)      RRI participated in Plaintiff's sex trafficking and knowingly benefitted by receiving money from Plaintiff's trafficker for lookout work and other illegal services provided to Plaintiff's trafficker, and by receiving money from Plaintiff's trafficker for the rental of hotel rooms in which Plaintiff was subsequently and openly sold for sex as many as 20 times per day. Through these

---

[9] Exhibit 2, Judy Maxwell, *Asian American Hoteliers Raise the Red Roof*, Asian Hospitality, (Nov. 19, 2018), https://www.asianhospitality.com/asian-american-hoteliers-raise-the-red-roof/ (last visited Aug. 18, 2019).

and other actions, RRI participated in a venture it knew or should have known engaged in the sex trafficking of Plaintiff.

29.

At all times relevant to this Complaint, Defendants WHG SU Atlanta LP, SUB-SU Hotel GP, LLC, Westmont, Choice Hotels International, Inc., and John Does Nos. 1-10 (collectively, the "Suburban Extended Stay Defendants") owned, managed, supervised, operated, oversaw, controlled the operation of, and were inextricably connected to the renting of rooms at the Suburban Extended Stay located at 2050 Peachtree Industrial Court, Chamblee, Georgia, 30341, from which they benefited financially.

30.

WHG SU Atlanta LP ("WHG") owns, manages, supervises, operates, and controls the Suburban Extended Stay. WHG is a Delaware limited partnership with its principle place of business in Houston, Texas. WHG may be served with service of process by serving its registered agent Capitol Corporate Services, Inc. at 3675 Crestwood Parkway, Suite 350, Duluth, Georgia, 30096.

a) WHG controls and oversees the training, policies, supervision, operation, management, security, and employees at the Suburban Extended Stay.

15

b)   WHG participated in Plaintiff's sex trafficking and knowingly benefitted by receiving money from Plaintiff's trafficker for lookout work and other illegal services provided to Plaintiff's trafficker, and by receiving money from Plaintiff's trafficker for the rental of hotel rooms in which Plaintiff was subsequently and openly sold for sex as many as 20 times per day. Through these and other actions, WHG participated in a venture it knew or should have known engaged in the sex trafficking of Plaintiff.

31.

SUB-SU Hotel GP, LLC (SUB-SU) owns, manages, supervises, operates, and controls the Suburban Extended Stay. SUB-SU is a Delaware limited liability company with its principle place of business in Houston, Texas. SUB-SU is a general partner of WHG and is liable for the debts of WHG.  SUB-SU may be served with service of process by serving its registered agent Capitol Corporate Services, Inc. at 515 East Park Avenue, 2nd Floor, Tallahassee, Florida, 32301.

a)   SUB-SU controls and oversees the training, policies, supervision, operation, management, security, and employees at the Suburban Extended Stay.

16

b)      SUB-SU participated in Plaintiff's sex trafficking and knowingly benefitted by receiving money from Plaintiff's trafficker for lookout work and other illegal services provided to Plaintiff's trafficker, and by receiving money from Plaintiff's trafficker for the rental of hotel rooms in which Plaintiff was subsequently and openly sold for sex as many as 20 times per day. Through these and other actions, SUB-SU participated in a venture it knew or should have known engaged in the sex trafficking of Plaintiff.

32.

Choice Hotels International, Inc. ("Choice") owns, manages, supervises, operates, and controls the Suburban Extended Stay. Choice is a Delaware corporation with its principle place of business in Rocksville, Maryland. Choice may be served with service of process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, #300, Norcross, Georgia, 30092.

a)      Choice controlled and oversaw the training, policies, supervision, operation, management, security, and employees at the Suburban Extended Stay.

b)      Choice participated in Plaintiff's sex trafficking and knowingly benefitted by receiving money from Plaintiff's trafficker for

17

lookout work and other illegal services provided to Plaintiff's trafficker, and by receiving money from Plaintiff's trafficker for the rental of hotel rooms in which Plaintiff was subsequently and openly sold for sex as many as 20 times per day. Through these and other actions, Choice participated in a venture it knew or should have known engaged in the sex trafficking of Plaintiff.

33.

At all times relevant to this Complaint, Defendants LQ Properties, LLC, CPLG Properties, LLC, BRE/LQ Properties, LLC, La Quinta Worldwide, LLC, and John Does Nos. 1-10 (collectively, the "La Quinta Defendants") owned, managed, supervised, operated, oversaw, controlled the operation of, and were inextricably connected to the renting of rooms at the La Quinta Inn located at 1350 North Point Dr., Alpharetta, Georgia, 30022 ("La Quinta Inn"), from which they benefited financially.

34.

LQ Properties, LLC, ("LQ") owns, manages, supervises, operates, and controls the La Quinta Inn. LQ is a Delaware limited liability company with its principle place of business in Irving, Texas.  LQ may be served with service of process by serving its registered agent Corporation Service

18

Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

a)   LQ controlled and oversaw the training, policies, supervision, operation, management, security, and employees at the La Quinta Inn.

b)   LQ participated in Plaintiff's sex trafficking and knowingly benefitted by receiving money from Plaintiff's trafficker for lookout work and other illegal services provided to Plaintiff's trafficker, and by receiving money from Plaintiff's trafficker for the rental of hotel rooms in which Plaintiff was subsequently and openly sold for sex as many as 20 times per day. Through these and other actions, LQ participated in a venture it knew or should have known engaged in the sex trafficking of Plaintiff.

35.

CPLG Properties, LLC, ("CPLG") owns, manages, supervises, operates, and controls the La Quinta Inn. CPLG is a Delaware limited liability company with its principle place of business in Irving, Texas.  CPLG may be served with service of process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

19

a) CPLG controlled and oversaw the training, policies, supervision, operation, management, security, and employees at the La Quinta Inn.

b) CPLG participated in Plaintiff's sex trafficking and knowingly benefitted by receiving money from Plaintiff's trafficker for lookout work and other illegal services provided to Plaintiff's trafficker, and by receiving money from Plaintiff's trafficker for the rental of hotel rooms in which Plaintiff was subsequently and openly sold for sex as many as 20 times per day. Through these and other actions, CPLG participated in a venture it knew or should have known engaged in the sex trafficking of Plaintiff.

36.

BRE/LQ Properties, LLC, ("BRE/LQ") owns, manages, supervises, operates, and controls the La Quinta Inn. BRE/LQ is a Delaware limited liability company with its principle place of business in Irving, Texas. BRE/LQ may be served with service of process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

20

a)    BRE/LQ controlled and oversaw the training, policies, supervision, operation, management, security, and employees at the La Quinta Inn.

b)    BRE/LQ participated in Plaintiff's sex trafficking and knowingly benefitted by receiving money from Plaintiff's trafficker for lookout work and other illegal services provided to Plaintiff's trafficker, and by receiving money from Plaintiff's trafficker for the rental of hotel rooms in which Plaintiff was subsequently and openly sold for sex as many as 20 times per day. Through these and other actions, BRE/LQ participated in a venture it knew or should have known engaged in the sex trafficking of Plaintiff.

37.

La Quinta Worldwide, LLC ("La Quinta Worldwide") owns, manages, supervises, operates, and controls the La Quinta Inn. La Quinta Worldwide is a Nevada limited liability company with its principle place of business in Irving, Texas. La Quinta Worldwide may be served with service of process by serving its registered agent Corporate Creations Network, Inc. at 8275 South Eastern Avenue #200, Las Vegas, Nevada, 89123.

21

a) La Quinta Worldwide controlled and oversaw the training, policies, supervision, operation, management, security, and employees at the La Quinta Inn.

b) La Quinta Worldwide participated in Plaintiff's sex trafficking and knowingly benefitted by receiving money from Plaintiff's trafficker for lookout work and other illegal services provided to Plaintiff's trafficker, and by receiving money from Plaintiff's trafficker for the rental of hotel rooms in w7hich Plaintiff was subsequently and openly sold for sex as many as 20 times per day. Through these and other actions, La Quinta Worldwide participated in a venture it knew or should have known engaged in the sex trafficking of Plaintiff.

c) La Quinta Worldwide is subject to the jurisdiction of this Court because it regularly transacts business in Georgia, owns and operates dozens of hotels in Georgia, including the La Quinta Inn, contracts to supply services in Georgia, caused indivisible injuries to Plaintiff in Georgia, and participated in illegal sex trafficking ventures at the La Quinta Inn.

38.

At all times relevant to this Complaint, Defendants Extended Stay America, Inc. ("ESA"), ESA Management, LLC ("ESA Management"), ESA P Portfolio, LLC, f/k/a BRE/ESA P Portfolio, LLC ("ESA Portfolio"), ESA P Portfolio Operating Lessee, LLC ("ESA Operating"), and John Does Nos. 1-10 (collectively, the "ESA Defendants") owned, managed, supervised, operated, oversaw, controlled the operation of, and were inextricably connected to the renting of rooms at the Extended Stay America located at 1050 Hammond Drive, NE, Atlanta, Georgia, 30328 ("Atlanta ESA"), from which they benefited financially.

39.

ESA owns, manages, supervises, operates, and controls the Atlanta ESA. ESA is a Delaware corporation that regularly conducts business in the State of Georgia with its principal place of business in Fort Lauderdale, Florida and is subject to the jurisdiction of this Court. ESA may be served with service of process by serving its registered agent for service, National Registered Agents, Inc., 160 Greentree Dr. Ste. 101, Dover, Delaware, 19904.

    a)    ESA controls and oversees the training, policies, supervision, operation, management, security, and employees at the Atlanta ESA.

b) ESA participated in Plaintiff's sex trafficking and knowingly benefitted by, on information and belief, receiving money from Plaintiff's traffickers for lookout work and other illegal services provided to Plaintiff's traffickers, and by receiving money from Plaintiff's trafficker for the rental of hotel rooms in which Plaintiff was subsequently and openly sold for sex as many as 20 times per day. Through these and other actions, ESA participated in a venture it knew or should have known engaged in the sex trafficking of Plaintiff.

40.

ESA Management owns, manages, supervises, operates, and controls the Atlanta ESA. ESA Management is a Delaware limited liability company that regularly conducts business in the State of Georgia with its principal place of business in Charlotte, North Carolina, and is subject to the jurisdiction of this Court. ESA Management may be served with service of process by serving its registered agent for service, National Registered Agents, Inc., 289 S. Culver Street, Lawrenceville, Georgia, 30046.

a) ESA Management controls and oversees the training, policies, supervision, operation, management, security, and employees at the Atlanta ESA.

24

b)     ESA Management participated in Plaintiff's sex trafficking and knowingly benefitted by, on information and belief, receiving money from Plaintiff's trafficker for lookout work and other illegal services provided to Plaintiff's trafficker, and by receiving money from Plaintiff's trafficker for the rental of hotel rooms in which Plaintiff was subsequently and openly sold for sex as many as 20 times per day. Through these and other actions, ESA Management participated in a venture it knew or should have known engaged in the sex trafficking of Plaintiff.

41.

ESA Portfolio owns, manages, supervises, operates, and controls the Atlanta ESA. ESA is a Delaware limited liability company that regularly conducts business in the State of Georgia with its principal place of business in Charlotte, North Carolina and is subject to the jurisdiction of this Court. ESA Portfolio may be served with service of process by serving its registered agent for service, National Registered Agents, Inc., 289 S. Culver Street, Lawrenceville, Georgia, 30046.

a)     ESA Portfolio controls and oversees the training, policies, supervision, operation, management, security, and employees at the Atlanta ESA.

b)      ESA Portfolio participated in Plaintiff's sex trafficking and knowingly benefitted by, on information and belief, receiving money from Plaintiff's trafficker for lookout work and other illegal services provided to Plaintiff's trafficker, and by receiving money from Plaintiff's trafficker for the rental of hotel rooms in which Plaintiff was subsequently and openly sold for sex as many as 10 times per day. Through these and other actions, ESA Portfolio participated in a venture it knew or should have known engaged in the sex trafficking of Plaintiff.

42.

ESA Operating owns, manages, supervises, operates, and controls the Atlanta ESA. ESA Operating is a Delaware limited liability company that regularly conducts business in the State of Georgia with its principal place of business in Charlotte, North Carolina and is subject to the jurisdiction of this Court. ESA Operating may be served with service of process by serving its registered agent for service, National Registered Agents, Inc., 289 S. Culver Street, Lawrenceville, Georgia, 30046.

a)      ESA Operating controls and oversees the training, policies, supervision, operation, management, security, and employees at the Atlanta ESA.

26

b)    ESA Operating participated in Plaintiff's sex trafficking and knowingly benefitted by, on information and belief, receiving money from Plaintiff's trafficker for lookout work and other illegal services provided to Plaintiff's trafficker, and by receiving money from Plaintiff's trafficker for the rental of hotel rooms in which Plaintiff was subsequently and openly sold for sex as many as 20 times per day. Through these and other actions, ESA Operating participated in a venture it knew or should have known engaged in the sex trafficking of Plaintiff.

43.

Defendants John Does Nos. 1-10 are additional owners or operators of the hotel locations in this Complaint, employees of the owners or operators, management companies or employees of the management companies, managers or employees of the managers, security companies or employees of the security companies or security personnel of the hotel locations in this complaint. Defendants John Does Nos. 1-10 will be named and served with the summons and complaint once their identity is known.

44.

Whenever reference is made in this complaint to any act, deed, or conduct of the Defendants, the allegation is that the Defendants engaged in

the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendants.

## III.   The Sex Trafficking of Jane Doe 1

45.

From 2011 to 2016, Plaintiff was forced to engage in commercial sex acts at Defendants' hotels by various sex traffickers after being advertised on www.backpage.com. Plaintiff suffered violent beatings, controlled and forced drug use, manipulation, threats, fraud, and coercion. Plaintiff was physically, sexually, mentally, and verbally abused by her traffickers. Plaintiff was bought and sold for drugs and money and her "ownership" was transferred between different traffickers in Atlanta.

46.

Plaintiff's traffickers retained the money from the commercial sex acts, keeping Plaintiff financially dependent on her traffickers for food, clothing, and other basic necessities of life.

28

47.

A number of hotels in Atlanta, including the Defendants in this lawsuit, accommodate, facilitate, and participate in the sex trafficking of women, men, and children in Atlanta. Victims, including Plaintiff, were and are rotated through these hotels in a never-ending cycle of exploitation, staying at one hotel for as little as a few hours or at times for more than a month.

48.

Without the complicity of hotels, where illicit sexual encounters are taken off the street and cloaked in the anonymity of a hotel's customers, the sex trafficking industry would be hugely disrupted. This obvious fact has been noted by experts[10] and justices of the United States Supreme Court. In

---

[10] Hotel/Motel-Based, National Human Trafficking Hotline, https://humantraffickinghotline.org/sex-trafficking-venuesindustries/hotelmotel-based (last visited Aug. 3, 2019) ("Hotels and motels are a common venue for sex trafficking, due to ease of access for buyers, ability to pay in cash and maintain secrecy through finances, and lack of facility maintenance or upkeep expenses."); *see also* Avni Ahuja, *Sex Trafficking Prevention in Georgia: Equipping Hotel Workers with the Proper Resources*, The Roosevelt Institute, (2017), *available at http://rooseveltinstitute.org/wp-content/uploads/2017/05/715_Final-3-2.pdf* (last visited Aug. 3, 2019) ("Hotels and motels represent a disproportionate site of sex trafficking due to the privacy and anonymity they offer to traffickers, customers, and victims.").

2015, Justice Antonin Scalia, joined in dissent by Chief Justice John Roberts and Justice Clarence Thomas, noted that,

> Motels . . . are also a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers.

*City of Los Angeles, Calif. v. Patel*, 135 S. Ct. 2443, 2457 (2015).

49.

Ninety-two percent of the calls received by the National Human Trafficking Hotline involving hotels and motels reported sex trafficking and two percent reported a combination of sex and labor trafficking.[11]

50.

The Polaris Project found that "75% of survivors responding to Polaris' survey reported coming into contact with hotels at some point during their exploitation . . . Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff."[12]

---

[11] *Human Trafficking and the Hotel Industry*, Polaris Project, https://polarisproject.org/sites/default/files/human-trafficking-hotel-industry-recommendations.pdf (last visited Aug. 3, 2019).
[12] *Hotels and Motels Recommendations*, The Polaris Project, https://polarisproject.org/hotels-motels-recommendations (last visited Aug. 8, 2019).

51.

According to a 2012 BEST Alliance study, 63 percent of trafficking incidents studied occurred in hotels.[13]

52.

Attorneys for the hospitality industry estimated and reported to hospitality industry representatives that eight out of ten human trafficking arrests occur in or around hotels.[14]

53.

Years before Plaintiff was trafficked, Defendants knew or should have known of the widespread national epidemic of hotel sex trafficking.

54.

The longstanding complicity of hotels in sex trafficking is common throughout the country, but it is particularly pervasive in Atlanta, which the

---

[13] Jon Conte, et. al, *Inhospitable to Human Trafficking Program Evaluation*, at 2, Businesses Ending Slavery and Trafficking, (July 2014), https://www.bestalliance.org/uploads/5/0/0/4/50047795/itt_program_evaluatio n.11_without_appendix.pdf (last visited Aug. 3, 2019).
[14] Rich Keating, *Human Trafficking: What It Is and How It Impacts the Hospitality Industry*, Presentation Delivered at AHIA Sprint Conference 2013, Washington, D.C., http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983 (last visited Aug. 6, 2019).

31

FBI has ranked as one of the worst cities in the country for child sex trafficking.[15]

55.

According to a study commissioned by the U.S. Department of Justice, Atlanta has one of, if not the, largest illegal sex trafficking economies in the country, and is also one of the most profitable cities in the country for sex traffickers. In 2007, Atlanta's sex trafficking economy was worth $290 million annually and traffickers reported average *weekly* earnings of roughly $33,000.[16]

---

[15] Chris Swecker testimony to the Commission on Security and Cooperation in Europe United States Helsinki Commission, *Exploiting Americans on American Soil: Domestic Trafficking Exposed*, The Federal Bureau of Investigation, (June 7, 2005), *available at* https://archives.fbi.gov/archives/news/testimony/exploiting-americans-on-american-soil-domestic-trafficking-exposed (last visited Aug. 3, 2019).
[16] *See* Christian Boone, *Study: Atlanta's Sex Trade Highly Profitable*, Atlanta Journal-Constitution, (March 13, 2014) https://www.ajc.com/news/crime--law/study-atlanta-sex-trade-highly-profitable/GiuU5vZdoUo5vdUYSaOBNM/ (last visited Aug. 8, 2019); *see also* Meredith Dank, et.al, *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities*, Urban Institute, (March 12 2014), 30-32, *available at* https://www.urban.org/research/publication/estimating-size-and-structure-underground-commercial-sex-economy-eight-major-us-cities (last visited Aug. 3, 2019).

56.

A large percentage of the cash flow in Atlanta's sex trafficking economy is funneled directly to hotels via the daily rental of the hotel rooms needed as a venue in which to harbor, exploit, and sell victims, including Plaintiff.[17]

57.

Years before Plaintiff was trafficked, Defendants knew of Atlanta's well-publicized reputation as the country's "epicenter for human trafficking, and particularly child sex trafficking,"[18] that sex trafficking in Atlanta was

---

[17] *Id.* at 123 (Finding that, in Atlanta, "most [sex] transactions occur in hotels and motels."), at 224 (Noting the "overwhelming use of hotels and motels" and finding that "[h]otel and motel rooms were a primary expense for many sex workers . . . . Sex workers noted that often, hotel and motel staff members and managers knew that sex was being traded in their venues but did not attempt to stop the work."); *see also id.*, (Graph at 224 showing the most common location for commercial sex acts to occur, 66.7 percent, is at hotels and motels.); *see also id.* at 103 ("Despite the thousands of dollars that are made in a week, there are operational costs associated with the business."), *see also id.* at 191 ("The costs of operating and facilitating sex work varied greatly across pimps, though this study identifies some common costs. Pimps routinely covered costs associated with employee housing, transportation, employee appearance and personal appearance, advertisements, and hotels and motels."); *see also id.* at 203 n.65 ("Hotels were the most common location of in-calls for respondents.").

[18] Sally Yates, Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month, (Jan. 29, 2015), *available at* https://www.justice.gov/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department (last visited Aug. 3, 2019) (" Atlanta . . . has been an epicenter for human trafficking, and particularly child sex trafficking.  There are varying reports, some identifying Atlanta as the number one city for child sex trafficking, others ranking it somewhat

an "epidemic of tragic proportions,"[19] and of the prevalence of sex trafficking

in hotels in Atlanta.

58.

Sex trafficking in Atlanta has been front-page news since at least 2001,

when the Atlanta Journal-Constitution published Jane Hansen's

groundbreaking series, *Selling Atlanta's Children*.[20]

---

lower.  I think that it's actually hard to quantify those numbers, but it is clear that whatever the number, it is way too high.").

[19] Exhibit 3, Nina Hickson, *An Epidemic of Tragic Proportions*, Atlanta Journal-Constitution, June 11, 2000. *See also* Letitia Campbell, *Selling Our Children: Atlanta Does Battle Against the Sex Trafficking of Kids*, Sojourner's Magazine, https://www.questia.com/magazine/1G1-234920022/selling-our-children-atlanta-does-battle-against (last visited Aug. 3, 2019) (discussing Judge Hickson's editorial and noting the creation of a large and well-established coalition of advocates in Atlanta publicizing sex trafficking in the city).

[20] Hansen's series is attached as Exhibit 4. Jane O. Hansen, *Selling Atlanta's Children: Runaway Girls Lured into the Sex Trade are being Jailed for Crimes while their Adult Pimps go Free*, The Atlanta Journal-Constitution, Jan. 7, 2001, at 1A; Jane O. Hansen, *The Pimps: Prostitution's Middle Man Slides by in Court*, The Atlanta Journal-Constitution, Jan. 7, 2001, at 1A; Jane O. Hansen, *Feds, Police Elsewhere Finding Solutions*, The Atlanta Journal-Constitution, Jan. 8, 2001 ("Atlanta City Councilman Derrick Boazman said it's also time to crack down on hotels where adult men take children. "We need to go after these hotel owners who should know what's happening when someone walks in with a 13-year-old girl," Boazman said."); Jane O. Hansen, *When Danger is as Close as a Phone*, The Atlanta Journal-Constitution, Jan. 9, 2001; Jane O. Hansen, *Police Plan Child Prostitution Unit*, The Atlanta Journal-Constitution, April 28, 2001. *See also*, Jane O. Hansen, *Selling Atlanta's Children: What Has and Hasn't Changed*, Special to CNN, July 18, 2015, https://www.cnn.com/2015/07/17/us/child-sex-trafficking-update-hansen/index.html.

59.

Hansen's reporting was part of a larger nationwide conversation that named, recognized, and raised the awareness of the evils of sex and labor trafficking at the turn of the century. That recognition culminated nationally in the passage of the Trafficking Victims Protection Act in 2000 and globally with the United Nations' adoption of the Palermo Protocol to prevent, suppress, and punish trafficking in persons.

60.

Recognizing the pervasiveness of sex trafficking in the hospitality industry, End Child Prostitution and Trafficking (ECPAT-USA) launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States in 2004.[21]

61.

The Code is well-known in the hospitality industry. It identifies six steps companies can take to prevent child sex trafficking:

(1) establish corporate policy and procedures against sexual exploitation of children;

(2) train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

---

[21] *See The Tourism Child-Protection Code of Conduct*, ECPAT-USA, *available at* www.ecpatusa.org/code/ (last visited Aug. 6, 2019).

35

(3) include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

(4) provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

(5) support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and

(6) report annually on the company's implementation of Code-related activities.

62.

Defendants knew of the Code and were urged to sign the Code and commit to taking action against sex trafficking in their hotels.

63.

For example, in 2010 more than 4,200 individuals signed a petition to encourage Choice Hotels to sign the Code. In response, Choice Hotels made a statement that it would agree to take steps to fight sex trafficking in its hotels.[22] Though it met with EPCAT representatives in 2010 to develop an optional training, Choice Hotels did not sign the Code until 2015.[23]

---

[22] *Tell Choice Hotels to Prevent Child Prostitution in Their Hotels*, Change.org,  https://www.change.org/p/tell-choice-hotels-to-prevent-child-prostitution-in-their-hotels (last visited Aug. 6, 2019).
[23] Choice Hotels, *Human Rights Policy*, https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited Aug. 6, 2019).

64.

RRI knew of the Code in 2010, but has never signed the Code.

65.

RRI has never taken any steps to publicly address or even comment on the frequent sex trafficking at its hotels.

66.

For years, Defendants have known what signs to look for and which policies to implement in order to identify sex trafficking in their hotels and to ensure they were not profiting from sex trafficking, as required by federal law.

67.

The Department of Homeland Security ("DHS") identifies a number of warning signs that indicate the presence of human trafficking at hotels. According to DHS, housekeeping, room service, maintenance, concierge, bellman, front desk, food and beverage, security, and valet staff at hotels all can and should be vigilant in observing indicia of human trafficking on the hotel premises such as:

(a) persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

(b) persons who lack freedom of movement or are constantly monitored;

(c) persons who have no control over or possession of money or ID;

(d) persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

(e) requests for room or housekeeping services (additional towels, new linens, etc.), but denial of hotel staff entry into the room;

(f) the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

(g) extended stay with few or no personal possessions in the room;

(h) excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion);

(i) the same person reserves multiple rooms;

(j) a room is rented hourly, less than a day, or for an atypical extended stay;

(k) attempts to sell items to or beg from patrons or staff;

(l) cars in the parking lot regularly parked backward, so the license plates are not visible;

(m)  loitering and solicitation of male patrons;

(n) waiting at a table or bar and picked up by a male (trafficker or customer);

(o) persons asking staff or patrons for food or money; and (p) persons taking cash or receipts left on tables.[24]

---

[24] U.S. Dep't of Homeland Security, *Human Trafficking and the Hospitality Industry*, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited Aug. 6, 2019).

68.

The indicia of human trafficking and effective preventative measures are widely known and available to all in the hospitality industry, including Defendants. Hotels and brands that do not identify and report evidence of human trafficking on hotel properties do so despite knowing that preventative training and resources are widely available. These hotels and brands elect not to engage in preventative policies and practices and instead consciously gamble that they will make more money from sex trafficking than they will be held civilly liable for under the law.

69.

The motivation for Defendants' willful blindness and continuing failure to act is simple—sex trafficking is profitable for Defendants. Defendants know the obvious dangers associated with sex trafficking and the remedial safety precautions they should take to curtail it, but they choose to ignore the signs of and solutions to sex trafficking because doing so makes them money.

70.

Defendants review hotel performance, room occupancy, and profitability like all businesses. When revenue is down, Defendants quickly investigate individual hotel locations and take swift remedial action. However, Defendants intentionally turn a blind eye to safety and security

issues at their hotels when revenue is up—even when Defendants knew or should have known part of those profits were derived from providing a venue for, or being actively involved in, the crime of sex trafficking. This overt policy of willful blindness to sex trafficking by hotel brands like RRI and Choice communicates the perverse but clear message to hotel owners and employees that the *more* sex trafficking allowed at a hotel—resulting in higher profits—the *less* likely RRI and Choice are to investigate.

### 71.

At a 2013 presentation to the hospitality industry, hotel industry representatives were informed, among other things, to "Make sure hotel not complicit," "Manager not looking the other way," and "No pay off for silence or lack of curiosity."[25]

### 72.

Defendants in this case failed to follow even those three very basic guidelines. As a result, Plaintiff was trafficked for years at Defendants' hotels, causing her substantial and lifelong injuries, while Defendants grossly profited from Plaintiff's unceasing and involuntary sexual servitude.

---

[25] Keating, *supra* n.14.

### IV.    The Sex Trafficking of Jane Doe 1 at the Smyrna Red Roof Inn

73.

Plaintiff was trafficked at the Smyrna Red Roof Inn on a regular basis from 2011 to 2016 by multiple traffickers. While she was trafficked at the Smyrna Red Roof Inn, Plaintiff stayed there with her various traffickers and other victims, for weeks at a time.

74.

The Smyrna Red Roof Inn frequently kept Plaintiff and other trafficking victims in the same set of rooms, often in the back building.

75.

While Plaintiff was trafficked at the Smyrna Red Roof Inn she exhibited numerous well-known and visible signs of a sex trafficking victim, including physical deterioration, malnourishment, poor hygiene, fatigue, sleep deprivation, injuries, a failure to make eye contact with others, lack of control and possession of money, physical evidence of beatings by her trafficker, and monitoring by her traffickers.

76.

While Plaintiff was trafficked at the Smyrna Red Roof Inn her room evidenced numerous well-known and visible signs of sex trafficking. Frequently the trash cans in the rooms in which Plaintiff was trafficked

41

would contain an extraordinary number of used condoms, multiple cell phones were in the room, she stayed for extended periods with very few personal items or possessions in the room, and she frequently requested excessive items from housekeeping while preventing housekeeping from entering the room.

77.

RRI had a policy to physically enter a room and inspect the room if housekeeping had not been in the room for three days. However, RRI did not enforce this policy. While Plaintiff was being trafficked at the Smyrna Red Roof Inn, housekeeping frequently did not enter the room for weeks at a time.

78.

While Plaintiff was trafficked at the Red Roof Inn the number of daily male visitors to the room was obviously indicative of sex trafficking, with as many as 20 men visiting Plaintiff's room each day for short periods. Plaintiff was aware that several other trafficking victims were at the Smyrna Red Roof Inn being trafficked each night while Plaintiff was at the hotel. At a bare minimum, at least 50 buyers came to the Smyrna Red Roof Inn to purchase sex each day.

79.

Multiple Smyrna Red Roof Inn employees participated in, assisted, and facilitated Plaintiff's sex trafficking and worked as lookouts for Plaintiff's and other victim's traffickers for several years.

80.

These employees often stood guard for Plaintiff's traffickers and protected their activities. They often called Plaintiff's traffickers while Plaintiff was being victimized and warned Plaintiff's traffickers that the police were at the hotel or coming to the hotel, or to stop the frequent traffic to the room if it had been too busy for a time, or cautioned them if other guests were complaining.

81.

Plaintiff frequently spoke to these employees when they called to provide this information because she was usually made to answer the phone in case a buyer called.

82.

These employees were paid in cash by sex traffickers when they provided tips that helped the sex traffickers evade being caught.

83.

After providing a tip, the employees were paid in cash outside the view of the front office cameras. Plaintiff frequently saw a Smyrna Red Roof Inn employee receive cash from Plaintiff's trafficker for his tips and lookout work.

84.

Cobb County police informed management at the Smyrna Red Roof Inn that one current employee and a former general manager were paid by sex traffickers to act as lookouts so that women could be trafficked at the hotel.

85.

The then-current employee continued to work at the Smyrna Red Roof Inn for approximately six more months.

86.

Plaintiff told one of the complicit Smyrna Red Roof Inn employees—a third employee—she was being trafficked at the Smyrna Red Roof Inn.

87.

The Red Roof Defendants received a percentage of the revenue generated by the operations of the Smyrna Red Roof Inn, including a percentage of the revenue generated for the rate charged on the rooms in which Plaintiff was trafficked.

44

88.

The Red Roof Defendants knew or should have known that sex trafficking was a constant occurrence at the Smyrna Red Roof Inn.

89.

The wider community is aware of the Smyrna Red Roof Inn's reputation as a haven for sex trafficking. Nonprofit and religious groups routinely and regularly visit the Smyrna Red Roof Inn to provide food and rescue information to the sex trafficking victims they encounter at the hotel.

90.

The Red Roof Defendants did nothing in response to a litany of known, documented, and publicized incidents of sex trafficking and related crimes at the Smyrna Red Roof Inn.

91.

During all the years Plaintiff was trafficked at the Smyrna Red Roof Inn, a well-known prostitute and dancer was a permanent resident at the Smyrna Red Roof Inn and frequently had buyers come to her room for commercial sex acts.

92.

In December 2010, the Metro Atlanta Child Exploitation Task Force and the Marietta Police Department conducted a prostitution sting involving

the Smyrna Red Roof Inn. As part of the sting, a 16-year-old victim was rescued from the Smyrna Red Roof Inn, and an 18-year-old was arrested on prostitution charges.[26]

93.

The Red Roof Defendants knew or should have known about the 2010 sting, the rescue of a minor at the hotel, and the ensuing media reports.

94.

On March 2, 2011, Cobb County Police arrested a wanted person at the Smyrna Red Roof Inn and reported that the "location is known for problems with drugs and prostitution."

95.

On March 4, 2011, Cobb County Police arrested a wanted person at the Smyrna Red Roof Inn and reported that the area was a "hotbed of illegal activities."

---

[26] Katy Ruth Camp, *Six Women Arrested in Prostitution Sting*, Marietta Daily Journal, (Dec. 22, 2010), www.mdjonline.com/news/six-women-arrested-in-prostitution-sting/article_a1a08727-b64a-5b5f-8b67-5b38927d16b9.html (last visited July 31, 2019).

96.

On July 18, 2011, police responded to a theft call at the Smyrna Red Roof Inn where the victim reported her items were stolen "by a pimp and a prostitute, because she refused to work for [the pimp]."

97.

On April 18, 2012, police responded to a dispute at the Smyrna Red Roof Inn between a guest and a Smyrna Red Roof Inn employee. The guest demanded his money back from the Smyrna Red Roof Inn for, among other things, being "harassed by prostitutes." The Smyrna Red Roof Inn refused.

98.

On May 11, 2012, Cobb County Police arrested multiple suspects on drug charges at the Smyrna Red Roof Inn and reported that the hotel was known "to be a location known for the drug trade and other illicit activity."

99.

On June 28, 2012, a woman responded to an online advertisement for an escort and met another woman named "Daisy" at the Smyrna Red Roof Inn. The hotel staff allowed "Daisy" to pay for a room at the Smyrna Red Roof Inn in the woman's name. The woman performed commercial sex acts for two buyers before "Daisy" confiscated the money and left the woman at the Smyrna Red Roof Inn, where she called the police.

100.

On March 6, 2013, a 19-year-old woman was arrested at the Smyrna Red Roof Inn for prostitution and drugs. Cobb County Police reported the operation was "in reference to complaints of suspected prostitution occurring in the area. These complaints were being reported by business owners, patrol officers working the area and the general public."

101.

Publicly-available online reviews of the Smyrna Red Roof Inn, including reviews from TripAdvisor.com, reported widespread prostitution and crime occurring at the hotel. The reviews quoted below are attached hereto as Exhibit 5.

102.

A July 2013 review of the Smyrna Red Roof Inn stated,

**Prostitutes everywhere** . . . There were prostitutes at a couple of doors too. Around midnight we heard loud yelling and looked out our window. Seven (yes seven!) cop cars were directly in front of our room and were arresting someone as a prostitute stood 5 feet from our window. It was hard to sleep to say the least. The only security I felt was the fact our dog was with us. Don't stay here!!!

103.

On October 1, 2013, Cobb County Police investigated a complaint of drug activity at the Smyrna Red Roof Inn and reported the "hotel is also

48

known to be a high drug area." After kicking a room door in and finding four

men in a room rented by a woman not on the premises and evidence of "drug

activity" inside the room, the staff of the Smyrna Red Roof Inn determined

that the unknown men inside the room were welcome guests of the hotel.

Cobb County Police reported,

> Apparently the staff at Red Roof changed their minds because
> originally, they wanted to know who was residing in their room
> and that if [the registered guest] was not inside, then it was time
> for a criminal trespass warning. After we checked the room and
> saw that there was no one injured inside, the front desk decided
> to allow the subjects to stay inside the room without having [the
> registered guest] present.

104.

On May 2, 2014, a man was robbed by a woman after arranging to meet

him at a gas station and then go to the Smyrna Red Roof Inn. Cobb County

Police reported that,

> [W]hen he was not looking, she ran out of the room and got in her
> Audi and started the engine. He stated that he stood behind the
> car in an attempt to keep her from leaving. He stated that she hit
> him with the car and sped away. When I asked [the man] why he
> did not call the police, *he stated that the girl at the front desk
> told him not to call.* I next spoke with the on-duty receptionist.
> She was able to provide the information [in] reference to the
> suspect . . . The receptionist did not want to provide her name.

105.

An August 2014 review of the Smyrna Red Roof Inn stated,

**PROSTITUTION – COCK ROACHES – AND DOG POOP!"**
**DELUXE ROOM** DO NOT GO THERE!!!!!" My worst experience ever!
Saw prostitution, dogs pooping outside, loitering, dead cockroaches in
my room. I askd thm 2 come get it up th clerk said he could "bring me a
broom!"[] NOT! . . . I wouldn't send my enemy here! Unless you want
crackheads and prostitutes and don't mind . . .

106.

A person identified as "Bob P, General Manager at Red Roof Inn

Atlanta – Smyrna/Ballpark" read and responded to this August 2014 review.

In the reply, "Bob P" wrote, "I am writing deep apology for prostitution came

in our property. I just hire new security person for watch night for any one

who make any kind of problem.this will not happen again."

107.

On information and belief, "Bob P" is Bharatkumar R. Patel, the

manager of Varahi Hotel.

108.

An August 2014 review stated,

It's true...you get what you pay for. The comments that were registered
are accurate. Apparently, some people LIVE at this motel. It seems
that it is for transient individuals, as I saw people just hanging out,
sitting around, smoking. I can't say definitively that there were
prostitutes on the premises, but some sure did look like ones.

50

109.

A person identified as "Bob P, General Manager at Red Roof Inn Atlanta – Smyrna/Ballpark" read and responded to this August 2014 review.[27]

110.

An August 2014 review of the Smyrna Red Roof Inn stated,

This hotel is unsanitary and a hotbed for criminal activity. My family and I were on the last leg of our vacation when this "motel" was recommended to us by hotels.com. We were stopping in Atlanta for a day to see the aquarium and Coca Cola factory before returning home to Savannah. We booked over the phone for one night after being assured that this was a pretty good hotel. Not so. We were sorely disappointed upon arrival. Dirty pillow cases, blood on the floor, bugs, cigarette burns everywhere, prostitutes, and drug activity right outside our door, which had no lock because apparently it had been kicked in by the police. The desk clerk couldn't have cared less. We left and drove 5 hours home in the middle of the night! I will never recommend this place ever!!!

111.

A person identified as "Bob P, General Manager at Red Roof Inn Atlanta – Smyrna/Ballpark" read and responded to this August 2014 review.

---

[27] Only responses that mention the reviewers' complaints in specific terms are included herein. Responses noted without quotation were general and vague responses that are common on TripAdvisor because the hotel brands require hotel owners to respond to all negative reviews. Those responses are evidence of the Red Roof Defendants' actual knowledge of the review.

112.

A September 2014 review of the Smyrna Red Roof Inn stated,

**Nothing but a dope and prostitution den!!** The room was nasty. The television didn't work. Kind of scary with men hanging out in lobby while checking in. The parking lot was filled with young people drinking and smoking dope. I believe it should be condemned! Avoid at all costs. You would be better off sleeping in your car.

113.

A person identified as "Bob P, General Manager at Red Roof Inn Atlanta – Smyrna/Ballpark" read and responded to this September 2014 review.

114.

A September 2014 review of the Smyrna Red Roof Inn stated,

I am in the room right now scared! Im waiting for the sun to come up so I can leave! This is where georgia's tax dollars are spent! I watched as a young girl did the 2 fingers to her eyes and a point to guy across to other building only to push him a min later and say"10 dollars? Im a dime baby you no im worth more than that!" Then the traffic throughout the day.... its a drug and prostitute headquarters. Im a young male well over 6ft tall and fear for my safety! I smoke cigarettes religiously and have quit and made a promise to never do it again because I had to stand outside and witness these acts and wonder if I would be jumped! This place has changed my life for the better for the fact I want to be nothing like these people! I hear running along outside of my door and a bottle broken on what sounded like a car... I have laid ontop of my clothes in this filthy room waiting for the sun! This is a true nightmare! Im a tough guy only to feel like im the new guy in jail! I am greatful for the life I have and would recommend staying here if your about to go all robin willams! [. . .] oh and now I hear shamika making a quick buck in the next room, classy! The roof is red and so are

the sheets! [. . .] Im starving from the thc in the air, [. . .] Just waiting for the gun fire as I already planned my emergency plan over and over in my head! [. . .] wish me the best in the next hour as I use all my strength to grab all my bags and run for the truck, I did not sign up for this! [. . .] Hey red roof inn you tried! You just gotta know when to light the flame and let it burn!

### 115.

A person identified as "Bob P, General Manager at Red Roof Inn Atlanta – Smyrna/Ballpark" read and responded to the September 2014 review.

### 116.

On December 6, 2014, a man was arrested at the Smyrna Red Roof Inn after engaging in commercial sex acts with a 16-year-old trafficking victim at the Smyrna Red Roof Inn. After the 16-year-old performed commercial sex acts for the man, he grabbed the girl by the hair, dragged her into the bathroom, turned on the water, and attempted to drown the trafficking victim. This incident was reported in the media shortly thereafter.[28]

---

[28] *See, e.g., Police: Marietta Man Tried to Kill 16-year-old*, Marietta Daily Journal, (Dec. 16, 2014), https://www.mdjonline.com/news/police-marietta-man-tried-to-kill--year-old/article_1ef10907-7df1-53d3-bb4a-37038e97cc0f.html (last visited Aug. 2, 2019).

117.

The Red Roof Defendants knew or should have known about the

December 6, 2014 child sex trafficking and attempted murder incident at the

Smyrna Red Roof Inn.

118.

A July 2015 review of the Smyrna Red Roof Inn stated

Bed bugs crawling on top of the bedding, prostitutes roaming the
facility, drug deals taking place in the walkways, loitering in the office
people sitting , with a nice facelift on the facility , new coat of paint and
furniture, with a nice contrast of poorly patched walls, rusting bathtub,
nasty lavatory, unsavory characters every where [sic], not
recommended for anyone. If it were possible to give less than 1 star I
would needless to say, this review was captured in less than 15 minutes
at the establishment. BEWARE!!

119.

A person identified as "Bob P, General Manager at Red Roof Inn

Atlanta – Smyrna/Ballpark" read and responded to the July 2015 review.

120.

An August 2015 review of the Smyrna Red Roof Inn stated,

DO NOT STAY HERE. Terrible place to stay. [. . .] Stayed 2 nights
when arrived back to room at midnight discovered the maid hadn't
even came to our room. Went to get clean towels from desk and was
informed I need to go back to my room and bring them my used towels
before I could receive new ones. Sheets had holes and burn spots in
them. [. . .] Prostitutes and drug dealers roam the parking lot. There
are at least 5 people on the parking lot all hours of the night..

121.

A person identified as "Bob P, General Manager at Red Roof Inn

Atlanta – Smyrna/Ballpark" read and responded to this August 2015 review.

122.

An August 2015 review of the Smyrna Red Roof Inn stated,

DO NOT stay here! The website advertises "newly renovated rooms",
but my "newly renovated" room included bedding with blood stains on
it and bed bugs. Additionally, the toilet seat in the bathroom didn't
even fit the toilet...some "renovations" this place has done. There were
shady people hanging out outside of our room door at all hours of the
night and there was open prostitution occurring on the property. I was
traveling alone with my teenage daughter and felt extremely unsafe at
this location. This hotel is a transient hotel and I would have been
better off buying a tent from the Target behind the hotel and sleeping
in the tent instead of staying even 1 night in this dump. To top it all off,
I was charged for 3 nights instead of the 1 night I shamefully stayed
and they refused to refund my money for the nights I did not stay.

123.

A person identified as "Bob P, General Manager at Red Roof Inn

Atlanta – Smyrna/Ballpark" read and responded to this August 2015 review.

In the reply, "Bob P" stated that he apologized that "people wear hanging out

in hallway. I will hire security man for night. i will make sure it will not

happen again."

124.

An August 2015 review of the Smyrna Red Roof Inn stated,

55

Ok so I get there, she tells me system down I seen people just hanging out in lobby. Just sitting smelled really funny, housekeepers steal and look real shady. Needs more cameras lots of prostitution going on and I know the staff know. They will call peoples room when the police come and say don't answer. I seen this happen to me . . . . This hotel is a trap spot for $60 do not put your life at risk! BaD AREA!!!!!!

125.

A person identified as "Bob P, General Manager at Red Roof Inn

Atlanta – Smyrna/Ballpark" read and responded to this August 2015 review.

126.

A September 2015 review of the Smyrna Red Roof Inn stated,

I recently stayed here during my trip to Atlanta for the Auburn v/s Louisville Football game. I booked 3 rooms. I was approached from 2 officers informing us that we needed to place all our belongings inside and lock our vehicles because this is a high drug area & prostitution area.

127.

A person identified as "Bob P, General Manager at Red Roof Inn

Atlanta – Smyrna/Ballpark" read and responded to this September 2015

review.

128.

A May 2016 review of the Smyrna Red Roof Inn stated,

Ok to start do not stay here. I stayed here thinking smryna was a great area to stay in well this placed showed me otherwise. There were drug dealers (fake thugs), prostitution, and for two days straight there were police leaving the premises. I was scared at night. Check in was

horrible I had a disagreement with the front desk agent (didn't bother to get his name) he acted as if he didn't want me to stay there. The 1st day of me checking in I found blood on the bathroom door, walls and floor.

### 129.

Red Roof Defendants knew or should have known about the online reviews and police incidents regarding rampant prostitution and related crime at the hotel.

### 130.

RRI knew or should have known about the online reviews discussing prostitution and crime at the hotel. RRI hosts TripAdvisor reviews of the Smyrna Red Roof Inn, including the reviews quoted above, on its own website.[29]

### 131.

RRI knows what it publishes on its own website.

### 132.

In fact, RRI closely monitors online reviews from TripAdvisor, including the reviews quoted above. Online review scores and ratings make up an essential part of RRI's evaluation metrics on hotel performance.

---

[29] Exhibit 6, showing "trip-advisor-section" of the Smyrna Red Roof Inn web site, hosted by RRI, *available at* https://www.redroof.com/property/ga/smyrna/RRI088#trip-advisor-section.

133.

Each hotel is monitored by employees of RRI, principally by a Vice President of Operations. For the Smyrna Red Roof Inn, those persons included Jay Moyer and Vicky Lam.

134.

Moyer, Lam, and others closely monitored the revenue, occupancy, and online reviews of the Smyrna Red Roof Inn.

135.

It was common for Moyer, Lam, and other RRI employees to call the Smyrna Red Roof Inn regarding particular reviews online.

136.

It was common for Moyer, Lam, and other RRI employees to respond directly to guests regarding particular reviews.

137.

The Red Roof Defendants knowingly accepted and relied upon money derived from criminal enterprises occurring at the hotel, including sex trafficking. Despite knowing its origins, RRI actively thwarted attempts to reduce the income that flowed through the hotel from criminal enterprises. In the past, some employees made attempts to reduce the rampant crime at the Smyrna Red Roof Inn. Whenever they did so, occupancy and revenue

numbers fell. The drop in revenue quickly prompted remedial calls and visits from Moyer and other RRI employees to the Smyrna Red Roof Inn. When informed that the revenue numbers were down because the employees were trying to "clean up" the Smyrna Red Roof Inn, Moyer and other RRI employees reprimanded the employees with such directives as, "you need to sell rooms," "be alert but sell," and "you need to get your numbers up."

138.

The response from management made clear to the employees that profits and revenue were more important than safety and security, as such, efforts to reduce crime at the Smyrna Red Roof Inn were largely abandoned.

139.

For many years, including the years Plaintiff was trafficked and continuing to the present day, the Smyrna Red Roof Inn has had a policy, prominently displayed on the front desk and the night window in the front office, that there are "NO REFUNDS AFTER 15 MINUTES."

 

140.

There is no legitimate reason for the Smyrna Red Roof Inn to have such a policy. The policy exists so that commercial sex acts cannot be accomplished quickly at the Smyrna Red Roof Inn without also paying for a room at the Smyrna Red Roof Inn. In other words, the Smyrna Red Roof Inn has a policy that *allows* commercial sex acts in its rooms, but only for a fee—the full price of a daily room rental.

141.

Numerous publicly-available online reviews reference the NO REFUNDS AFTER 15 MINUTES policy, which was strictly enforced. The following review from August 2014, attached hereto as Exhibit 7, is representative of those reviews.

I have stayed at the red roof inn in many locations and I was shocked to see the shape and ambiance of this one. It is true, drug dealers and thugs in the hallway and the parking lot. No exaggeration. The sign, "no refunds after 15 min" is a clear indication that there is something really wrong going on here. I went to my room and I stayed for literally 5 minutes. Room had a very strong uncomfortable smell. In general, the room was awful. Front desk clerk was hesitant to give my money back arguing that I stayed more than 15 minutes. He checked the invoice and was very clear for him that I check-in 10 minutes before. He stopped arguing. The brand red roof inn changed for me since. If I ever book red roof inn, I will read the reviews before.

142.

The Red Roof Defendants created and enforced the NO REFUNDS AFTER 15 MINUTES policy to ensure that the Red Roof Defendants received money from room rentals in exchange for providing a venue for the illicit commercial sex acts the Red Roof Defendants facilitated and encouraged at the hotel, including the sex trafficking of Plaintiff and others.

143.

RRI knew or should have known about the NO REFUNDS AFTER 15 MINUTES policy because it was featured prominently in numerous publicly-available online reviews and because RRI routinely audited and inspected the Smyrna Red Roof Inn and any audit or inspection should have and would have revealed the policy prominently displayed in all capital letters in multiple locations around the office, including on top of the front desk.

144.

The fact that the policy has been in place for so many years—*and is still in place*—is evidence that RRI knows of, approves of, and has ratified the NO REFUNDS AFTER 15 MINUTES policy. The reason is simple. The policy ensures that RRI will be paid money for room rentals in exchange for allowing the illegal commercial sex acts that RRI facilitates and encourages at the hotel, including the sex trafficking of Plaintiff and others.

145.

During the years Plaintiff was trafficked, RRI audited and inspected the hotel several times a year. Other RRI employees, including Moyer and Lam, visited the hotel for inspections and meetings with hotel management multiple times a year.

146.

RRI auditors inspected the condition of the hotel, the documentation of employees, and whether the security cameras were operational, among other things.

147.

In 2014, a website was created entitled "Red Roofie Blog: Avoid Red Roof Inn Smyrna Georgia" with the web address of www.redroofie.blogspot.com.  The site was created for the sole purpose of

warning the public about the rampant prostitution and unhindered crime

occurring at the Smyrna Red Roof Inn.

148.

The Red Roofie Blog "About" page states,

This blog is intended to aid fellow travelers by providing information about the condition of Red Roof Inn, Smyrna, Georgia before stopping off there for the night.  This place should be avoided and especially if you have children due to the drug activities and unsanitary conditions. This Inn has been a subject of drug busts and prostitution sting operations by the local police (see blog posts July 1, 2014). The manager is well aware of the conditions, but has done nothing to rectify them.

For two years, he has posted the same response to reviews saying 'renovations' are underway but nothing has been renovated and it has become obvious his review responses are just a 'smoke' screen. Even the drug dealers living there long-term and the pets staying as guests deserve better and cleaner conditions than what is provided for them in the $179 week special.

If you happen to prepay unknowingly, you will never get your money back nor an apology. You will be expected to sleep in unclean, marijuana smoke filled rooms, with bugs crawling on you at night. If you are scheduled to take a drug test anytime soon, you for sure would fail after staying here. These conditions may appeal to some people, so in that case this is the place for you. Red Roofie doesn't judge. However, it is not indicative of what people expect from the Red Roof brand image. Also, all people deserve to be treated respectfully which they are not by the manager and his wife at the Red Roof Inn, Smyrna, Georgia location. Corporate Red Roof seem to be turning their head the other way, but Red Roofie wants to get the word out, so you don't end up wasting 50 bucks or having a creepy night.[30]

---

[30] *See* Exhibit 8, www.redroofie.blogspot.com (last visited Aug. 14, 2019).

63

149.

Red Roof Defendants knew or should have known about the publicly-available website, created for the purpose of alerting the public to the dangers of rampant prostitution and unhindered crime occurring at the Smyrna Red Roof Inn.

150.

Incredibly, another website also focused on publicizing crime, particularly sex trafficking, at the Smyrna Red Roof Inn ("Trafficking Site"). The site was taken offline in 2019.[31]

151.

Several articles on the Trafficking Site stated that sex trafficking occurred openly at the Smyrna Red Roof Inn and identified known traffickers at the hotel, including one of Plaintiff's traffickers.

152.

One article ("Article 1") stated that an employee of the Red Roof Inn told the website

---

[31] This website and the articles quoted below are no longer available online and are not attached to the complaint because of personally identifying information contained in the articles that could present a safety threat to Plaintiff. Plaintiff can provide these articles to the Court in camera if necessary and will provide them to Defendants subject to a protective order.

> he had read [the website's] most recent article on the Red Roof in Smyrna and admitted that much of the information contained in the article regarding sex trafficking occurring in their rooms is true . . . [the employee] also confirmed that the national Red Roof Corporate office is aware of the situation, as well as the franchise owner.

This article was publicly available online for years. This employee admission is evidence that the Red Roof Defendants did in fact know about sex trafficking occurring at the Smyrna Red Roof Inn.

153.

Other news websites published the story regarding the Smyrna Red Roof Inn employee's admission that the Red Roof Defendants knew of rampant sex trafficking at the Smyrna Red Roof Inn.

154.

Red Roof Defendants knew or should have known that the Smyrna Red Roof Inn employee had publicly admitted that the Red Roof Defendants knew about sex trafficking at the Smyrna Red Roof Inn.

155.

Article 1 stated that, "investigators recently filmed the manager of this Red Roof joking around with" a known sex trafficker "outside the manager's office. [The employee's] admission now further confirms the Red Roof is aware of what is going on."

156.

Article 1 stated, "What is it going to take for Red Roof Corporate (614-744-2600) to pull the franchise rights from this owner?"

157.

Article 1 stated, "Concerned citizens should call the Cobb County elected officials as well as the Red Roof Corporate offices right away," and provided contact information for contacting RRI, RRI's communications department, and RRI's public relations agency.

158.

On information and belief, RRI received numerous phone calls and complaints reporting sex trafficking and other criminal activity occurring at the Smyrna Red Roof Inn.

159.

Another article on the Trafficking Site ("Article 2") was entitled "Red Roof Runs Rampant."

160.

Article 2 stated,

The Red Roof Inn in Smyrna (2200 Corporate Plaza, Smyrna, GA 30080), located next to the new Braves stadium construction, is a hotbed of trafficking activity! This hotel is used for prostitution and has been this way for many years. Any day of the week, dozens of girls are

trafficked out of this location, some of whom look underage, even as young as 12.

161.

Article 2 stated, "Private investigators recently observed a young woman being trafficked repeatedly at the Red Roof in Smyrna over a 3 day period while her 7 week old baby slept at the foot of the bed in which she was entertaining 'client' after 'client.'"

162.

Article 2 also identified one of Plaintiff's traffickers as having trafficked women and children at the Smyrna Red Roof Inn and stated that Plaintiff's trafficker "has been living at this Red Roof in the room (#201) above the manager's office. Investigators have photographically documented [Plaintiff's and other traffickers] frequently hanging out and laughing with the hotel manager for extended periods of time."

163.

Article 2 stated, "Why has Red Roof not pulled their name from this franchise? Is this what they want us to expect from a Red Roof? Contact the Red Roof Corporate office (614-744-2600) . . . ."

164.

Red Roof Defendants knew or should have known about every article on the Trafficking Site that reported details of sex trafficking at the Smyrna Red Roof Inn, including employee and management complicity in sex trafficking at the Smyrna Red Roof Inn, and knowledge of sex trafficking at the Smyrna Red Roof Inn by Red Roof Defendants.

165.

In fact, Red Roof Defendants did know about these articles. They were sent directly to the president of RRI.

166.

A high-ranking hospitality industry executive and anti-trafficking advocate arranged a one-on-one phone call with RRI president and CEO, Andrew Alexander. On the call, she personally informed Mr. Alexander of the ongoing sex trafficking venture occurring at the Smyrna Red Roof Inn, in which Plaintiff was trafficked, and informed Mr. Alexander of the name of one of Plaintiff's traffickers and the fact that this person was a known sex trafficker with a lengthy criminal history related to sex crimes involving minors.

167.

Mr. Alexander received the articles documenting the Smyrna Red Roof Inn hotel sex trafficking venture and of the complicity of the staff. He was further told the sex trafficker was on the Georgia Sex Offender Registry.[32] All of this information was easily verifiable and readily available to the public.

168.

Mr. Alexander's only response was to have an attorney search for the name of the organization that published the articles online.

169.

RRI did nothing further in response to receiving this information.

170.

RRI's franchise agreements allow the company to terminate its agreements and pull its brand from a hotel location on the basis of criminal activity, including sex trafficking, at a hotel.

171.

In September 2015, RRI terminated its franchise agreement with a hotel in Charlotte, North Carolina after the hotel was the subject of media

---

[32] O.C.G.A. § 42-1-12.

scrutiny following a prostitution sting that uncovered child sex trafficking at the hotel during the 2012 Democratic National Convention.[33]

172.

However, RRI pulled its brand from the Charlotte hotel only after the FBI attempted to seize the property.[34]

173.

Following the widespread media reports and attempted seizure, RRI finally stated,

> Red Roof Inn has terminated its franchise agreement with the Inn located at 3300 Queen City Road, Charlotte, NC. Once we were made aware of the situation, swift and immediate action was taken to terminate this franchisee's agreement with the brand. This property is no longer part of the Red Roof brand. Red Roof is contacting current guests as well as those with prior reservations to ensure that they will be accommodated at the nearest Red Roof Inn or another Inn of their choice. Red Roof is working with Federal Authorities."[35]

---

[33] *Feds Look into Sex Trafficking at Charlotte Hotel*, Associated Press, (Sept. 18, 2015), https://www.citizen-times.com/story/news/2015/09/18/feds-look-sex-trafficking-charlotte-hotel/72386068/ (last visited Aug. 5, 2019).

[34] *NC Motel Loses Franchise after Trafficking Allegations*, Fox 8, (Sept. 17, 2015), https://myfox8.com/2015/09/17/nc-motel-loses-franchise-after-trafficking-allegations/ (last visited Aug. 5, 2019).

[35] Courtney Francisco, *Feds: Teen Sex Trafficking at CLT Motel*, WCCP Charlotte, (Dec. 3, 2015), https://www.wccbcharlotte.com/2015/12/03/feds-teen-sex-trafficking-at-clt-motel/.

174.

Nonetheless, RRI retained the profits it had made from what it then definitively knew was child sex trafficking at the Charlotte hotel.

175.

Similarly, despite specific knowledge by RRI's president and CEO of a sex trafficking operation occurring at the Smyrna Red Roof Inn, and documented and publicized instances of rampant crime and sex trafficking at the hotel from at least 2010 to the present, RRI keeps profiting from the illegal activity and sex trafficking at the Smyrna Red Roof Inn and continues to promote the Smyrna Red Roof Inn as "one of the best budget hotels in Smyrna, GA."[36]

176.

Though Plaintiff's claims are not solely dependent on the general knowledge of RRI of a national sex trafficking epidemic occurring at its properties, RRI knew or should have known its properties and the policies governing those properties were being utilized nationwide to make Red Roof

---

[36] Exhibit 9, Red Roof Inn Atlanta – Smyrna/Ballpark, Red, https://www.redroof.com/property/ga/smyrna/RRI088 (last visited Aug. 8, 2019).

Inns an attractive location for sex traffickers to exploit women, men, and children.

177.

RRI knew or should have known about sex trafficking from which it profited in its hotels nationwide, including its hotels in Atlanta and Smyrna, Georgia, in Charlotte, North Carolina,[37] Houston, Texas,[38] Champaign, Illinois,[39] Newark, New Jersey,[40] St. Louis, Missouri,[41] St. Charles,

---

[37] Joe Marusak, *Feds Oversee Sale of Former Charlotte Red Roof Inn that Harbored Teen Sex Trafficking*, The Charlotte Observer, (Aug. 2, 2016), https://www.charlotteobserver.com/news/local/crime/article93210577.html (last visited Aug. 8, 2019).

[38] Maria Salazar, *Houston Attorney Sues Hotels in Sex Trafficking Case Involving 15-year-old Girl*, Fox 26, (May 15, 2019), http://www.fox26houston.com/good-day/morning-news/houston-attorney-sues-hotels-in-a-sex-trafficking-case-involving-a-15-year-old (last visited Aug. 8, 2019).

[39] Erick Payne, *Two People Face Charges for Involvement in Trafficking Ring*, WCIA, (July 25, 2018), https://www.wcia.com/news/local-news/two-people-face-charges-for-involvement-in-trafficking-ring/ (last visited Aug. 8, 2019).

[40] Carl Hamilton & Josh Shannon, *Indictment: Alleged Sex Traffickers Held Abducted Teen at Newark Motel*, Newark Post, (Feb. 26, 2018), https://www.newarkpostonline.com/news/indictment-alleged-sex-traffickers-held-abducted-teen-at-newark-motel/article_484c66f0-bab7-5cf9-a175-2d989728b25f.html (last visited Aug. 8, 2019).

[41] Joe Currier, *Man Charged with Sex Trafficking at Red Roof Inn in St. Louis*, St. Louis Post-Dispatch, (June 30, 2017), https://www.stltoday.com/news/local/crime-and-courts/man-charged-with-sex-trafficking-at-red-roof-inn-in/article_4c70ac45-ac34-5d28-bd3c-92efde095381.html (last visited Aug. 8, 2019).

Missouri,[42] Toledo, Ohio,[43] Flint, Michigan,[44] Louisville, Kentucky,[45] Sioux

Falls, South Dakota,[46] Rockville, Maryland,[47] Milwaukee, Wisconsin,[48]

---

[42] Alana Broe, *Sex, Drugs, and Res Gestae: The Eighth Circuit Says Evidence is "Inextricably Related" to Sex Trafficking*, Matters, (2018), https://www.traffickingmatters.com/sex-drugs-and-res-gestae-the-eighth-circuit-says-evidence-is-inextricably-related-to-sex-trafficking/ (last visited Aug. 8, 2019).

[43] Allison Dunn, *Victim: 'Father Figure' Haynes Manipulated her in Sex-Trafficking Case*, Toledo Blade, (March 26, 2019), https://www.toledoblade.com/local/courts/2019/03/26/victim-testifies-in-pastor-anthony-haynes-sex-trafficking-case/stories/20190326115 (last visited Aug. 8, 2019).

[44] Roberto Acosta, *Mother Accused of Sex Trafficking 6-year-old Daughter Appears in Court*, MLive, (July 15, 2019), https://www.mlive.com/news/flint/2019/07/mother-accused-of-sex-trafficking-6-year-old-daughter-appears-in-court.html (last visited Aug. 8, 2019).

[45] *Cincinnati Man Pleads Guilty to Sex Trafficking by Force, Fraud, and Coercion*, Department of Justice, (Nov. 14, 2014) https://www.justice.gov/opa/pr/cincinnati-man-pleads-guilty-sex-trafficking-force-fraud-and-coercion (last visited Aug. 8, 2019).

[46] Press Release, *Two From Minneapolis Sentenced for Sex Trafficking*, Department of Justice, (June 9, 2015), https://www.justice.gov/usao-sd/pr/two-minneapolis-sentenced-sex-trafficking (last visited Aug. 8, 2019).

[47] Kevin Lewis, *Teenage Prostitution Ring Busted, Pimp Claims to Also Work as School Bus Driver*, CBS Austin, (March 4, 2016), https://cbsaustin.com/news/offbeat/teenage-prostitution-ring-busted-pimp-claims-to-also-work-as-school-bus-driver-03-04-2016-154655883 (last visited Aug. 8, 2019).

[48] Amani Booker, *2 Face Federal Sex Trafficking Charges*, Milwaukee Journal Sentinel (June 16, 2010), http://archive.jsonline.com/news/crime/96508359.html/ (last visited Aug. 8, 2019).

Scranton, Pennsylvania,[49] Baltimore, Maryland,[50] Amherst, New York,[51]

Woodbury, Minnesota,[52] Joliet, Illinois,[53] Milford, Connecticut,[54] Nashville,

---

[49] Joseph Kohut, *Scranton Sex Trafficking Cases Move Forward*, Pocono Record, (Dec. 4, 2016), https://www.poconorecord.com/news/20161204/scranton-sex-trafficking-cases-move-forward (last visited Aug. 8, 2019).

[50] *2 Charged with Human Trafficking at Jessup Red Roof Inn*, CBS Baltimore, (July 23, 2019), https://baltimore.cbslocal.com/2019/07/23/2-charged-with-human-trafficking-at-jessup-red-roof-inn/ (last visited Aug. 8, 2019).

[51] Matt Chandler, *Alleged Underage Sex Trafficking in Amherst*, Buffalo Business First, (Dec. 17, 2012), https://www.bizjournals.com/buffalo/news/2012/12/17/alleged-underage-sex-trafficking-in.html (last visited Aug. 8, 2019).

[52] Katie Kather, *13 Men Charged in Woodbury Sex-with-Minors Sting*, Twin Cities Pioneer Press, (Sept. 21, 2015) https://www.twincities.com/2015/09/21/13-men-charged-in-woodbury-sex-with-minors-sting/ (last visited Aug. 8, 2019).

[53] Felix Sarver, *Joliet Hotel Among Meeting Places in Rappers' Sex Trafficking Ring*, The Herald-News, (Jan. 18, 2016) https://www.theherald-news.com/2016/01/18/joliet-hotel-among-meeting-places-in-rappers-sex-trafficking-ring/alh59bo/ (last visited Aug. 8, 2019).

[54] Jonathan Shugarts, *Suspected Waterbury Sex Trafficker Facing Charges*, Republican American, (Jan. 17, 2019), https://www.rep-am.com/news/2019/01/17/suspected-waterbury-sex-trafficker-facing-charges-3/ (last visited Aug. 8, 2019).

Tennessee,[55] Lubbock, Texas,[56] Secaucus, New Jersey,[57] Burlingame,

California,[58] Ann Arbor, Michigan,[59] Enfield, Connecticut,[60] Tinicum,

---

[55] *23-Year-Old Nashville Man Faces 18 Charges after Prostitution Sting at Donelson Hotel*, End Slavery Tennessee, (June 24, 2014), https://www.endslaverytn.org/news/23yearoldnashvillemanfaces18chargesaft erprostitutionstingatdonelsonhotelnewsarticle (last visited Aug. 8, 2019).
[56] *5 Arrested in Online Prostitution Sting Operations*, KCBD 11, (Aug. 1, 2013), https://www.kcbd.com/story/23023825/5-arrested-in-online-prostiution-sting-operations/(last visited Aug. 8, 2019).
[57] Jonathan Lin, *Man Charged with Promoting Prostitution at Red Roof Inn in Secaucus*, NJ.com, (Feb. 5, 2014), https://www.nj.com/jjournal-news/2014/02/man_charged_with_promoting_pro.html (last visited Aug. 8, 2019).
[58] Jason Green, *Berkely Man Gets Life Sentence for Prostituting Teen*, The Mercury News, (July 21, 2017), https://www.mercurynews.com/2017/07/21/berkeley-man-gets-life-sentence-for-prostituting-teen/ (last visited Aug. 8, 2019).
[59] Patrick Dunn, *A Road Back from Walking the Streets*, Ann Arbor Observer, (April, 2014), https://annarborobserver.com/articles/a_road_back_from_walking_the_streets .html#.XUg6Tm9KjZk (last visited Aug. 8, 2019).
[60] David Owens, *Hartford Man Sentenced to Prison for Sex Trafficking of 15-year-old Girl*, The Morning Call, (Nov. 14, 2016), https://www.mcall.com/hc-sex-trafficking-teenager-prison-1115-20161114-story.html (last visited Aug. 8, 2019).

Pennsylvania,[61] Lafayette, Indiana,[62] Savannah, Georgia,[63] Farragut,

Tennessee,[64] Ridgeland, Connecticut,[65] and Woburn, Massachussetts,[66] and

Philadelphia, Pennsylvania,[67] among other locations.[68]

---

[61] Tim Logue, *Chester Man Gets Life in Jail for Sex Trafficking*, Daily Times, (Dec. 19, 2014), https://www.delcotimes.com/news/chester-man-gets-life-in-jail-for-sex-trafficking/article_03bf3c6e-62cc-5fa6-b531-0ac7ab630e85.html (last visited Aug. 8, 2019).

[62] Joseph Paul, *Men Accused of Promoting Prostitution in Lafayette*, Journal & Courier, (Dec. 27, 2016), https://www.jconline.com/story/news/crime/2016/12/27/men-accused-promoting-prostitution-lafayette/95870334/ (last visited Aug. 8, 2019).

[63] *Man, Woman Charged with Pimping Women out of Pooler Hotel*, WTOC, (Dec. 29, 2014), https://www.wtoc.com/story/27724967/man-woman-charged-with-pimping-women-out-of-pooler-hotel/ (last visited Aug. 8, 2019).

[64] *Farragut Man Faces Federal Sex Trafficking Charges*, WBIR 10, (April 7, 2015) https://www.wbir.com/article/news/farragut-man-faces-federal-sex-trafficking-charges/93434205 (last visited Aug. 8, 2019).

[65] Katie Eubanks, *Sex Trafficking Victim Shares Story*, Clarion Ledger, (April 16, 2015) https://www.clarionledger.com/story/news/2015/04/16/sex-trafficking-victim-shares-story/25919625/ (last visited Aug. 8, 2019).

[66] Eric T. Berkman, *Alleged Sex Trafficker Can't be Compelled to Unlock Phone*, LeagalNews.com, (Aug. 18, 2017), http://legalnews.com/detroit/1446866 (last visited Aug. 8, 2019).

[67] Sam Wood, *Pimp 'Gucci Prada' Gets Life for Forcing Child into Prostitution*, The Philadelphia Inquirer, (Dec. 18, 2014), https://www.inquirer.com/philly/news/new_jersey/Pimp_Gucci_Prada_gets_life_for_forcing_child_into_prostitution.html (last visited Aug. 8, 2019).

[68] This list was compiled from a simple Google search of "red roof inn" and "sex trafficking." It is inconceivable that any national brand could possibly *avoid* knowing about these well-publicized incidents while at the same time monitoring and managing its brand reputation online, as RRI spends millions of dollars doing each year.

178.

Via the terms of its franchise agreement, RRI contractually required itself to know about each and every safety and security issue at the Smyrna Red Roof Inn and required the other Red Roof Defendants to comply with the safety and security provisions "as designated" by RRI. The Red Roof Inn franchise agreement between RRI and the other Red Roof Defendants states:

> Franchisee shall promptly report to Franchisor all incidents involving safety, security, public relations or serious injury to persons or property that occur at, or involve, the Inn and shall consult with Franchisor before speaking to or corresponding with the media about any such incident. Franchisee shall otherwise comply with those portions of the safety, security and public relations provisions as designated by Franchisor in the Manual.

179.

RRI should have known what it contractually obligated itself to know.

180.

RRI should have known it was profiting from the sex trafficking of Plaintiff.

181.

The collusion of the Red Roof Inn employees with Plaintiff's traffickers, in combination with management's blatant disregard for warning signs and gross failure to act, laid the foundation for criminal enterprises to flourish at their hotels, including sex trafficking.  By failing to address or curtail the

77

criminal activity, and instead, knowingly accepting and relying upon money earned from these criminal enterprises, the Red Roof Inn Defendants knowingly benefitted or received something of value from their facilitation of or participation in a venture that they knew or should have known engaged in sex trafficking.

## V. The Sex Trafficking of Jane Doe 1 at the Suburban Extended Stay

182.

Plaintiff was trafficked at the Suburban Extended Stay on a regular basis from 2011 to 2016 by multiple traffickers.

183.

Multiple employees at the Suburban Extended Stay were paid by Plaintiff's traffickers to work as lookouts to assist and facilitate Plaintiff's trafficking.

184.

Two employees at the Suburban Extended Stay were paid in cash when Plaintiff's trafficker arrived at the hotel.

185.

These two employees would then be instructed by the trafficker to call him if "anything crazy is going on" and to "look out for my girl here and let me know if she does something crazy."

186.

These employees asked Plaintiff's trafficker if he would like a room in the "usual spot."

187.

Plaintiff's traffickers regularly spoke to these two employees on the phone in the hotel room to discuss the employees' payments for their assistance.

188.

These employees would call the room where Plaintiff was being trafficked and warn Plaintiff's traffickers if there were police at the hotel and, if so, whether they needed to temporarily stop the flow of buyers to the room.

189.

A third employee of the Suburban Extended Stay also worked for Plaintiff's traffickers.

190.

On one occasion, another trafficking victim of Plaintiff's trafficker asked this third male employee for a ride or the use of his cell phone to call a cab so that she could escape. The man told her he could not give her a ride. The employee then told the trafficker that the victim had tried to get his help to escape. That night, the victim's trafficker (also Plaintiff's trafficker) came to the victim's room and ruthlessly beat her for confiding in the employee and trying to escape, saying, "You think somebody is going to help you? None of these people are going to help you."

191.

While Plaintiff was trafficked at the Suburban Extended Stay she exhibited numerous well-known and visible signs of a sex trafficking victim, including physical deterioration, malnourishment, poor hygiene, fatigue, sleep deprivation, physical injuries, a failure to make eye contact with others, lack of control and possession of money, physical evidence of beatings by her trafficker, and monitoring by her traffickers.

192.

While Plaintiff was trafficked at the Suburban Extended Stay her room evidenced numerous well-known and visible signs of sex trafficking. Frequently the trash cans in the rooms in which Plaintiff was trafficked

would contain an extraordinary number of used condoms, multiple cell phones were in the room, she stayed for extended periods with very few personal items or possessions in the room, and she frequently requested excessive items from housekeeping while preventing housekeeping from entering the room.

193.

While Plaintiff was trafficked at the Suburban Extended Stay the foot traffic of men to the room was obviously indicative of sex trafficking, with as many as 20 men visiting Plaintiff's room for short periods each day. Plaintiff was aware that several other trafficking victims were at the Suburban Extended Stay being trafficked each night while Plaintiff was at the hotel. At a bare minimum, at least 50 buyers came to the Suburban Extended Stay to purchase sex each day Plaintiff was trafficked.

194.

The Suburban Extended Stay Defendants received a percentage of the revenue generated by the operations of the Suburban Extended Stay, including a percentage of the revenue generated for the rate charged on the rooms in which Plaintiff was trafficked.

195.

The Suburban Extended Stay Defendants knew or should have known that sex trafficking was a constant occurrence at the Suburban Extended Stay.

196.

The Suburban Extended Stay Defendants did nothing in response to a litany of known, documented, and publicized incidents of sex trafficking and related crimes at the Suburban Extended Stay.

197.

Publicly-available online reviews of the Suburban Extended Stay reported widespread prostitution and crime occurring at the hotel.  These reviews are attached hereto as Exhibit 10.

198.

A review from January 2012 stated,

**A place of horror, if you want to know what hell is like stay here.** I can understand why there no improvements most of people that I see are crackheads rough looking thugs or prostitutes and they don't use computers. front desk is rude, does nothing about putting the customer first. there are always people hanging out in the parking lot full of alcohol no telling what else. you don't go outside at night here for fear of your own safety from the thugs thet make up most of the clients.

199.

A review from August 2012 stated,

lots of people hanging out.. I was in the room for 5 minutes and requested a refund. I'm still waiting on the refund and it has been 2 months. Manger said that she would mail the refund, still waiting. Have spoken with the mangsr several times, still waiting. I think this hotel is a hangout spot for Drug dealers and Crackheads.

200.

A review from May 2014 stated,

Marijuana Smoke, [. . .] Drug dealers next door, Cops circling the premises, The staff is rude, Cum stained sheets and Telephones with no cords, If you want to live a Herpe, drug free wait, if you just want to LIVE, do not stay here.

201.

A review from June 2014 stated,

Disgusting. Hotel. [. . .] 2 working prostitutes and many drug dealers. I am stuck here.

202.

A review from June 2014 stated,

Great if your looking for new drug dealers. . . . Getting to sleep at night can be a challenge, especially if you are not comfortable being surrounded by felons, thieves, drug dealers (the bad drugs to boot) and also prostitutes and some pimps. If you are a female traveling without a male companion, or if you are not carrying a firearm, it would be foolish to stay here. I wasn't here for even an hour before I was in a rigorous habit of using all available door locks AS SOON as I entered my room. I will admit, if you are looking to get high (on pretty much anything other than hallucinogenic drugs such as mushrooms and LSD) during your stay, this may just be the best place you could possibly come across in the area. I was offered, and I quote, "that hard, that soft, ice, boy, Cali bud" of course, the proper medical tools for administering said chemicals, and I even happened across no less than

3 partially used portions of what I am pretty sure was crack just lying around in the breezeways waiting for anybody to pick up and check out! So if drugs are your thing, this may be your favorite new home away from home.

203.

A review from June 2015 stated,

The building and surrounding areas aren't much better. The hall ways are dirty, including the elevator which has a broken hand rail. In addition, during our 2 week stay I noticed 4 different police offficers responding to calls in the building. I was also informed by a business owner very similar to the Suburban Extended Stay that the hotel is "ghetto" and is frequently used for selling drugs and prostitution... DISGUSTING again!

204.

A review from November 2015 stated,

No matter how much you complain nothing will get done, all the review's in the world could be left on here and management or corporate will do anything about it. There a choice property so the only person you can even complain to is a 800 number and they only document what you say and forward it to the hotel, a lot of good that will do. They have so many bad reviews and complaints but still open.

205.

The Suburban Extended Stay Defendants knew or should have known about the online reviews describing prostitution, sex trafficking, and related criminal activity occurring at the Suburban Extended Stay.

84

206.

The Suburban Extended Stay Defendants knew or should have known that the rampant criminal activity taking place at the Suburban Extended Stay created a violent and deadly environment.

207.

Between 2010 and 2016, sixteen people killed themselves or attempted to kill themselves at the Suburban Extended Stay, according to records from the Chamblee Police Department.

208.

Between 2010 and 2016, at least seventeen people were found dead at the Suburban Extended Stay, according to records of the Chamblee Police Department.

209.

Sex trafficking and prostitution were a routine occurrence at the Suburban Extended Stay.

210.

On July 22, 2010, a 20-year-old was arrested for prostitution and drugs at the Suburban Extended Stay as part of a sting operation conducted by the Dekalb County Vice Unit. The woman stated she was prostituting to make money for her boyfriend.

211.

On April 21, 2011, a 31-year-old was arrested for prostitution at the Suburban Extended Stay as part of a sting operation conducted by the Dekalb County Vice Unit.

212.

On June 20, 2012, the Dekalb County Vice Unit conducted an operation at the Suburban Extended Stay solely "to deter prostitution on going [sic] at this hotel." As part of the operation, two individuals, one sex offender, were arrested on drug charges and for failing to register as a sex offender.

213.

On January 2, 2013, a 19-year-old and a 24-year-old were arrested for prostitution and drugs at the Suburban Extended Stay as part of a sting operation conducted by the Dekalb County Vice Unit.

214.

On January 21, 2014, an 18-year old was arrested for prostitution and a 26-year-old male was arrested for pimping and drugs at the Suburban Extended Stay as part of a sting operation conducted by the Dekalb County Vice Unit. The 18-year-old stated that she had traveled to Atlanta from Wisconsin to live at the Suburban Extended Stay with the man. At the

86

Suburban Extended Stay, she worked as a prostitute; the man kept half of the proceeds from her prostitution.

215.

The Suburban Extended Stay Defendants knew or should have known of the open and rampant criminal activity, including prostitution and sex trafficking, occurring at the Suburban Extended Stay.

216.

The wider community is also aware of the Suburban Extended Stay's reputation as a haven for sex trafficking. Nonprofit and religious groups routinely and regularly visit the Suburban Extended Stay to provide food and rescue information to the sex trafficking victims they encounter at the hotel.

217.

Choice sent inspectors to examine the Suburban Extended Stay, at times anonymously.

218.

Choice controls the training and policy standards for the Suburban Extended Stay. Choice was responsible for training the owners and general managers of the Suburban Extended Stay, as required by Choice's franchise agreement.

219.

However, Choice failed to implement and enforce any of its own policies or training procedures that were intended to protect guests at the Suburban Extended Stay from rampant criminal activity, including the sex trafficking of Plaintiff.

220.

Choice knew or should have known about the extensive prostitution and sex trafficking, including Plaintiff's sex trafficking, that was occurring at the Suburban Extended Stay.

221.

In spite of its knowledge, Choice did not require managers or employees of the Suburban Extended Stay to participate in any training related to sex trafficking.

222.

Choice did not enforce any policies related to sex trafficking at the Suburban Extended Stay.

223.

Choice did not provide checklists, escalation protocols, prevention information to management staff or employees, or track performance indicators or metrics on human trafficking prevention.

224.

Choice did not tell management and staff at the Suburban Extended Stay to escalate or report known or reported instances of sex trafficking to Choice's attention.

225.

In fact, Choice did the opposite. It is Choice's policy to refer, without action or comment, guest complaints directly back to hotel management for resolution. Choice's rules and regulations require individual hotel management to respond to all guest complaints and to maintain those responses for review by Choice.

226.

Choice runs an extensive customer service and complaint department, receiving reports and complaints directly from customers about its many hotel locations around the world.

227.

Choice knew the content of the complaints it received from guests, including the guests at the Suburban Extended Stay.

228.

Choice rules and regulations require hotel management to respond to complaints—which have been received by Choice and sent by Choice to hotel

management—within 48 hours. Hotel management must resolve the complaint issues within seven days.

### 229.

Though Choice knows the content of the complaints it receives, Choice takes no action to resolve a complaint, regardless of the content.

### 230.

Choice does not follow-up with hotel management to ensure action was taken to resolve complaints. Choice does not contact the police in response to reports of criminal activity at its hotels.

### 231.

Only if Choice is contacted by the same guest *a second time* will Choice modify its standard protocol of simply referring the complaint back to hotel management without comment.

### 232.

Even then, if the hotel management responded to the first complaint by checking the appropriate administrative box, Choice refuses to take any further action.

### 233.

If hotel management did not respond the first time, Choice will then evaluate and attempt to resolve the complaint.

234.

On information and belief, Choice directly received numerous phone calls and complaints about the vast criminal activity that was occurring at the Suburban Extended Stay, including prostitution and sex trafficking.

235.

However, Choice continued to follow its deficient complaint procedure—and failed to require any trainings or take any other preventative measures—because Choice actively tries to remain willfully blind to the rampant sex trafficking occurring at its hotels, including the Suburban Extended Stay.

236.

Choice knew it benefitted financially from sex trafficking at its hotels, including the Suburban Extended Stay. But rather than make any attempts to curtail criminal activity, Choice consciously distanced itself from any corrective measures, knowing it would continue to profit from sex trafficking at its hotels, including the Suburban Extended Stay.

237.

Specifically, Choice ignored complaints and reports of crime, prostitution, and sex trafficking, and continued to profit from the criminal activity occurring at those locations by encouraging and permitting hotel

91

management and staff, who they knew or should have known were complicit in sex trafficking, to "resolve" customer complaints themselves.

238.

The Suburban Extended Stay Defendants' agents, representatives, and employees did not properly resolve complaints and known instances of sex trafficking, including Plaintiff's.

239.

The collusion of the Suburban Extended Stay employees with Plaintiff's traffickers, in combination with management's blatant disregard for warning signs and gross failure to act, laid the foundation for criminal enterprises to flourish at their hotels, including sex trafficking. By failing to address or curtail the criminal activity, and instead, knowingly accepting and relying upon monies earned from these criminal enterprises, the Suburban Extended Stay Defendants knowingly benefitted or received something of value from their facilitation of or participation in a venture that they knew or should have known engaged in sex trafficking.

## VI.   The Sex Trafficking of Jane Doe 1 at the La Quinta Inn

240.

Plaintiff was trafficked at the La Quinta Inn on a regular basis by multiple traffickers from 2011 to 2013.

241.

The La Quinta Defendants received a percentage of the revenue generated by the operations of the La Quinta Inn, including a percentage of the revenue generated for the rate charged on the rooms in which Plaintiff was trafficked.

242.

Employees at the La Quinta Inn participated in, assisted, and facilitated Plaintiff's sex trafficking.

243.

Employees intentionally rented rooms to Plaintiff and her traffickers near the back door of the hotel so that buyers could come and go without other guests noticing.  The employees told Plaintiff and her traffickers to "use the back door" to hide the number of men visiting the room each day from other guests.

244.

The employees gave Plaintiff and her traffickers extra key cards so that numerous buyers could easily access the hotel each day.  Extra key cards were left outside the back door so that buyers could let themselves into the hotel from the back without being noticed.

245.

La Quinta Inn employees knew of an incident where Plaintiff was nearly beaten to death by her trafficker for roughly six hours at the La Quinta Inn. Plaintiff's trafficker videotaped himself viciously beating Plaintiff for hours, leaving blood all over the room and the walls.  Hotel employees knew Plaintiff's trafficker was violently beating Plaintiff in the room but did nothing to help.

246.

While Plaintiff was trafficked at the La Quinta Inn she exhibited numerous well-known and visible signs of a sex trafficking victim, including physical deterioration, malnourishment, poor hygiene, fatigue, sleep deprivation, injuries, a failure to make eye contact with others, lack of control and possession of money, physical evidence of beatings by her trafficker, and monitoring by her traffickers.

247.

While Plaintiff was trafficked at the La Quinta Inn her room evidenced numerous well-known and visible signs of sex trafficking. Frequently the trash cans in the rooms in which Plaintiff was trafficked would contain an extraordinary number of used condoms, multiple cell phones were in the room, she stayed for extended periods with very few personal items or possessions in the room, and she frequently requested excessive items from housekeeping while preventing housekeeping from entering the room.

248.

While Plaintiff was trafficked at the La Quinta Inn the foot traffic of men to the room was obviously indicative of sex trafficking, with as many as 20 men visiting Plaintiff's room for short periods in a day.

249.

The La Quinta Inn Defendants control the training and policies for the La Quinta Inn where Plaintiff was trafficked.

250.

The collusion of the La Quinta Inn employees with Plaintiff's traffickers, in combination with management's blatant disregard for warning signs and gross failure to act, laid the foundation for criminal enterprises to flourish at their hotels, including sex trafficking. By failing to address or

curtail the criminal activity, and instead, knowingly accepting and relying upon money earned from these criminal enterprises, the La Quinta Inn Defendants knowingly benefitted or received something of value from their facilitation of or participation in a venture that they knew or should have known engaged in sex trafficking.

## VII.   The Sex Trafficking of Jane Doe 1 at the Atlanta ESA

251.

Plaintiff was trafficked at the Atlanta ESA from 2011–2016.

252.

The ESA Defendants received a percentage of the revenue generated by the operations of the Atlanta ESA, including a percentage of the revenue generated for the rate charged on the rooms in which Plaintiff was trafficked.

253.

Employees at the Atlanta ESA knew of, participated in, assisted, and facilitated Plaintiff's sex trafficking.

254.

On information and belief, employees were paid by Plaintiff's traffickers to allow open sex trafficking Atlanta ESA, including Plaintiff's

trafficking, and to act as lookouts to assist the traffickers in evading the police.

255.

While another trafficking victim was trafficked at the Atlanta ESA, she confided in an employee who worked at the front desk that she was being trafficked.

256.

Sex trafficking at the Atlanta ESA was so pervasive and condoned that upon learning that the other victim was being trafficked, the front desk employee revealed that he kept lingerie outfits behind the counter for sale. The employee pulled out bags of outfits and tried to sell the lingerie to the victim.

257.

Any reasonable oversight or supervision of the Atlanta ESA by the ESA Defendants would have revealed the existence of an illicit commercial enterprise where a front desk employee sold lingerie to sex trafficking victims at the hotel.

258.

ESA Defendants knew or should have known about the pervasive sex trafficking at the Atlanta ESA, including its employee's role in that sex trafficking.

259.

While Plaintiff was trafficked at the Atlanta ESA she exhibited numerous well-known and visible signs of a sex trafficking victim, including physical deterioration, malnourishment, poor hygiene, fatigue, sleep deprivation, physical injuries, a failure to make eye contact with others, lack of control and possession of money, physical evidence of beatings by her trafficker, and monitoring by her traffickers.

260.

While Plaintiff was trafficked at the Atlanta ESA her room evidenced numerous well-known and visible signs of sex trafficking.  Frequently the trash cans in the rooms in which Plaintiff was trafficked would contain an extraordinary number of used condoms, she stayed for extended periods with very few personal items or possessions in the room, and she frequently requested excessive items from housekeeping while preventing housekeeping from entering the room.

261.

The ESA Defendants control the training and policies for the Atlanta ESA where Plaintiff was trafficked.

262.

The collusion of the Atlanta ESA employees with sex traffickers, in combination with management's blatant disregard for warning signs and gross failure to act, laid the foundation for criminal enterprises to flourish at their hotels, including sex trafficking. By failing to address or curtail the criminal activity, and instead, knowingly accepting and relying upon monies earned from these criminal enterprises, the ESA Defendants knowingly benefitted or received something of value from their facilitation of or participation in a venture that they knew or should have known engaged in sex trafficking.

## VIII. CAUSES OF ACTION

### Trafficking Victims Protection Reauthorization Act

263.

In 2003, the TVPRA was amended to provide victims with a civil cause of action "against the perpetrator" of a violation of the TVPRA. 18 U.S.C. § 1595 (2003).

264.

In 2008, another cause of action was added to § 1595, allowing victims to sue not only a perpetrator who violates the criminal provisions of the TVPRA, but also making civilly liable "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person *knew or should have known* has engaged in an act in violation of this chapter[.]" 18 U.S.C. § 1595 (emphasis added).

265.

Thus, since 2008, Defendants have known that if they did not take steps to determine whether they profited from what they should have known was sex trafficking, they would be held civilly liable for damages as a result of their willful blindness.

**COUNT ONE**
**Perpetrator Claim:**
**Sex Trafficking in Violation of 18 U.S.C. §§ 1591(a)(1), 1595(a)**
**(Against All Defendants)**

266.

Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

267.

Plaintiff is authorized to bring this civil claim against all Defendants for a direct violation of 18 U.S.C. § 1591(a)(1) by 18 U.S.C. § 1595(a).

268.

In violation of 18 U.S.C. §§ 1591(a)(1) and 1595(a), Defendants knowingly harbored and maintained Plaintiff at Defendants' hotels and benefitted from her labor or services, knowing or in reckless disregard of the fact that means of force, fraud, coercion, or the combination of such means would be used to force Plaintiff to engage in commercial sex acts in Defendants' hotels.

269.

In violation of 18 U.S.C. §§ 1591(a)(1) and 1595(a), Defendants protected and warned Plaintiff's trafficker of detection by the police, hotel guests, or any other threat to the continued sex trafficking of Plaintiff, thereby keeping her in bondage and ensuring the sex trafficking venture continued.

270.

Defendants' actions related to Plaintiff were in or affecting interstate commerce.

271.

Plaintiff has suffered substantial physical, emotional, and psychological injuries and other damages as a direct and proximate result of Defendants' harboring of, and active participation in, Plaintiff's sex trafficking at Defendants' hotels.

272.

Plaintiff claims damages in an amount to be proven at trial, including attorneys' fees and punitive damages.

## COUNT TWO
### Perpetrator Financial Beneficiary Claim:
### Sex Trafficking in Violation of 18 U.S.C. §§ 1591(a)(2), 1595(a)
### (Against All Defendants)

273.

Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

274.

Plaintiff is authorized to bring this civil claim against all Defendants for a direct violation of 18 U.S.C. § 1591(a)(2) by 18 U.S.C. § 1595(a).

275.

In violation of 18 U.S.C. §§ 1591(a)(2) and 1595(a), Defendants assisted, supported, and facilitated Plaintiff's sex trafficking and benefitted

from her labor or services, knowing or in reckless disregard of the fact that means of force, fraud, coercion, or the combination of such means would be used to force Plaintiff to engage in commercial sex acts in Defendants' hotels.

### 276.

Defendants benefitted financially from Plaintiff's sex trafficking by receiving money from renting the hotel rooms in which Plaintiff was sex trafficked.

### 277.

Plaintiff has suffered substantial physical, emotional, and psychological injuries and other damages as a direct and proximate result of Defendants' support and facilitation of the sex trafficking venture to which Plaintiff was subjected.

### 278.

Plaintiff claims damages in an amount to be proven at trial, including attorneys' fees and punitive damages.

**COUNT THREE**
**Financial Beneficiary Claim:**
**Sex Trafficking in Violation of 18 U.S.C. § 1595(a)**
**(Against All Defendants)**

279.

Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

280.

Plaintiff is authorized to bring this civil claim against all Defendants by 18 U.S.C. § 1595(a).

281.

In violation of 18 U.S.C. § 1595(a), Defendants knowingly benefitted from participation in a venture with Plaintiff's traffickers that Defendants knew or should have known engaged in a violation of the TVPRA.

282.

Defendants benefitted financially from Plaintiff's sex trafficking by receiving money from renting the hotel rooms in which Plaintiff was sex trafficked and by receiving money from Plaintiff's sex traffickers for illegal assistance in the sex trafficking venture.

283.

Defendants knew or should have known the money they received for the hotel rooms came from allowing Plaintiff's traffickers to use Defendants' hotel rooms as venue for commercial sex acts that were compelled by force, fraud or coercion.

284.

Plaintiff has suffered substantial physical, emotional, and psychological injuries and other damages as a direct and proximate result of Defendants' participation in her trafficker's sex trafficking venture.

285.

Plaintiff claims damages in an amount to be proven at trial, including attorneys' fees and punitive damages.

**COUNT FOUR**
**Perpetrator Claim:**
**Forced Labor in Violation of 18 U.S.C. §§ 1589, 1595(a)**
**(Against All Defendants)**

286.

Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

287.

Plaintiff is authorized to bring this civil claim against all Defendants for a direct violation of 18 U.S.C. § 1589(a) by 18 U.S.C. § 1595(a).

288.

In violation of 18 U.S.C. §§ 1589(a) and 1595(a), Defendants knowingly obtained forced sexual services from Plaintiff by means of force, threats of force, physical restraint, or threats of physical restraint in violation of 18 U.S.C. § 1589(a)(1); serious harm or threats of serious harm in violation of 18 U.S.C. § 1589(a)(2); and a scheme, plan, or pattern intended to cause Plaintiff to believe that, if she did not perform such labor or services, she would suffer serious harm or physical restraint in violation of 18 U.S.C. § 1589(a)(4).

289.

Plaintiff has suffered substantial physical, emotional, and psychological injuries and other damages as a direct and proximate result of Defendants' violations of 18 U.S.C. § 1589(a).

290.

Plaintiff claims damages in an amount to be proven at trial, including attorneys' fees and punitive damages.

## COUNT FIVE
### Perpetrator Financial Beneficiary Claim:
### Forced Labor in Violation of 18 U.S.C. §§ 1589(b), 1595(a)
### (Against All Defendants)

291.

Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

292.

Plaintiff is authorized to bring this civil claim against all Defendants for a direct violation of 18 U.S.C. § 1589(b) by 18 U.S.C. § 1595(a).

293.

In violation of 18 U.S.C. §§ 1589(b) and 1595(a), Defendants knowingly benefitted from participation in a venture, knowing or in reckless disregard of the fact, that the venture was engaged in the providing or obtaining of Plaintiff's labor or services by means of force, threats of force, physical restraint, serious harm or threats of serious harm, and/or a scheme, plan, or pattern intended to cause Plaintiff to believe that if she did not perform such labor or services, she would suffer serious harm or physical restraint.

294.

Plaintiff has suffered substantial physical, emotional, and psychological injuries and other damages as a direct and proximate result of Defendants' violations of 18 U.S.C. § 1589(b).

295.

Plaintiff claims damages in an amount to be proven at trial, including attorneys' fees and punitive damages.

**COUNT SIX**
**Financial Beneficiary Claim:**
**Forced Labor in Violation of 18 U.S.C. § 1595(a)**
**(Against All Defendants)**

296.

Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

297.

Plaintiff is authorized to bring this civil claim against all Defendants by 18 U.S.C. § 1595(a).

298.

In violation of 18 U.S.C. § 1595(a), Defendants knowingly benefitted from participation in a venture with Plaintiff's traffickers that Defendants knew or should have known engaged in a violation of the TVPRA, specifically,

in the providing or obtaining of Plaintiff's labor or services by means of force, threats of force, physical restraint, serious harm or threats of serious harm, and/or a scheme, plan, or pattern intended to cause Plaintiff to believe that if she did not perform such labor or services, she would suffer serious harm or physical restraint.

299.

Defendants benefitted financially from this venture by receiving money from renting the hotel rooms in which Plaintiff was sex trafficked and by receiving money from Plaintiff's sex traffickers for illegal assistance in the sex trafficking venture.

300.

Defendants knew or should have known the money they received for the hotel rooms came at the cost of Plaintiff's forced labor in violation of 18 U.S.C. § 1589.

301.

Plaintiff has suffered substantial physical, emotional, and psychological injuries and other damages as a direct and proximate result of Defendants' violation of the TVPRA.

302.

Plaintiff claims damages in an amount to be proven at trial, including attorneys' fees and punitive damages.

**COUNT SEVEN**
**Georgia Racketeer Influenced and Corrupt Practices Act**
**O.C.G.A. § 16-14-1, *et seq.***
**(Against all Defendants)**

303.

Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

304.

Defendants, through a pattern of racketeering activity and money derived therefrom, acquired or maintained, directly or indirectly, an interest in and/or control of the enterprise that trafficked Plaintiff for sex at Defendants' hotels, as described above, in violation of O.C.G.A. § 16-14-4(a) and (b).

305.

The association in fact of Defendants, their agents and employees, and Plaintiff's traffickers for the purpose of sex trafficking Plaintiff was an enterprise under Georgia law.

306.

Defendants were and are associated with the enterprise that sex trafficked Plaintiff.

307.

Defendants aided and abetted the enterprise that sex trafficked Plaintiff.

308.

Each and every Defendant directly or indirectly participated in and profited from the enterprise's sex trafficking of Plaintiff at each of Defendants' hotels.

309.

As described above, Defendants were knowingly complicit in the sex trafficking of Plaintiff, and provided a venue for the sex trafficking enterprise, in exchange for money in the form of bribes and room rentals.

310.

In addition to Defendants, there are various persons and entities who are employed by and/or associated with the sex trafficking enterprise of Plaintiff, including, but not limited to, various individual employees and agents of Defendants and Plaintiff's traffickers who participated, directly or indirectly, in the enterprise's criminal sex trafficking scheme. These

individuals performed multiple predicate acts within the scope of their employment on behalf of Defendants.

311.

Defendants and their agents and employees engaged in hundreds of acts of racketeering activity in furtherance of the sex trafficking scheme, which occurred over a period of years at Defendants' hotels.

312.

Each time Plaintiff was forced to engage in a commercial sex act with a buyer at one of Defendants' hotels, she did so under threat of serious violence and other harms, or after being physically beaten or raped.

313.

Defendants conspired to conduct or participate, directly or indirectly, in the affairs of the sex trafficking enterprise through a pattern of racketeering activity, including, but not limited to:

a)    Assault and aggravated assault in violation of O.C.G.A. §§ 16-5-20 and 16-5-21 when Defendants, through their interest in the sex trafficking enterprise, profited from and concealed the assault and battery of Plaintiff, when she was beaten or threatened repeatedly at Defendants' hotel locations by her trafficker in order to force Plaintiff to have sex with buyers at Defendants

112

hotels, in violation of Article 2 of Chapter 5 of Title 16 of the Code of Georgia;

b)    Kidnapping and false imprisonment in violation of O.C.G.A. § 16-5-40 and § 16-5-41 when Defendants, through their interest in the sex trafficking enterprise, participated in and concealed the kidnapping and false imprisonment of Plaintiff by keeping her trapped at Defendants' hotels under the control of her trafficker and preventing her escape or rescue by acting as informants for Plaintiff's trafficker;

c)    Prostitution, keeping a place of prostitution, pimping, and pandering in violation of O.C.G.A. §§ 16-6-9 through 16-6-12 when Defendants, through their interest in the sex trafficking enterprise, participated in the forced prostitution of Plaintiff each time Plaintiff was forced to engage in a commercial sex act at Defendants' hotels, which occurred hundreds of times;

d)    Money laundering in violation of 18 U.S.C. §§ 1956 and 1957 when Defendants accepted and derived more than $10,000 in the form of direct payments from Plaintiff's traffickers for lookout work and money for room rentals that Defendants knew were the proceeds of a criminal offense, the sex trafficking of Plaintiff;

113

e)     Sex trafficking in violation of 18 U.S.C. § 1591, as alleged in Counts 1–3 above when Defendants, through their interest in the sex trafficking enterprise, violated the TVPRA each time Plaintiff was forced to engage in commercial sex acts at Defendants' hotels, which occurred hundreds of times;

f)     Labor trafficking in violation of 18 U.S.C. § 1589, as alleged in Counts 4–6 above when Defendants, through their interest in the sex trafficking enterprise, violated the TVPRA each time Plaintiff engaged in forced labor at Defendants' hotels, which occurred hundreds of times.

314.

Defendants' predicate acts were related to one another and formed a pattern of racketeering activity in that the acts were a constant and continuous exploitation of Plaintiff over the course several years of sex and labor trafficking at Defendants' hotels.

315.

Defendants' predicate acts demonstrated criminal conduct of a continuing and longstanding enterprise.

114

316.

Plaintiff diligently sought medical and mental health assistance and attempted to investigate her claims with the help of several rescue organizations after she was rescued from the sex trafficking venture. Plaintiff received counseling and treatment from health care professionals and counselors. However, the nature of injuries from sex trafficking are ongoing and take years to uncover in the best circumstances when resources are available and the trafficker is incarcerated. Most of Plaintiff's traffickers are not incarcerated. The necessity of constantly concealing herself from sex traffickers—even to this day—and the continuous fear of reprisal, continues to interfere with Plaintiff receiving the safe, effective, and continuous medical attention required to uncover her injuries. Defendants, meanwhile, continue to conceal their knowledge, acceptance, facilitation, and profit from sex trafficking. The clandestine nature of Defendants' involvement in Plaintiff's sex trafficking prevented the discovery of the pattern of Defendants' racketeering activities until, at the earliest, in 2016 when a Smyrna Red Roof Inn employee admitted online knowledge of sex trafficking by the Red Roof Defendants, after which Plaintiff undertook investigative efforts to uncover all Defendants' involvement in her sex trafficking.

317.

Plaintiff was injured and suffered substantial harm by Defendants' overt acts committed in furtherance of the sex trafficking enterprise.

318.

Plaintiff has suffered substantial physical, emotional, and psychological injuries and other damages as a direct and proximate result of Defendants' pattern of racketeering activity.

319.

Plaintiff is entitled to recover actual and compensatory damages in an amount to be proven at trial including attorneys' fees, costs of investigation, punitive damages, treble damages, and equitable relief pursuant to O.C.G.A. § 16-14-6.

**Joint and Several Liability**

320.

Defendants caused indivisible injuries to Plaintiff and are jointly and severally liable for Plaintiff's damages.

**Demand for Jury Trial**

321.

Plaintiff is entitled to and hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court:

(a)     Enter judgment against Defendants on all counts, jointly and severally, in such amounts as will fully and adequately compensate Plaintiff for the damages she has suffered, in an amount to be determined at trial;

(b)     Award Plaintiff treble damages against Defendants, jointly and severally, for Defendants' violation of Georgia law;

(c)     Award Plaintiff punitive damages against Defendants, jointly and severally, in an amount to be determined by the jury, for Defendants' violation of federal and Georgia laws;

(d)     Award Plaintiff pre-judgment and post-judgment interest;

(e)     Award Plaintiff the actual expenses of litigation and investigation, including reasonable attorneys' fees;

(f)     Award Plaintiff equitable and such other and further relief as the Court deems just and proper.

Respectfully submitted, this 26th day of August, 2019.

ANDERSEN, TATE & CARR, P.C.

/s/ Jonathan S. Tonge
Jonathan S. Tonge
Georgia State Bar No. 303999

117

jtonge@atclawfirm.com
Patrick J. McDonough
Georgia State Bar No. 489855
pmcdonough@atclawfirm.com
Trinity Hundredmark
Georgia State Bar No. 140808
thundred@atclawfirm.com
Attorneys for Plaintiff Jane Doe 1

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile
3569442_1.docx

118