### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

JANE DOE 1

        Plaintiff,

v.

RED ROOF INNS, INC., et al.

        Defendants.

Civil Action No.
1:19-cv-03840

JURY TRIAL DEMANDED,
Pursuant to Fed. R. Civ. P. 38

### PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND MOTIONS FOR JUDGMENT ON THE PLEADINGS

Movants are in the hotel business. Hotels promise to welcome guests with soft beds, free breakfast, and convenient amenities. Plaintiff enjoyed none of these when she was trafficked out of Movants' hotels—sold to as many as 20 buyers a day for commercial sex. Movants did more than look the other way, they facilitated her trafficking and they profited from the rental of every room in which she was trafficked. Plaintiff seeks to recover under the Trafficking Victims Protection Reauthorization Act, Georgia RICO, and negligence.

### STATEMENT OF FACTS[1]

Atlanta's sex trafficking epidemic is not new. Beginning more than two decades ago, a nationwide effort commenced to name, recognize, and raise awareness

---

[1] Unless otherwise noted, pin citations to record refer to the page number affixed in the Court's CM/ECF heading and not to the numbers appearing in document footers.

of the evils of sex trafficking.  That effort resulted in the passage of the Trafficking

Victims Protection Act in 2000.  Doc. 87 ¶ 78.  Atlanta, ranked by the FBI as one of

the worst cities for child sex trafficking, *id.* ¶ 80, has one of the largest and most

profitable illegal sex trafficking economies in the country.  *Id.* ¶ 79.  In 2007,

Atlanta's sex trafficking economy was worth $290 million annually, and traffickers

reported average ***weekly*** earnings of roughly $33,000.  *Id.*  Years before Jane Doe 1

was trafficked, Defendants knew or should have known of the widespread national

epidemic of hotel sex trafficking and Atlanta's well-publicized reputation as the

country's "epicenter for human trafficking."  *Id.* ¶ 81.

Indeed, hotel sex trafficking is the most common sex trafficking venture in

Atlanta.  *Id.* ¶ 5.  Without the complicity of hotels, where illicit sexual encounters

are taken off the street and cloaked in the anonymity of a hotel's customers, the sex

trafficking industry would be significantly disrupted.  *Id.* ¶ 83.  A 2012 study found

that 63 percent of trafficking incidents occurred in hotels.  *Id.* ¶ 84.  Even attorneys

for the hotel industry estimated and reported to industry representatives that eight

out of ten human trafficking arrests occur in or around hotels.  *Id.* ¶ 85.

Recognizing the pervasiveness of sex trafficking in the hospitality industry,

End Child Prostitution and Trafficking (ECPAT-USA) launched the Tourism Child-

Protection Code of Conduct (the "Code") in the United States ***in 2004***.  The Code is

well-known in the hospitality industry and identifies six steps companies can take to

prevent sex trafficking. *Id.* ¶ 89. And in 2010, the Department of Homeland Security ("DHS") launched the Blue Campaign to fight human trafficking. As part of that campaign, DHS published warning signs that indicate the presence of human trafficking at hotels. According to DHS, hotel staff, including housekeeping, room service, maintenance, front desk, and security, can and should be vigilant in observing indicia of human trafficking on hotel premises. *Id.* ¶ 91.

Instead of heeding this advice or following these suggestions, Defendants chose to facilitate—or at minimum, ignore—sex trafficking in order to obtain the revenue and profits that flowed from it. *Id.* ¶ 93. A significant percentage of the revenue generated in Atlanta's sex trafficking economy is funneled directly to hotels via the daily rental of the hotel rooms needed to harbor, exploit, and sell victims, including Jane Doe 1. *Id.* ¶ 87.

## Specific Facts Relating to Individual Hotels[2]

## I.    Red Roof Inn (Smyrna)[3]

---

[2] In the interest of efficiency for the Court and the parties, Plaintiff has grouped relevant facts for each location for which there is a pending motion to which Plaintiff has not yet responded and identified the moving Defendants against whom counts are alleged for conduct at that location.

[3] "Red Roof Inn (Smyrna)" refers to the Red Roof Inn located at 2200 Corporate Plaza, Smyrna, Georgia, 30080. Doc. 87 ¶ 17. Plaintiff has alleged claims against four Defendants related to her trafficking at the Red Roof Inn (Smyrna)—Varahi Hotel LLC ("Varahi-RRI"), FMW RRI NC, LLC, Westmont Hospitality Group, Inc. ("Westmont"), and Red Roof Inns, Inc. ("Red Roof Inn"). Together, the Amended Complaint defines these parties as the "Red Roof (Smyrna) Defendants." Doc. 87 ¶ 17. Only Varahi-RRI, which moved for judgment on the pleadings, *see* Doc. 214,

For years, Varahi-RRI, FMW RRI NC, LLC, Westmont and Red Roof Inn, profited from a sex trafficking venture operating out of the Red Roof Inn (Smyrna). Plaintiff was trafficked at the hotel during roughly 20 separate stays between 2011 and 2016.  Doc. 87 ¶¶ 2, 8–9, 111.  The sex trafficking venture at the Red Roof (Smyrna) was open and obvious.  A sign prominently displayed at the front desk read "NO REFUNDS AFTER 15 MINUTES."  *Id.* ¶ 124.  Guests frequently commented on this policy and other problems at the Red Roof (Smyrna) in publicly available on-line reviews, referring to the hotel as a "drug and prostitute headquarters."  *Id.* ¶¶ 129–33.  Law enforcement described how the hotel "location is known for problems with drugs and prostitution."  *Id.* ¶ 141.  As part of the sex trafficking venture, hotel employees often placed Plaintiff and other trafficking victims in rooms near the back of the building and acted as "lookouts" for traffickers to warn of police presence. *Id.* ¶¶ 112, 119–23.

Red Roof Inn (Smyrna) Defendants ignored well-established and readily observable indicators of sex trafficking, such as trash cans filled with condoms, frequent requests for towels, and the absence of personal items in Plaintiff's possession.  *Id.* ¶¶ 114–15.  Not only did the Red Roof Inn (Smyrna) ignore its own policy to enter a room every three days (often failing to enter Plaintiff's room for

---

has a motion before the Court.

weeks at a time), but they ignored foot traffic indicative of sex trafficking, with as many as 20 men a day visiting Plaintiff's room for short periods of time. *Id.* ¶ 117. The sheer number of male patrons visiting not only Plaintiff, but the one to five other victims (each with 10-20 buyers per day), all being trafficked out of the Red Roof Inn (Smyrna) leaves any deniability implausible. *Id.* ¶ 118.

This sex trafficking venture extended to management and owners as well. *Id.* ¶ 107. Along with Varahi-RRI, FMW RRI NC, LLC, Westmont and Red Roof Inn among other things, managed, supervised, and controlled the operation of the Red Roof Inn (Smyrna). *Id.* ¶¶ 17, 107. The sex trafficking venture at the Red Roof Inn (Smyrna) was not an abstract problem—Red Roof Inn's president and CEO, and its General Counsel were specifically notified that a known sex trafficker, listed on Georgia's sex offender registry, was staying at the Red Roof Inn (Smyrna). *Id.* ¶¶ 151–56.

In fact, Red Roof Inn touts the close relationship that it has with its franchisees. *Id.* ¶ 24 (President of Red Roof Inn stated "Our relationship with our franchisees is as close as you can get."). Red Roof Inn employees, Jay Moyer and Vicky Lam routinely visited the Red Roof Inn (Smyrna), and when efforts to "clean up" the hotel resulted in lower revenue, employees were instructed to "sell rooms." *Id.* ¶¶ 127–28, 135–40. Despite knowledge of sex trafficking in their hotels, the Red Roof Defendants and their franchisee partners failed to address the trafficking

crisis, all the while profiting by receiving rental revenue from rooms in which Plaintiff and other victims were trafficked.  *Id*. ¶ 108.

## II.    Microtel (Atlanta)[4]

For years, the Microtel (Atlanta) Defendants—namely movants Wyndham, Microtel Franchising, and Kuzzins Buford—profited from a sex trafficking venture operating out of the Microtel (Atlanta).  Plaintiff was trafficked at the Microtel (Atlanta) over more than 20 separate stays between 2011 and 2016, with individual stays lasting as long as 14 days.  Doc. 87 ¶ 203.

As at the other hotel locations involved in this suit, Plaintiff's traffickers enjoyed not just the tacit acceptance of the Microtel (Atlanta) Defendants and their agents and employees, but their active assistance.  Plaintiff's traffickers paid front desk employees daily—in drugs or money each time—to allow the trafficking and to act as lookouts for the trafficking operation.  *Id*. ¶ 206.  In exchange for that payment, Microtel (Atlanta) employees alerted traffickers when police were at the location.  *Id*. ¶¶ 206–07.  Of course, employees also ignored the open and obvious

---

[4] "Microtel (Atlanta)" refers to the Microtel Inn & Suites by Wyndham, 1840 Corporate Boulevard NE, Atlanta, Georgia 30329. Doc. 87 ¶ 33. Plaintiff has alleged claims against three Defendants related to her trafficking at the Microtel (Atlanta)— Wyndham Hotels & Resorts, Inc. ("Wyndham"), Microtel Inns and Suites Franchising, Inc. ("Microtel"), and Kuzzins Buford, LLC ("Kuzzins Buford"). Together, the Amended Complaint defines these three Defendants as the "Microtel Defendants." *Id*.  Together, Wyndham and Microtel have moved to dismiss. Doc. 208. Kuzzins Buford has moved for judgment on the pleadings. Doc. 213.

signs of sex trafficking at the Microtel (Atlanta)—Plaintiff and other victims asking for numerous extra towels, *id.* ¶ 215, Plaintiff and other victims exhibiting well known signs of trafficking, like malnourishment, poor hygiene, *id.* ¶ 218, room trash cans containing an extraordinary number of condoms, multiple cell phones, but virtually no personal possessions despite extended stays, *id.* at 219, and more than 30 men visiting Plaintiff's room in a single day, for short periods. *Id.* ¶ 220.

The pervasiveness of trafficking at the Microtel (Atlanta) was inescapable to anyone who set foot in the location. A single trafficker frequently controlled the hotel's entire third floor, using it for trafficking. *Id.* ¶¶ 9, 209–12. Management and employees booked other guests on the third floor only with the authorization of the trafficker. *Id.* ¶ 210. Traffickers used the hotel as a venue for sex acts, of course, but they also used the location as their personal headquarters. Plaintiff's trafficker and others used the Microtel (Atlanta) business center to post internet advertisements for sex with Plaintiff and Jane Doe 2 from the center's computers in full view of the hotel lobby and its employees. *Id.* ¶ 208.

And this venture did not stop with the traffickers and complicit employees and managers at the Microtel (Atlanta). It extended to owners and franchisors. *Id.* ¶ 199. Along with Kuzzins Buford, Wyndham and Microtel Franchising managed, supervised, and controlled the location's operation. *Id.* ¶¶ 33, 199. Wyndham and Microtel Franchising, sent inspectors to examine the hotel who could not have

escaped the open and obvious signs of sex trafficking discussed above.  Moreover, numerous public, online reviews and guest complaints alerted the Microtel (Atlanta) Defendants in graphic detail to the prevalence of commercial sex there.  *Id.* ¶¶ 223–25.  Despite knowledge of sex trafficking in their hotels, the Microtel (Atlanta) Defendants failed to address the trafficking crisis the location.  Instead, they profited from the sex trafficking venture by receiving rental revenue from rooms in which Plaintiff and other victims were trafficked.  *Id.* ¶ 226.

## III.  Ramada (Alpharetta)[5]

Plaintiff was trafficked over more than 20 separate stays between 2011 to 2016, with individual stays lasting up to 14 days.  Doc. 87 ¶ 231.  The Ramada Defendants and their agents and employees were not just complicit in this venture; they actively assisted Plaintiff's traffickers.  Jane Doe 1 was forced to have sex with each of three Ramada (Alpharetta) employees every day that she was trafficked at the hotel.  *Id.* ¶¶ 8(d), 234. These same employees alerted Plaintiff's traffickers to law enforcement activity and warned traffickers when to slow or stop traffic to

---

[5] "Ramada (Alpharetta)" refers to the Ramada Limited Suites, n/k/a Ramada by Wyndham, 3020 Mansell Road, Alpharetta, Georgia 30022.  Doc. 87 ¶ 43.  Plaintiff has alleged claims against four Defendants related to her trafficking at the Ramada (Alpharetta)—Wyndham, Ramada Worldwide, Inc. ("Ramada"), Jeet & JJ LLC ("Jeet"), and Newtel V Corporation ("Newtel"). Together, the Amended Complaint defines these four Defendants as the "Ramada Defendants."  *Id.*  Presently, only the joint motion to dismiss of Wyndham and Ramada, Doc. 208, is pending before the Court.

Plaintiff's room.  *Id.* ¶ 237.  Of course, these same employees, and others, also ignored the open and obvious signs of sex trafficking at the Ramada (Alpharetta)—Plaintiff and other victims exhibiting well known signs of trafficking, like malnourishment, poor hygiene, *id.* ¶ 238, room trash cans containing an extraordinary number of condoms, multiple cell phones, but virtually no personal possessions despite extended stays, *id.* ¶ 239, and as many as 20 men visiting Plaintiff's room in a single day, each for short periods.  *Id.* ¶ 240.

And Ramada's participation was not limited to the agents and employees of franchisees, local operators, and their employees; it extended to owners and franchisors Wyndham and Ramada.  *Id.* ¶ 227.  Together with local franchisees and operators—Jeet & JJ, LLC, and Newtel V Corporation—Wyndham and Ramada managed, supervised, and controlled the location's operation.  *Id.* ¶¶ 43, 227. They also controlled policies and standards applicable to and enforced—or not—at the location, to include policies about the training of managers and employees.  *Id.* ¶ 229.  Wyndham and Ramada also sent inspectors to whom the open and obvious signs of sex trafficking would have been apparent.  *Id.* ¶¶ 241–42.  Moreover, numerous public, online reviews, guest complaints, and police reports alerted the Microtel (Atlanta) Defendants in graphic detail to the prevalence of commercial sex there.  *Id.* ¶¶ 244–48.  Despite knowledge of sex trafficking in their hotels, the Microtel (Atlanta) Defendants profited from the sex trafficking venture by receiving

rental revenue from rooms in which Plaintiff was trafficked.  *Id*. ¶¶ 228, 249.

## IV.    La Quinta (Alpharetta)[6]

For years, CPLG HOL, CorePoint Lodging, Inc., and LQ Management, LLC—just like CPLG-LQ and LQW—profited from a sex trafficking venture operating out of the La Quinta (Alpharetta).  Plaintiff was trafficked at the La Quinta (Alpharetta) over roughly 20 separate stays from 2011 to 2013, Doc. 87 ¶¶ 2, 8–9, 254.  La Quinta (Alpharetta) employees intentionally placed victims and traffickers near the back exit of the hotel to hide the number of buyers of commercial sex—sometimes as many as 20 in one day for Plaintiff alone—who were coming and going for short periods of time.  *Id*. ¶¶ 8(c), 256–57, 261.  La Quinta (Alpharetta) employees provided extra key cards to be left outside by the back door so buyers could let themselves in without being noticed.  *Id*. ¶ 257.

When Plaintiff's trafficker beat and raped her over a period of hours, La Quinta (Alpharetta) employees who could hear the violent attack did nothing to

---

[6] "La Quinta (Alpharetta)" refers to the La Quinta Inn located at 1350 North Point Dr., Alpharetta, Georgia 30022. Doc. 87 ¶ 49. Plaintiff has alleged claims against five Defendants related to her trafficking at the La Quinta (Alpharetta). Plaintiff has already responded to the joint motion filed by CPLG Properties, LLC ("CPLG-LQ"), and La Quinta Worldwide, LLC ("LQW"). *See* Doc. 181 (Plaintiff's response to Defendants' motion, Doc. 132). CPLG HOL, LLC ("CPLG HOL"), CorePoint Lodging, Inc. ("CorePoint"), and LQ Management, LLC ("LQM"), together filed a motion to dismiss on January 20, 2020, Doc. 206, to which this brief responds.  Together, the Amended Complaint defines these five Defendants as the "La Quinta Defendants." Doc. 87 ¶ 49.

help.  *Id.* ¶¶ 8(c), 258.  La Quinta (Alpharetta) employees ignored the blood left on the walls following Plaintiff's violent beating and rape much like they ignored the trash cans filled with condoms, the frequent requests for towels, and the absence of personal items in Plaintiff's possession—all well-established and readily observable indicators of sex trafficking.  *Id.* ¶¶ 89–91, 258, 260.

This sex trafficking venture was not limited to the traffickers and the complicit employees at the La Quinta (Alpharetta); it extended to management, owners, and others.  *Id.* ¶ 250.  Together with LQW and CPLG (the title holder of the La Quinta (Alpharetta)), *id.* ¶ 54, CPLG HOL, CorePoint, and LQM, among other things, owned, managed, supervised, and controlled the operation of the La Quinta (Alpharetta).  *Id.* ¶ 49.  LQW and CPLG managers and inspectors sent to examine the hotel were aware of the open and obvious signs of Plaintiff's sex trafficking at the La Quinta (Alpharetta), including Plaintiff's and other victims' physical condition, the number of daily buyers, and the state of the rooms in which the trafficking occurred.  *Id.* ¶¶ 259–62.  These signs were readily observable, to CPLG HOL, CorePoint, LQM, and their employees and agents as well, as shown by the fact that they were obvious to the average hotel guest.  Publicly available websites aggregated graphic complaints of hotel guests who commented on blood found in rooms and criminal activity, including sex trafficking.  *Id.* ¶¶ 263–68.

Despite knowledge of sex trafficking in their hotels, CPLG HOL, CorePoint,

and LQM, just like LQW and CPLG failed to address the problem.  The La Quinta

Defendants have also failed to adequately train their employees and agents to

maintain safe premises and protect their invitees.  *Id*. ¶ 796.  All the while, LQW

and CPLG profited from the sex trafficking venture by receiving rental revenue from

rooms in which Plaintiff was trafficked.  *Id*. ¶ 428.

## V.   Hampton Inn (NDH Atlanta)[7]

SE Owner, Auro, LAXMI, and JHM—just like the Hilton Defendants—profited

from a sex trafficking venture operating out of the Hampton Inn (NDH Atlanta).

Plaintiff was trafficked at the hotel during roughly 20 separate stays between 2011

and 2016.  Doc. 87 ¶¶ 2, 8–9, 311.  As at other hotels, Plaintiff's traffickers enjoyed

the cooperation of hotel employees.  *Id*. ¶ 313.  A male front desk employee worked

as a lookout for Plaintiff's traffickers, providing discounts in exchange for drugs and

---

[7] "Hampton Inn (NDH Atlanta)" refers to the Hampton Inn located at 1975 North
Druid Hills Road NE, Atlanta, Georgia 30329. Doc. 87 ¶ 61. Plaintiff has alleged
claims against seven Defendants related to her trafficking at the Hampton Inn
(NDH Atlanta).  Together, the Amended Complaint defines these seven Defendants
as the "Hampton Inn (NDH Atlanta) Defendants."  *Id*.  Plaintiff has already
responded to the joint motion filed by Hilton Franchise Holdings, LLC, Hilton
Domestic Operating Company, Inc., and Hilton Worldwide Holdings, Inc.
(collectively, "the Hilton Defendants").  *See* Doc. 185 (Plaintiff's response to the
Hilton Defendants' motion, Doc. 160). Since then, the other four defendants have
also filed motions. 2014 SE Owner 5-Emory, LLC ("SE Owner") filed a motion for
judgment on the pleadings, Doc. 207, while Defendants Auro Hotels Management,
LLC ("Auro"), LAXMI Druid Hills Hotel, LLC ("LAXMI"), and JHM Hotels
Management, Inc. ("JHM"), together filed a motion to dismiss on January 20, 2020,
Doc. 203.  This brief responds to both those motions.

money.  *Id*. ¶ 314.  Another front desk employee also accepted drugs to act as a "lookout" for Plaintiff's trafficker.  *Id*. ¶ 316.

The Hampton Inn (NDH Atlanta) Defendants ignored well-established and readily observable indicators of sex trafficking, such as trash cans filled with condoms, the frequent requests for towels, and the absence of personal items in Plaintiff's possession.  *Id*. ¶¶ 317–18.  The Hampton Inn (NDH Atlanta) Defendants also ignored foot traffic indicative of sex trafficking, with as many as 20 men a day visiting Plaintiff's room for short periods of time.  *Id*. ¶ 319.

This sex trafficking venture was not limited to the traffickers and the complicit employees at the Hampton Inn (NDH Atlanta); it extended to management, owners, and others.  *Id*. ¶ 307.  Along with the Hilton Defendants, SE Owner, Auro, LAXMI, and JHM, among other things, managed, supervised, and controlled the operation of the Hampton Inn (NDH Atlanta).  *Id*. ¶¶ 61, 307.  The Hilton Defendants' managers and inspectors sent to examine the hotel were aware of the open and obvious signs of sex trafficking at the Hampton Inn (NDH Atlanta), including Plaintiff's and other victims' physical condition, the number of daily buyers, and the state of the rooms in which the trafficking occurred.  *Id*. ¶¶ 317, 320.  Numerous guest complaints confirmed these easily observable facts.  *Id*. ¶¶ 322–23.  All the while, SE Owner, Auro, LAXMI, and JHM, along with the Hilton Defendants, profited from the sex trafficking venture by receiving rental revenue from rooms in

which Plaintiff was trafficked.  *Id*. ¶¶ 308, 326.

## ARGUMENT AND CITATION OF AUTHORITY[8]

### I.   The Amended Complaint is not a Shotgun Pleading.

A complaint need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Fed. R. Civ. P. 8(a)(2).  Neither detailed factual allegations nor "technical forms of pleading . . . are required." *Crowe v. Coleman,* 113 F.3d 1536, 1539 (11th Cir. 1997).

Several Movants[9] argue that the Complaint is an impermissible shotgun pleading.  Movants argue that by grouping them together with other named defendants, Plaintiff fails to specify which Defendants allegedly took which specific actions pled in the Amended Complaint.  *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.,* 917 F.3d 1249, 1274 (11th Cir. 2019) ("the gist of the problem with group pleading . . . is the failure to give fair notice to each named

---

[8] To the extent Movants' have incorporated the arguments raised by Choice Hotels International, Inc., regarding liability on a joint and several basis and on punitive damages, Plaintiff incorporates by reference here response at Doc. 180 at 24-25.
[9] Varahi, Wyndham, Microtel, Inc., Kuzzins Buford, Ramada, CorePoint, CPLW HOL, LQM, SE Owner, LAXMI, JHM, and Auro.  *E.g.* Doc. 214 at 1–2 (Varahi incorporating arguments of SE Owner); Doc. 213-1 at 5–8 (Kuzzins Buford brief); Doc. 208-1 at 5–6 (joint brief of Wyndham, Microtel, and Ramada); Doc. 207 at 5–9 (brief of SE Owner 5-Emory, LLC); Doc. 206-1 at 5–7 (joint brief of LQM, CorePoint, and CPLG HOL); Doc. 203 at 2 (LAXMI, JHM, and Auro, together incorporating arguments made by, among others, LQW and CPLG-LQ, Choice, and the Hilton Defendants); *see also* Doc. 132-1 at 5–6 (brief of LQW, and CPLG-LQ); Doc. 133 at 6–9 (Choice's brief).

defendant of the claims against it.").

Movants are simply wrong. "When multiple defendants are named in a complaint, the allegations can be and usually are to be read in such a way that each defendant is having the allegation made about him individually." *Crowe,* 113 F.3d at 1539; *Kyle K. v. Chapman*, 208 F.3d 940, 944 (11th Cir. 2000) (Where complaint accuses defendants collectively, "[t]he complaint can be fairly read to aver that all defendants are responsible for the alleged conduct."). Ample authority confirms that this remains the standard post *Twombly* and *Iqbal*. *E.g., Crespo v. Coldwell Banker Mortg.,* 599 F. App'x 868, 872 (11th Cir. 2014) (applying post-*Iqbal*); *FTC v. Hornbeam Special Situations, LLC,* 308 F. Supp. 3d 1280, 1288 (N.D. Ga. 2018) (rejecting argument that group pleading rule did not apply following *Iqbal*).

That is what Plaintiff has done here.  The "Red Roof (Smyrna) Defendants" is defined specifically to include Varahi-RRI. Doc. 87 ¶ 17.  The "Microtel Defendants" is defined specifically to include Wyndham, Microtel, and Kuzzins Buford.  *Id*. ¶ 33. The "Ramada Defendants" is defined specifically to include Wyndham and Ramada. *Id.* ¶ 43.  The "La Quinta Defendants" is defined specifically to include CPLG HOL, CorePoint, and LQM. *Id.* ¶ 49.  And, not surprisingly, the "Hampton Inn (NDH Atlanta) Defendants" is defined specifically to include SE Owner, LAXMI, JHM, and Auro.  *Id.* ¶ 61.  These explicit and specific definitions leave no defensible basis for any Defendant to argue that it remains unaware which allegations are against it.

What's more, the Eleventh Circuit's 2019 ruling in *Quality Auto Painting*—also a post-*Iqbal* decision—is fatal to the argument that defining Defendant groups and pleading allegations against them is somehow impermissible.  In *Quality Auto Painting*, the Court of Appeals reversed a district court's 12(b)(6) dismissal of claims based on a purported violation of the group pleading doctrine where "Defendants" was specifically defined. 917 F.3d at 1274.  In fact, the Eleventh Circuit reversed the district court even though the *Quality Auto Painting* complaint defined "Defendants" *less* specifically than does the Amended Complaint.  In *Quality Auto Painting*, the complaint did not identify groups of defendants and instead defined "Defendants" to "mean each and every Defendant named in the caption above." *Id.*  Thus, the argument that this pleading convention is improper is contrary to binding law of the Eleventh Circuit, and any dismissal based on group pleading would be erroneous.

Finally, to the extent Movants criticize the Amended Complaint generally as a "shotgun pleading" because some paragraphs incorporate others by reference, that argument also fails.  As both Kuzzins Buford and SE Owner acknowledge, *e.g.*, Docs. 213-1 at 6 and 207-1 at 7, respectively, the counts naming Defendants incorporate only the paragraphs applicable to them.  *See, e.g.,* Doc. 87 ¶¶ 433, 441, 450 (incorporating, in TVPRA claims against Microtel Defendants, factual allegations involving Microtel Defendants).  Far from rendering it impossible to discern "which allegations of fact are intended to support which claims of relief," Doc. 213-1 at 7

(internal quotations omitted), this incorporation means each of the substantive counts specifically identifies—as if by chapter and verse—the factual allegations supporting it.  Similarly, rather than relying merely on "[c]onclusory allegations of alter ego and conspiracy," Doc. 208-1 at 5 (brief in support of Wyndham, Microtel, and Ramada's joint motion), Plaintiff's allegations include the nature of the relationship among the Defendant groups.[10]  While this litigation may be complex, Movants are ably represented by sophisticated counsel.  Length and complexity do not, alone, render a complaint a shotgun pleading, and no Eleventh Circuit precedent would authorize dismissing this complaint as a shotgun pleading.

## II.    Plaintiff has alleged Movants' liability under the TVPRA.

### A.    Plaintiff has alleged three distinct claims against each Movant under the plain language of the TVPRA.

Plaintiff has adequately alleged three different civil claims against all Movants under the civil remedy provision of the TVPRA.  18 U.S.C. § 1595.  In 2003, the TVPRA was amended to provide victims with a civil cause of action "against the perpetrator" of a violation of, *inter alia*, 18 U.S.C. § 1591.  18 U.S.C. § 1595(a).  In 2008, Congress significantly expanded § 1595(a) by adding an additional basis for

---

[10] *E.g.,* Doc. 87 ¶ 41 ("Microtel is the Wyndham entity that enters into franchise agreements with Microtel Inn & Suites franchisees, and it is an agent of, and/or the alter-ego of, Wyndham."), ¶ 46 ("Ramada is the Wyndham entity that enters into franchise agreements with Ramada branded hotel franchisees, and it is an agent of, and/or the alter-ego of, Wyndham.").

liability, allowing victims to sue not only the perpetrator, but "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person *knew or should have known* has engaged in an act in violation of this chapter[,]" 18 U.S.C. § 1595(a) (emphasis added), which includes violations of § 1591.  Thus, since 2008, three distinct bases for sex trafficking liability have been available under § 1595.[11]

*First*, a Defendant may be liable for perpetrator trafficking claim under § 1591(a)(2) for (1) harboring or maintaining a person, (2) *knowing or in reckless disregard* that the person will be subjected to sex trafficking.

*Second,* even if a Defendant has not violated § 1591(a)(1), that Defendant may be liable for a perpetrator financial beneficiary claim under § 1591(a)(2) if it (1) knowingly benefits from (2) participation in a venture and (3) the venture has violated § 1591(a)(1); and the Defendants (4) *knew or recklessly disregarded* the fact that the person will be subjected to sex trafficking.

*Third,* even if a Defendant is not liable under § 1591(a)(1) or § 1591(a)(2) it may still be liable under a § 1595(a) negligent financial beneficiary claim if it (1) knowingly benefits (2) from participation in a venture and it (3) *knew or should*

---

[11] "We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous . . . judicial inquiry is complete." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) (citations and quotation marks omitted).

*have known* the venture "engaged in an act in violation of this chapter."  18 U.S.C. § 1595(a).

Unlike § 1591(a) claims, it is *not* a requirement under § 1595(a) that the Defendant have any particularized knowledge of the Plaintiff's trafficking or knowledge of a specific instance of force, fraud, or coercion.  Knowledge of a single violation of the TVPRA is sufficient.  Congress intended § 1595(a) to be a broad remedial provision that allows victims of sex trafficking to bring claims against anyone who benefitted from their sex trafficking and should have known about it. "In short, it is possible for a defendant to be civilly liable without having violated any of the criminal portions of the TVPA, because the statute permits recovery under a civil standard *even in the absence of proof of intentional conduct*." *Ricchio v. Bijal, Inc.*, No. CV 15-13519-FDS, 2019 WL 6253275, at *9 (D. Mass. Nov. 22, 2019) (emphasis added).

1.  **Plaintiff alleges perpetrator trafficking claims under § 1591(a)(1).**

Plaintiff alleges Movants violated § 1591(a)(1), by (1) knowingly providing a place for or keeping in existence,[12] "by any means," Plaintiff, (2) "knowing, or in reckless disregard of the fact" that Plaintiff was being subjected to sex trafficking.

---

[12] To "harbor" is to "provide a place, home, or habitat for."  HARBOR, The American Heritage Dictionary of the English Language (5th ed. 2016).  To "maintain" is to "keep in existence." *Id.* at MAINTAIN.

18 U.S.C. § 1591(a)(1).  Knowingly harboring under the TVPRA consist of

"continuing to rent [the trafficker] the room after [the trafficker's] conduct was

manifest." *Ricchio v. McLean*, 853 F.3d 553, 556 (1st Cir. 2017).  Plaintiff has so

alleged.[13]

Every TVPRA hotel sex trafficking case thus far has either cited omissions or

explicitly found omissions to be actionable under the TVPRA.  *See Ricchio*, 853 F.3d

at 555 (citing hotel owner indifference and ignoring plea for help); *M.A. v. Wyndham*

*Hotels & Resorts, Inc.*, *et al.*, No. 2:19-CV-849, 2019 WL 4929297 at *3 (S.D. Ohio

Oct. 7, 2019) (defendants on notice about "prevalence of sex trafficking generally at

their hotels and failed to take adequate steps to train staff in order to prevent its

occurrence"); *H.H, Plaintiff, v. G6 Hospitality, LLC, et al.,* No. 2:19-CV-755, 2019 WL

6682152 (S.D. Ohio Dec. 6, 2019) (same).[14]

Plaintiff has also alleged that Movants, *inter alia*, supervised, oversaw, and

controlled the operations of their respective hotels,[15] that they controlled the policies

---

[13] Plaintiff has alleged that Defendants' agents *participated in* Plaintiff's trafficking.
Doc. 87 ¶¶ 16; 119–23 (employee "lookouts" at Red Roof Inn (Smyrna); 207
(employees alerted to police at Microtel); 234 (Plaintiff required to have sex with
employees at the Ramada); 256–57 (employees left key cards to the back door at
LaQuinta; 314, 316 (employees acted as "lookout[s]" at the Hampton Inn NDH
Atlanta.  Whether any Defendant can disprove an agency relationship is a question
of fact, discussed *infra.*
[14] *See also Bistline v. Parker*, 918 F.3d 849, 875 (10th Cir. 2019) (citing acceptance of
funds with "awareness and acquiescence" of their origin in trafficking).
[15] Doc. 87 ¶¶ 17, 33, 43, 49, 61.

and standards, and that they supervised (or failed to supervise) training of management and employees.[16]  Plaintiff has alleged that Movants inspected the hotels and that the sex trafficking venture was open and obvious to those inspectors.[17]  Renting a hotel room to a trafficker to be used for sex trafficking is an overt act.  ***Accepting money is also an overt act*** that can, with knowledge, constitute a federal crime.  18 U.S.C. § 2315 (receiving stolen money).  Plaintiff has alleged that Movants rented hotel rooms to, and accepted money from, traffickers with knowledge that those actions furthered Plaintiff's sex trafficking.[18]  Plaintiff has alleged that Movants harbored and maintained Plaintiff's sex trafficking and did so with actual knowledge in violation of § 1591(a)(1).

### 2.   Plaintiff has alleged beneficiary claims under § 1591(a)(2) and § 1595(a).

Plaintiff alleges that Movants each violated § 1591(a)(2) by (1) knowingly benefitting from (2) participation in a venture that harbored, maintained, or otherwise trafficked Plaintiff, (3) and that Movants did so ***knowing or in reckless disregard*** of Plaintiff's trafficking.  Plaintiff alleges that Movants each violated § 1595(a) by (1) knowingly benefitting from their (2) participation in a venture (3) and that Movants ***knew or should have known*** that venture violated the TVPRA.

---

[16] *Id.* ¶¶ 50, 109, 201, 229, 252, 309.
[17] *Id.* ¶¶ 167, 221, 241, 262, 320.
[18] Doc. 87 ¶¶ 93, 108, 119–123, 200, 205, 228, 233, 251, 308, 313.

To state a financial beneficiary claim, the ***sex trafficking venture*** must be alleged to have committed an act in violation of the TVPRA.  This act is distinct from Movants' participation in the venture.  The Eleventh Circuit made this distinction clear in *United States v. Flanders*, holding "Section 1592(a)(2) does not require proof of such [criminal] conduct on the defendant's part, as only participation in a venture which has [violated § 1591(a)(1)] is required.  *Id.* § 1592(a)(2)."  752 F.3d 1317, 1338 (11th Cir. 2014) (emphasis added) (comparing the two subsections in a double jeopardy analysis).  That is, while a violation of § 1591(a)(1) requires, for example, harboring or maintaining, § 1591(a)(2) is a step removed—merely requiring participation in such a sex trafficking venture that harbored or maintained in violation of § 1591(a)(1).

Plaintiff's Amended Complaint details both the sex trafficking ventures, the Defendants' participation in those ventures,[19] and how Defendants reaped the financial benefits of that participation at each hotel.[20]  Every court that has ruled on a TVPRA sex trafficking claim against a hotel company has concluded the "knowing benefit" element is satisfied by the rental of a room.  *Ricchio*, 853 F.3d at 556 (knowing benefit satisfied by room rental); *M.A.*, 2019 WL 4929297, at *3 (same); *H.H*, 2019 WL 6682152, at *2 (same).  Plaintiff has alleged this benefit was accepted

---

[19] Doc. 87 ¶¶ 107–156, 199–249, 250–268, 307–326.
[20] *Id.* ¶¶ 93, 108, 119–123, 200, 205, 228, 233, 251, 256, 308, 313.

by Movants ***knowing*** that the money was exchanged for the provision of a sex

trafficking venue for the sex trafficking venture that victimized Plaintiff.[21]

### B.   Movants' arguments against the viability of Plaintiff's TVPRA claims fail.

#### 1.   The TVPRA provides three distinct paths to liability.

In large part, Movants' interpretations of the TVPRA seek to collapse the

meaning of Plaintiff's three claims in an attempt to eliminate financial beneficiary

liability altogether.   Under Movants' interpretations, liability does not exist without

additional unwritten knowledge, intent, and purpose requirements that would

render § 1591(a)(2) and § 1595(a) completely meaningless.[22]   But that interpretation

ignores both the plain language of the statute,[23]  and the Eleventh Circuit's decision

in *Flanders*, 752 F.3d at 1338.

#### 2.   The Knowledge Standard of § 1595(a) is Negligence

Section 1595 explicitly does ***not*** require a showing of "reckless disregard."

Reckless disregard is conscious indifference,[24] while "should have known" is the well-

---

[21] *Id.*

[22] Courts "must attempt to give effect to every word or provision" in a statute and "disfavor an interpretation when that interpretation would render a 'clause, sentence, or word . . . superfluous, void, or insignificant.'"  *In Re Shek*, No. 18-14922, 2020 WL 372995, at *4 (11th Cir. Jan. 23, 2020) (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)).

[23] Doc. 208-1 at 13.

[24] Reckless disregard is a "[c]oncious indifference to the consequences of an act . . ."RECKLESS DISREGARD, Black's Law Dictionary (11th ed. 2019) (emphasis added).

established knowledge standard of negligence, also referred to as constructive

knowledge.[25]  Constructive knowledge is the "[k]nowledge that one ***using***

***reasonable care or diligence*** should have, and therefore that is attributed by law

to a given person."[26]  The legal standard applicable to § 1595 presents a classic jury

question: whether a reasonable person in a Movant's position, using reasonable care

or diligence, would have known that it profited from sex trafficking.

    *Ricchio* did not apply a reckless disregard standard but merely held that the

plaintiff "at least" alleged reckless disregard.  *Ricchio*, 853 F.3d at 556.  Following

reversal of the district court's dismissal, and consistent with the First Circuit's

decision, the district court explicitly held the applicable standard was negligence and

that no intentional conduct was required.  *Ricchio v. Bijal, Inc.*, 2019 WL 6253275,

at *9.  The district court in *M.A.* and *H.H.* similarly held that § 1595 is governed by a

negligence standard.  *M.A.*, 2019 WL 4929297, at *4; *H.H.*, 2019 WL 6682152, at *3.

### 3.    The definition of "participation in a venture" in § 1591 does not limit a civil cause of action under § 1595.

    The definition of "participation in a venture," 18 U.S.C. § 1591(e)(4),[27] was

---

[25] *See Hendrix v. Raybestos-Manhattan, Inc.*, 776 F.2d 1492, 1497 (11th Cir. 1985)
("appellants had actual or constructive knowledge (i.e., they knew
or should have known in the exercise of ordinary care)").

[26] CONSTRUCTIVE KNOWLEDGE, Black's Law Dictionary (11th ed. 2019)
(emphasis added).

[27] 18 U.S.C. § 1591(e)(4) states: "The term 'participation in a venture' means
knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)."

added to § 1591 in 2018 as part of the Allow States and Victims to Fight Online Sex Trafficking Act of 2017 ("FOSTA").  Pub. L. No. 115-164.  That definition does not limit the application of any civil cause of action other than an action under the Communications Act of 1934.  FOSTA, § 7, Savings Clause.[28]  Even absent FOSTA's savings clause, all definitions in § 1591 are expressly limited to § 1591 by subsection § 1591(e) which begins, "In this ***section*** . . ." (emphasis added).  Finally, the definition of "participation in a venture" from § 1591 cannot apply to § 1595(a).  To do so would render much of § 1595(a)—particularly the constructive knowledge standard—meaningless.  Courts "must attempt to give effect to every word or provision" in a statute and "disfavor an interpretation when that interpretation would render a 'clause, sentence, or word . . . superfluous, void, or insignificant.'"  *In Re Shek*, 2020 WL 372995, at *4 (quoting *TRW Inc.*, 534 U.S. at 31).  Congress's addition of the words "should have known" in § 1595(a) is not without meaning.

### 4.  Plaintiff adequately alleges Movants' participation in sex trafficking ventures.

Movants argue Plaintiff failed to allege "participation in a sex trafficking venture."  However, Plaintiff defines "hotel sex trafficking ventures" in the first twelve paragraphs of the Complaint[29] and then particularly alleges the sex trafficking venture at each hotel.  Plaintiff identifies the nature and operation of

---

[28] Section Seven of FOSTA, Savings Clause.
[29] Doc. 87 ¶¶ 1–12.

"hotel sex trafficking ventures" in Section III of the Amended Complaint, entitled, "Hotels are Complicit in Sex Trafficking."[30]  Plaintiff alleges facts that establish there was a "sex trafficking venture" at Movants' hotels, and that Movants knowingly participated in those sex trafficking ventures by providing—in exchange for a room rental fee, or a portion thereof—a venue **to** sex traffickers **for the purpose of** sex trafficking Plaintiff.[31]

Movants argue the benefit they received must be received "because of" the facilitation of sex trafficking.  It was.  The Amended Complaint alleges "money obtained from Jane Doe 1's forced commercial sex acts was retained by her traffickers and used to pay Defendants for their hotel rooms and other services in furtherance of the sex trafficking ventures occurring at their hotels."[32]  Sex trafficking cannot occur without a place for sex.  Movants' knowing provision of hotel rooms, the venue, is essential to the sex trafficking ventures at their hotels.  Plaintiff's sex traffickers chose Movant's hotels and paid Movants for use of their hotel rooms **because**, **and only because**, they were allowed to operate sex trafficking ventures at those hotels.

     **5.**    **Plaintiff does not "concede" any of the facts pleaded regarding Wyndham, Ramada, Microtel, or any Movant.**

---

[30] *Id.* ¶¶ 82–101.
[31] *Id.* ¶¶ 93, 108, 119–123, 200, 205–220, 228, 233–240, 251, 256–261, 308, 313–319.
[32] *Id.* ¶ 104.

Wyndham, Ramada, and Microtel make several statements without citation that "[t]he Amended Complaint concedes" a number of facts actually alleged therein. This is untrue.  Plaintiff means what she alleged in her Amended Complaint, including that Movants "owned, managed, supervised, operated, oversaw, controlled the operation of, and/or were inextricably connected to the renting of rooms" at their respective hotels.[33]

### 6.   Movants are alleged to have actually known of Plaintiff's sex trafficking, not merely her "prostitution."

Wyndham, Ramada, and Microtel argue that just because they may have known about Plaintiff's "prostitution" at their hotels, the Amended Complaint does not allege that they knew or should have known she was the victim of force, fraud or coercion.  At the Microtel, Plaintiff has alleged that an entire floor of the hotel was controlled by a single sex trafficker[34] and that "Wyndham and Microtel—the hotel's franchisor—sent inspectors to examine this hotel, at times anonymously, and the ongoing sex trafficking activity would have been apparent to those inspectors."[35] When a sex trafficker openly controls a floor of a hotel, accepting known "prostitution" is, at minimum, reckless disregard.

These assertions by all Movants ignore a great deal of allegations in the

---

[33] *Id.* ¶¶ 17, 33, 43, 49, 61.
[34] *Id.* ¶¶ 209–22, 215–16.
[35] *Id.* ¶¶ 221, 241.

complaint, including the fundamental allegations that the management and staff of the hotels Defendants operated "participated in, assisted, and facilitated Plaintiff's sex trafficking"[36] and that these individuals and companies were agents of other Defendants.[37]  No Movant has cited to any law applicable to the TVPRA to support their argument that they are not liable for the acts and knowledge of their agents, whether the agent is an individual or another company.  Georgia law does not apply to the TVPRA, which is a federal statute governed by federal common law and the common law of agency.  *See, e.g.*, *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 324 (1992) (adopting common-law test to define terms under federal statute and citing the Restatement (Second) of Agency); *see also Daughtrey v. Honeywell, Inc.*, 3 F.3d 1488, 1492 (11th Cir. 1993) (applying *Darden*).  Even if Movants had cited applicable law, agency is a fact question.[38]

### 7.   Movants' "absurd results" arguments have no merit.

Movants argue that following Supreme Court precedent and using the dictionary definitions of the words "harbor" and "maintain" would lead to absurd results because "it would criminalize helpful conduct, such as a nonprofit providing a safe haven to a trafficking victim . . ."  Doc. 204-1 at 10.  This is ludicrous.  As long

---

[36] *Id.* ¶¶ 93, 108, 119–123, 200, 205–220, 228, 233–240, 251, 256–261, 308, 313–319.
[37] *Id.* ¶ 16.
[38] *Naviera Neptuno S.A. v. All Int'l Freight Forwarders, Inc.*, 709 F.2d 663, 665 (11th Cir. 1983), ("the existence of an agency relationship is a question of fact.").

as the nonprofit provides a "safe haven," i.e.—the victim is not being trafficked for sex at the nonprofit in exchange for money—then there is no liability under the TVPRA.   The TVPRA does not criminalize helping victims.   Where there is no sex trafficking, there is no liability.   Here, Movants did not offer "safe haven".   They provided the venue to make Plaintiff's trafficking possible.

### 8.   The TVPRA cases relied on by Movants are easily distinguishable.

The cases relied on by Movants are unavailing.   As a preliminary matter, none of the cases cited by Movants address liability under the ***knew or should have known*** standard of § 1595(a), as Plaintiff has alleged against Movants.

In the unpublished *United States v. Afyare*, the court "strictly construed [§ 1951] against the Government" and held that "evidence that [the defendants] were in a car together during unrelated traffic stops, or dined together, or drove one another's cars is irrelevant and properly excluded" from the defendants' criminal trial but the prosecution could "introduce evidence that the defendants associated for the purpose of furthering the sex trafficking."   632 F. App'x 272, 286 (6th Cir. 2016). Coffee shop visits and car rides are not the extent of the allegations here.   In this case, the facts alleged by Plaintiff (if taken as true), show Movants' provided the venue, and actively assisted in the sex trafficking venture that victimized Plaintiff. Movant's hotel rooms were an essential component of her trafficking, the crim scene itself, not a "wholly unrelated" incident as described in *Afyare.  Id.* at 279.

Similarly distinguishable is *Noble v. Weinstein*, 335 F. Supp. 3d 504 (S.D.N.Y. 2018), where the court dismissed a TVPRA claim against Harvey Weinstein's brother, Robert, because the plaintiff failed to "allege specific conduct that furthered the sex trafficking venture." *Id.* at 524 ("What is missing are factual allegations that link Robert's actions to Harvey's [conduct toward the plaintiff].")*; see also Geiss v. Weinstein Co. Holdings, LLC.*, 383 F. Supp. 3d 156, 170 (S.D.N.Y. 2019) (another Harvey Weinstein case where the court dismissed TVPRA claims against The Weinstein Company ("TWC"), Robert Weinstein, and other individuals that worked at TWC). In *Geiss*, the Court held that "[t]he controlling question" is whether Harvey provided any of the alleged benefits to TWC "***because*** of TWC's facilitation of [his] sexual misconduct," *id.* at 169 (emphasis in original), and found such allegations lacking.[39]  Unlike *Noble* and *Geiss,* where the plaintiff did not sufficiently allege that the companies participated in or obtained any benefit from facilitating Mr. Weinstein's predation on women, here, Movants' participation and resulting benefit is plain.  In this case, Movants are in the business of selling hotel rooms. Movants directly benefited from the sale of hotel rooms that were used to traffick

---

[39] Unlike the decisions in *Noble* and *Geiss*, two other Courts have held that plaintiffs adequately alleged TVPRA claims against TWC.  *Canosa v. Ziff*, 18 Civ. 4115, 2019 WL 498865, at *24-25 (S.D.N.Y. Jan. 28, 2019) (finding "symbiotic relationship between the TWC Companies and Weinstein, in which the companies affirmatively enabled and concealed Weinstein's predations[.]"); *Huett v. Weinstein Co., LLC*, No. 2:18-cv-6012, 2018 WL 6314159, at *3 (C.D. Cal. Nov. 5, 2018)

Plaintiff. The longer Plaintiff was trafficked, the more money in hotel room rentals

Movants received.  Neither *Noble* nor *Geiss* has any application here.[40]

## III.  The Amended Complaint States Claims Under Georgia RICO.

### A.  Plaintiff's Georgia RICO Claims are not Barred by the Statute of Limitations.

Plaintiff's RICO claims are not barred by the governing statute of

limitations,[41]  O.C.G.A. § 16-14-8.  A statute of limitations bar is an affirmative

defense which plaintiff was not required to negate in her complaint.  *La Grasta v.*

*First Union Secs., Inc.,* 358 F.3d 840, 845 (11th Cir. 2004).[42]  Consequently, a Rule

12(b)(6) dismissal on statute of limitations grounds is appropriate only if it is

apparent from the face of the complaint that the claim is time-barred.  *Id.*  Because

the face of the complaint does not establish that the RICO claims are time-barred—

and in fact shows the contrary—dismissal on limitations grounds is inappropriate.

---

[40] *Ratha v. Phatthana Seafood Co.*, No. CV 16-4271, 2017 WL 8293174, at *5-6 (C.D. Cal. Dec. 21, 2017) is also distinguishable.  On summary judgment the court held there was no evidence of defendants involvement with the trafficking.

[41] LaQuinta Defendants LQM, CorePoint, CPLG HOL L.L.C. have briefed a statute of limitations challenge to Plaintiff's Georgia RICO claims. Doc. 206 at 18–20. Hampton Inn (NDH Atlanta) Defendant SE Owner 5-Emory LLC adopts the argument of Hilton and LaQuinta, without making any arguments of its own. Doc. 207-1 at 17.  Red Roof (Smyrna) Defendant Varahi Hotel LLC in turn adopts SE Owner 5-Emory LLC's adoption.   Doc. 214 at 1–2.  Hampton Inn (NDH Atlanta) Defendants Laxmi Druid Hills Hotel, LLC, JHM Hotels Management, Inc. and Auro Hotels Management, LLC adopt the arguments of the Hilton, LaQuinta and Choice Defendants.  Doc. 203 at 2.

[42] None of the Movants who make a state of limitations argument dispute this point.

Dismissal is also inappropriate because Movants do not correctly measure the limitations period.  Unlike its federal counterpart, Georgia's RICO Act contains a codified limitations provision.  O.C.G.A. § 16-14-8.  That provision, which governs both criminal and civil cases, remained the same from the statute's enactment in 1980 until 2015, when the General Assembly amended the first sentence of § 16-14-8 as follows:

> Notwithstanding any other provision of law setting forth a statute of limitations, a criminal proceeding or civil action brought pursuant to Code Section 16-14-6 shall be commenced up until five years after the conduct in violation of a provision of this chapter terminates ~~or the cause of action accrues~~.

2015 Ga. Laws 693.  Prior to 2015, the limitations period for a civil RICO case began to run when the claim accrued, which was interpreted to be when a plaintiff discovered, or reasonably should have discovered, that she had been injured and that her injury was part of a pattern.  *Blalock v. Anneewakee, Inc.,* 426 S.E.2d 165, 167 (Ga. Ct. App. 1992).[43]  In criminal cases, however, § 16-14-8 has always been read to mean that the limitations period does not commence running until termination of

---

[43] This is called the "injury plus pattern" rule.  *See, Bivens Gardens Office Bldg., Inc. v. Barnett Bank of Florida, Inc.*, 906 F.2d 1546, 1554–55 (11th Cir. 1990) ("We hold, therefore, that with respect to each independent injury to the plaintiff, a civil RICO cause of action begins to accrue as soon as the plaintiff discovers, or reasonably should have discovered, both the existence and the source of his injury and that the injury is part of a pattern.").  *Blalock* adopted the *Bivens Gardens* injury plus pattern rule.  *Blalock*, 426 S.E.2d at 167.

the violation.[44]

Although Movants refuse to acknowledge it, the injury plus pattern rule was eliminated by the 2015 amendment to § 16-14-8, which put an end to the different applications of § 16-14-8 in criminal and civil cases by deleting the words "or the cause of action accrues" at the end of the first sentence, leaving "after the conduct in violation of a provision of this chapter terminates" as the sole point of measurement for both kinds of cases.[45]  As a result of this deletion, the limitations period in civil cases is no longer measured by reference to the plaintiff's injury.

Comparison of *Blalock* and the 2015 amendment to § 16-14-8 makes this clear. *Blalock* expressly rejected an argument that the statute of limitations does not run until the racketeering activity terminates.  426 S.E. 2d at 167 ("We do not agree with appellants' argument that the legislature intended that the statute of limitation[s] begin[s] to run from the time that the racketeering activity terminates.").  The 2015 amendment to § 16-14-8 now makes it clear that the legislature's intent was to adopt

---

[44] *Harper v. State*, 738 S.E. 2d 584, 587 (Ga. 2013) ("Generally, prosecutions for RICO violations must begin within five years of the termination of any violation, O.C.G.A. § 16-14-8 . . . ."); *Jannuzzo v. State*, 746 S.E. 2d 238, 242 (Ga. Ct. App. 2013) (RICO's five-year statute of limitations "runs from the last overt act during the existence of the conspiracy.") (citation omitted).

[45] This uniformity between criminal and civil cases is consistent with RICO's role as a private attorney general statute.  *See Williams Gen. Corp. v. Stone*, 614 S.E. 2d 758, 760 (Ga. 2005) (recognizing RICO's "goal of compensating victims and providing incentive for 'private attorney generals' to initiate actions against those in violation of the Act.").

the very rule that *Blalock* rejected, which it accomplished by deleting the language upon which *Blalock* relied.

The 2015 amendment did not revive RICO claims that became time-barred before the amendment became effective, i.e., claims that had accrued prior to July 1, 2010. *Glock, Inc. v. Harper*, 796 S.E. 2d 304, 306 (Ga. Ct. App. 2017). But plaintiff's claims are not governed by *Glock* because she alleges every Movant caused her injuries after July 1, 2010.[46] Because the time for Plaintiff to bring her RICO claims had not expired at the time the new version of § 16-14-8 was enacted (2015), and her complaint was filed after that enactment (2019), the amended version of § 16-14-8 applies. And, because the new statute of limitation was in effect when the action was filed in 2019, its application does not raise a retroactivity concern.[47] This means that claims based on conduct occurring after July 1, 2010 became subject to the limitations period set forth by amended § 16-14-8, and cannot become time-barred until five years after the conduct in violation of RICO terminates. No such time-bar

---

[46] *See,* e.g., Doc. 87 ¶¶ 111 (plaintiff was trafficked at the Red Roof (Smyrna) from 2011–2016); 311 (plaintiff was trafficked at the Hampton Inn (NDH Atlanta) from 2011-2016); 203 (plaintiff was trafficked at the Microtel (Atlanta) from 2011-2016); 254 (plaintiff was trafficked at the LaQuinta (Alpharetta) from 2011-2013).

[47] *See, e.g., Huggins v. Powell*, 726 S.E. 2d 730, 733–34 (Ga. Ct. App. 2012) (where the new statute of limitations is in effect at the time the action was filed, there is no question of retroactivity); *Beneke v. Parker*, 667 S.E. 2d 97, 102 (Ga. Ct. App. 2008) (same); *Atlanta Country Club v. Smith*, 458 S.E. 2d 136, 137 (Ga. Ct. App. 1995) (suit filed after effective date of amendment does not involve retroactive application of statute of limitation).

applies, because Plaintiff alleges that each Movant's conduct in violation of O.C.G.A. § 16-14-4 has not terminated[48] and alleges that the conduct in violation of RICO continued to within five years of the filing of this action.[49]

Plaintiff alleges both substantive and conspiracy violations of RICO.  Doc. 87 ¶¶ 534-695.  In a substantive RICO case, the limitations period runs from the time the conduct in violation of the statute terminates, i.e., the last act of racketeering activity in the pattern of racketeering activity.  O.C.G.A. § 16-14-8.  Under the express language of the RICO Act, that last act does not have to involve the plaintiff, because the definition of pattern encompasses acts committed against *similar* victims, in this case, other trafficking victims.  O.C.G.A § 16-14-3(4).[50]

In a RICO conspiracy case, the limitations period runs from the last overt act during the existence of the conspiracy.  *State v. Conzo*, 666 S.E. 2d 404, 406 (Ga. 2008).  Because a conspirator is responsible for all acts committed in furtherance of the criminal endeavor, *Pasha v. State,* 616 S.E. 2d 135, 138 (Ga. Ct. App. 2005),[51]

---

[48] Doc. 87 ¶ 623 (LaQuinta Defendants LQM, CorePoint, CPLG HOL L.L.C.), 583 (Red Roof (Smyrna), 685 (Hampton Inn (NDH Atlanta) Defendants SE Owner 5-Emory LLC, Laxmi Druid Hills Hotel, LLC, JHM Hotels Management, Inc. and Auro Hotels Management, LLC).

[49] *Id.* ¶¶ 617 (LQM, CorePoint, CPLG HOL L.L.C.), 691 (SE Owner 5-Emory LLC), 589 (Varahi Hotel LLC), 691 (Laxmi Druid Hills Hotel, LLC, JHM Hotels Management, Inc., and Auro Hotels Management, LLC).

[50] The Amended Complaint references the trafficking of multiple victims at the SES. Doc. 87 ¶¶ 172, 177, 185, 187.

[51] *See also, Akintoye v. State,* 798 S.E. 2d 720, 724 (Ga. Ct. App. 2017).

there is no requirement that each conspirator personally commit an overt act.  The limitations period is measured from the last overt act committed by *any* conspirator or party to the crime.  *Whaley v. State,* 808 S.E. 2d 88, 93 (Ga. Ct. App. 2017).[52]

LQM, CorePoint, Inc. and CPLG HOL L.L.C. argue that predicate acts directed toward third parties cannot impact application of the statute of limitations.  But this argument ignores the text of § 16-14-8 and conflates standing and timeliness.  While it is true that a plaintiff in a civil RICO action must establish standing under O.C.G.A § 16-14(c), i.e., that she has been "injured by reason of any violation of Code Section 16-14-4", Plaintiff has done so with regard to each set of defendants.[53]  But after the 2015 amendment injury has nothing to do with the question of timeliness, because by eliminating the words "or the cause of action accrues" from § 16-14-8, the 2015 amendment separated the questions of standing and timeliness from one another.  Thus, *Lockhart v. Columbian Chemicals Co.,* No. 1:07-CV-0669-BBM, 2007 WL 9706424 (N.D. Ga. Aug. 31, 2007), relied upon by LQM, CorePoint, CPLG HOL, and several other defendants, has no application

---

[52] *Harper*, 738 S.E. 2d at 590 (RICO count was timely where there was evidence showing that one or more of the alleged conspirators committed acts of racketeering activity within five years of the indictment).

[53] *See*, e.g., Doc. 87 ¶¶ 568, 574 (Red Roof (Smyrna) Defendants), 668, 692 (Hampton Inn (NDH Atlanta) Defendants). 584, 590 (Red Roof Atlanta Defendants), 601, 607 (Suburban Extended Stay Defendants), 618, 624 (LaQuinta Defendants), 635, 641 (Microtel Defendants), 652, 658 (Ramada Defendants), 669, 675 (America's Best Defendants).

because it only addresses standing and says nothing about limitations.[54]

## B. Movants' Arguments Regarding Predicate Acts Fail.

Movants challenge the allegations of predicate acts, asserting Plaintiff fails to allege predicate acts directly committed by Movants.[55] In so doing, Movants ignore the elements of the predicate acts themselves and of RICO generally. As noted above, Plaintiff alleges that Movants violated O.C.G.A § 16-14-4(a) and § 16-14-6(c), by conspiring to violate subsection (a).[56] A person violates O.C.G.A § 16-14-4(a) when they obtain money, directly or indirectly, through a pattern of racketeering activity. Evidence of two related predicate acts is sufficient to constitute a pattern. *Dorsey v. State,* 615 S.E. 2d 512, 518-19 (Ga. 2005). Acts of racketeering activity are related if they are in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated. *Cotman v. State,* 804 S.E. 2d 672, 684 (Ga. Ct. App. 2017). Financial

---

[54] *See, e.g., Lockhart,* 2007 WL 9706424, at * 3 ("Plaintiffs lack standing to assert theft of government property."), and * 6 ("If the fraudulent scheme was targeted at defrauding the government, Plaintiffs' alleged injury does not flow directly from the scheme.").

[55] *See, e.g.,* Hilton's Motion to Dismiss, Doc. 160-1 at 16-20.

[56] Liability for a substantive RICO violation can arise directly or as a party to a crime. *Whaley,* 808 S.E. 2d at 92; *Akintoye*, 798 S.E. 2d at 724-25; *See also*, O.C.G.A. § 16-2-21 ("Any party to a crime who did not directly commit the crime may be indicted, tried, convicted, and punished for commission of the crime upon proof that the crime was committed and that he was a party thereto . . .").

gain is sufficient to link acts of racketeering activity into a pattern. *Overton v. State*, 671 S.E. 2d 507, 517–18 (Ga. Ct. App. 2008).

If the predicate acts are related to each other, a violation of O.C.G.A. § 16-14-4(a) occurs if any of the acts which form the pattern results in the defendant acquiring or maintaining control over property, in this case money. *Dorsey*, 615 S.E. 2d at 519. A person engages in a RICO conspiracy "if they knowingly and willfully join a conspiracy which itself contains a common plan or purpose to commit two or more predicate acts." *Cotman,* 804 S.E. 2d at 684.

Movants ignore the fact that, as members of conspiracies to violate RICO, they are responsible for all acts committed in furtherance of the criminal endeavor.[57] There is no requirement that a Movant commit a predicate act, only that an overt act be committed by a member of the conspiracy of which the Movant was a part. *Pasha*, 616 S.E. 2d at 138. ("Thus, *Pasha's* argument is unavailing, since there is no requirement in a conspiracy case that the State prove that Pasha personally committed the underlying predicate offenses.").

Here, it is clear that Plaintiff has alleged acts of racketeering activity against Movants. For example, a person commits the offense of trafficking an individual for sexual servitude when it knowingly benefits financially or receives anything of value from the sexual servitude of another. O.C.G.A § 16-5-46(c)(3). Plaintiff alleges that

---

[57] *Akintoye,* 798 S.E.2d at 724; *Pasha*, 616 S.E. 2d at 138.

Movants benefitted financially from her sexual servitude.[58]

A corporation has liability for sexual servitude if *any* of its agents knew *or should have known* that the illegal activity was occurring.  O.C.G.A § 16-5-46(j).  Similarly, O.C.G.A. § 16-5-46, 18 U.S.C. § 1591 creates liability for anyone who financially benefits from participation in a venture which, *inter alia*, harbors, provides, or maintains persons who are coerced into engaging in commercial sex acts.  18 U.S.C. § 1591(a).  Liability may be based upon actual knowledge *or reckless disregard.  Id*.  Plaintiff alleges that Movants knew or should have known of the illegal activity and alleges specific facts supporting that actual or constructive knowledge.[59]  For example, Plaintiff alleges that she was trafficked during more than 20 separate stays at each of the Red Roof (Smyrna), Red Roof (Atlanta), Suburban Extended Stay (Chamblee), Microtel (Atlanta), Ramada (Alpharetta), LaQuinta (Alpharetta), Americas Best (Atlanta), Hampton Inn (NDH Atlanta)[60].  Some of these stays were for two weeks[61] or longer.

At most hotels, Jane Doe 1 was required to service twenty or more men per

---

[58] Doc. 87 a 597.

[59] *See*, e.g., Doc. 87 ¶¶ 111–56 (Red Roof (Smyrna) Defendants), 161–71 (Red Roof (Atlanta) Defendants), 176–98 (Suburban Extended Stay (Chamblee) Defendants), 203-226 (Microtel (Atlanta) Defendants), 231–49 (Ramada (Alpharetta) Defendants), 254-268 (LaQuinta (Alpharetta) Defendants), 273–306 (America's Best Defendants), 311-326 (Hampton Inn (N.D.H. Atlanta) Defendants).

[60] *Id*. ¶¶ 111, 161, 176, 203, 254, 273, 311, respectively.

[61] *Id*. ¶¶ 111, 176, 203.

#3011368v1

day.[62]  During many of those hotel stays, other women, including but not limited to

other Jane Doe plaintiffs, were being trafficked in the same hotel at the same time.[63]

It is entirely plausible that movants actually knew, should have known or recklessly

disregarded the fact that women were being trafficked and forced to serve as many

as 280 men during a 2 week stay at a hotel where multiple traffickers were forcing

women to service as many as 100 buyers per day.  Even ignoring such notable events

as police raids, customer on-line complaints, and other forms of notice such as

franchisor inspections, the sheer volume of buyers passing through these hotels,

amounting to many hundreds per week, week after week, provides sufficient factual

support for Plaintiff's allegations.

### C.    Movants' Conspiracy Argument is Unavailing.

Movants ignore the fact that, as members of conspiracies to violate RICO, they

are responsible for all acts committed in furtherance of the criminal endeavor,

including those of their co-conspirators.[64]

Several Movants rely upon a federal RICO case, *American Dental Association*

*v. Cigna Corporation*, 605 F.3d 1283 (11th Cir. 2010), to argue that Plaintiff does not

sufficiently allege a conspiracy.  *American Dental,* however, is inapposite.  In that

case, the Plaintiff alleged a conspiracy between various dental insurance companies,

---

[62] *Id.* ¶¶ 117, 165, 176, 205, 233, 240.

[63] *Id.* ¶¶ 118, 162, 177, 205, 255, 277, 312.

[64] *Akintoye,* 798 S.E.2d at 724; *Pasha*, 616 S.E.2d at 138.

each of which was a competitor of the other.  *Id.* at 1286.  In rejecting the conspiracy allegations in *American Dental*, the court noted that nothing more than parallel conduct by the competing insurance companies was alleged, and that such conduct could have been both lawful and independently adopted.  *Id.* at 1295.  That is not the case here.  First, in contrast to the conduct at issue in *American Dental*, the sex trafficking alleged here could not be lawful.  Second, and also unlike *American Dental*, the conspiracy alleged here is not between Movants and their competitors, it is between Movants and the sex traffickers who operated for years at their facilities.  Third, Plaintiff alleges details sufficient establishing that Movants knew the sex trafficking was occurring, citing not only its frequency and duration but also complaints to them and the knowledge of their own inspectors.

Fourth, Movants argue based on *American Dental* that a "meeting of the minds" is required for a RICO conspiracy.  Georgia law, however, is directly to the contrary.  *Kilgore v. State,* 305 S.E.2d 82, 90 (Ga. 1983)("The type of agreement necessary to form a conspiracy is not the 'meeting of the minds' necessary to form a contract and may be a 'mere tacit understanding between two or more people that they will pursue a particular criminal objective.'").  This rule fully applies to RICO conspiracies.  *Akintoye,* 798 S.E.2d at 780–81 (quoting *Kilgore).*

Several movants also rely upon *Roe v. Gary, Williams, Parenti, Watson & Gary, P.L.L.C.,* 181 F. Supp. 3d 1161 (N.D. Ga. 2016), rev'd on other grounds.  *Roe,*

however, is inapposite.  First, *Roe's* RICO analysis is limited to federal RICO: the Court conducted no analysis of the complaint's Georgia RICO claims.  *Id.*  Second, *Roe* relied upon fraud-based acts of racketeering activity which are subject to a Rule 9(b) analysis.  The racketeering activity alleged in this case is not fraud-based and is therefore subject to a Rule 8(a) analysis.

### D.     Movants Argue the Wrong Standard for Corporate Liability.

Just as movants argue the wrong standard for commission of predicate acts, they assert a similarly incorrect standard regarding corporate civil liability in RICO cases.  Simply put, the standard for corporate criminal liability set forth in O.C.G.A. § 16-2-22 does not govern this civil RICO case.[65]  In fact, *Williams General Corporation v. Stone,* 632 S.E.2d 376 (2006), rejected the exact argument that Movants assert:

> Appellees argue for application of OCGA § 16-2-22 which addresses criminal responsibility for corporations. . . . However, to construe the statute in the manner proposed by appellees would mandate that OCGA § 16-2-22 and other criminal statutes that limit imposition of corporation criminal liability would now be applied to civil suits which stem from criminal violations.  ***We have not previously applied OCGA § 16-2-22 or any other criminal statutes to civil suits brought by individuals, and we decline to do so here.***

---

[65] Kuzzins Buford, LLC argues that O.C.G.A. § 16-2-2 sets the standard for corporate liability in a civil RICO case Doc. 213-1 at 16–17), as do Wyndham Hotels & Resorts, Inc., Microtel Inns and Suites Franchise, Inc. and Ramada Worldwide Inc. Doc. 208 at 17–18).  Laxmi Druid Hills Hotel, LLC, JHM Hotels Management, Inc., and Auro Hotels Management, LLC adopt Choice, Hilton and LaQuinta's arguments (Choice does not assert § 16-2-22), and SE Owner 5-Emory, LLC and Varahi Hotel adopt Hilton and LaQuinta's arguments.  Doc. 207-1 at 17; Doc. 214 at 1–2.

*Id.* at 378 (emphasis added).  Precluding the exact argument made by movants, the Court went on to repeat that "OCGA § 16-2-22 does not pertain to civil suits brought under the Georgia civil RICO Act . . .."  *Id.*  Movant's argument fails because it depends upon a standard which does not apply to civil RICO cases.

## IV.   Plaintiff has Properly Alleged her Negligence Claims.

### A.   Plaintiff's Negligence Claims are Timely.

This Court should not dismiss Plaintiff's negligence claims against Movants based on the statute of limitations because Plaintiff's claims were tolled and are therefore timely.  "A dismissal for failure to state a claim on statute of limitations grounds is appropriate 'only if it is apparent from the face of the complaint that the claim is time-barred.'"  *United State ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1085 (11th Cir. 2018) (quoting *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004).  A statute of limitation bar is an affirmative defense, which plaintiffs are not required to negate in their complaint.  *La Grasta*, 358 F.3d at 845.  Certain Movants[66] assert that because the statute of limitation for a negligence claim is two years, O.C.G.A. § 9-3-33, Plaintiff's negligence claims are time-barred.  They fail to recognize, however, that the limitations periods for

---

[66] Movants asserting this argument are Varahi-RRI (a Red Roof (Smyrna) Defendant), Kuzzins Buford (a Microtel Defendant), and SE Owner, Auro, Laxmi, and JHM (Hampton Inn NDH Defendants).

Plaintiff's claims were tolled by O.C.G.A. § 9-3-99 for six years because Plaintiff's claims arise out of crimes committed against her.  As a result, Plaintiff had eight years to timely assert her negligence claim.

Section "9-3-99 provides for tolling as to 'any cause of action in tort' brought by a crime victim that 'arises out of the facts and circumstances relating to the commission of such alleged crime[.]'" *Harrison v. McAfee*, 788 S.E.2d 872, 876 (Ga. Ct. App. 2016) (quoting O.C.G.A. § 9-3-99).  In *Harrison*, an unknown perpetrator shot the plaintiff in the arm while he was at the defendant's bar.  *Id.* at 873.  More than two years later the plaintiff filed a premises liability lawsuit against the bar. *Id.*  The *Harrison* court held the plaintiff's claim was timely because he was a victim of an alleged crime and his lawsuit asserted a tort claim arising out of the facts and circumstances related to the commission of that crime.  *Id.* at 876, 878–79.  The court held that § 9-3-99 tolled the limitation period even though the defendant was not the perpetrator of the crime.  *Id.* at 878-79.  That there was no prosecution of the crime at issue in that case did not alter the Court's holding.  *See id.* at 873 (unknown perpetrator had "yet to be arrested or prosecuted").

Movants contend that *Stopanio v. Leon's Fence and Guardrail, LLC*, 815 S.E.2d 232 (Ga. Ct. App. 2018), limits the application of O.C.G.A. § 9-3-99 to cases in which criminal charges are pending.  It does not, as held by the Georgia Court of Appeals in *Jenkins v. Keown*, decided a year after *Stopanio*.  In *Jenkins*, the court

found that § 9-3-99 tolling did not apply because the Plaintiffs at summary judgment failed to "adduce[] any evidence that [the defendant] or anyone else was **or could be** prosecuted based on the [alleged crime]."  830 S.E.2d 498, 502 (Ga. Ct. App. 2019) (noting the "time for any prosecution has come and gone" and there could not be a prosecution "in the future").  Thus while "the statute contemplates extending the time in which a victim may file a tort action where there are pending criminal charges," *Stopanio*, 815 S.E.2d at 236, it also contemplates extending that time where the period in which a prosecution may be pursued has not yet terminated. *Jenkins*, 830 S.E.2d at 502.

Here, Plaintiff is the "victim of [] alleged crime[s]," O.C.G.A. § 9-3-99, at Movants' hotels and her cause of action "arises out of the facts and circumstances relating to the commission of such alleged crime[s]." *Id.*  The limitation period for her negligence claim was tolled for six years because no prosecution of those crimes has yet become final, nor has the time elapsed to pursue a prosecution for those crimes.[67]  For the same reasons Plaintiffs' Georgia RICO civil claims are timely (*see* Section III.A., *supra*), a prosecution of Movants or others involved in her trafficking would also be timely.   It is not apparent from the face of the complaint that Plaintiff

---

[67] If the legislature had intended to limit the application of O.C.G.A. § 9-3-99 to cases in which a prosecution had been initiated it could have done so.  "It did not, and any undesirable result is a matter properly addressed by the General Assembly rather than the courts."  *Harrison*, 788 S.E.2d at 879.

cannot prove a set of facts that toll the statute of limitations and her claims cannot be dismissed on that basis. *Lindley v. City of Birmingham*, 515 F. App'x 813, 815 (11th Cir. 2013) (A complaint may be dismissed on a statute-of-limitations defense only if it appears beyond a doubt that Plaintiffs can prove no set of facts that toll the statute.) Plaintiff's negligence claims are time-barred only to the extent they relate to crimes occurring more than eight years prior to filing this action. Plaintiff's negligence claims arising out of crimes committed at the Movants' hotels in late 2011 and later are timely.[68]

### B. Movants Owed a Duty of Care to Protect Plaintiff against an Unreasonable Risk of Harm and Breached that Duty.

Movants Wyndham (a Microtel Defendant and a Ramada Defendant), Microtel, and Ramada contend that they owed no duty of care to Plaintiff and, regardless, Plaintiff has failed to allege they breached any such duty. Plaintiff has alleged that Movants breached, among others, their duty to properly train employees at their hotels to observe and report potential threats to invitees' safety. Doc. 87 ¶¶ 744, 757. Plaintiff has alleged that Movants managed, oversaw, and/or controlled the operation of their hotels, and "controlled the policies and standards applicable to and enforced" at their hotels. *Id.* ¶¶ 33, 43, 201, 229. These Movants had

---

[68] Plaintiff was trafficked at the Red Roof Inn (Smyrna) from 2011 to 2016 (Doc. 87 ¶ 111) , the Microtel from 2011 to 2016 (*id.* ¶ 203), and the Hampton Inn NDH from 2011 to 2016 (*id.* ¶ 311).

supervisory control and authority over the hotels and their employees.  *Id.* ¶¶ 737–

38, 750–51.  Because Plaintiff alleged that Movants controlled the manner in which

its franchisees executed their work, Movants "can be held liable for the negligent

training and supervision of franchisee employees."  *New Star Realty, Inc. v. Jungang*

*PRI USA, LLC*, 816 S.E.2d 501, 513 (Ga. Ct. App. 2018) (citing *Hyde v. Scholtzsky's,*

*Inc.*, 561 S.E.2d 876 (Ga. Ct. App. 2002)).

Movants ask this Court to ignore Plaintiff's allegations, and to instead rule

that as a matter of law that Plaintiff cannot present evidence establishing that

Movants owed her a duty, in part because their hotels were franchised locations.

Yet Movants fail to cite a single case that would support such a holding,[69] and the

existence of a franchise agreement does not immunize Movants for the conduct of its

franchisees as a matter of law.  *C.f. Hunter v. Ramada Worldwide, Inc.*, No. 1:04-cv-

0062, 2005 WL 1490053, at *8 (E.D. Mo. June 23, 2005) ("the mere fact that a

franchise agreement governs the parties' relationship does not automatically

preclude a finding that an agency relationship exists,").  What the evidence in this

case will establish cannot be assessed on a motion to dismiss.  Plaintiff has

adequately alleged that Movants failed to keep their hotels safe, including by failing

---

[69] Numerous Georgia cases confirm this is a fact-intensive inquiry and only where a
plaintiff fails to offer evidence that a franchisor exercised control of a franchisee's
operation is summary judgment appropriate.  *See e.g., New Star Realty, Inc.*, 816
S.E.2d at 508–09; *Daimler Chrysler Motors Co. v. Clemente*, 668 S.E.2d 737, 746 (Ga.
Ct. App. 2008).

to properly train and supervise the employees at the hotels.

## C. Movants are Responsible for their Conduct and the Conduct of their Agents and Co-Conspirators.

Movants Varahi-RRI (a Red Roof (Smyrna) Defendant), SE Owner (a Hampton Inn NDH Defendant), and Kuzzins Buford (a Microtel Defendant) contend that they cannot be held liable for the conduct of employees at the hotels they owned. Movants do not argue that these employees were not their agents. Rather, Movants argue that even if an agency relationship existed, Movants are not responsible for their agents' conduct because it was not within the scope of Movant's business.

Movants are in the business of renting hotel rooms. Doc. 87 ¶¶ 17, 33, 61. Plaintiff has alleged that sex trafficking at the Movant's hotels furthered their business, at a minimum, through the rental of rooms, from which Movants obtained revenue. *Id.* ¶¶ 108, 128, 200, 308. The cases on which Movants rely—in which the businesses at issued received no benefit from its agent's improper conduct—are inapposite. *See Piedmont Hosp., Inc. v. Palladino*, 580 S.E.2d 215, 216 (Ga. Ct. App. 2003) (employee's actions "did nothing to further the employer's business").

## D. Plaintiff's Injuries were caused by Movants' Negligence.

Movants[70] seek dismissal of Plaintiff's negligence claims based on their

---

[70] Movants asserting this argument are Wyndham (a Microtel Defendant and a Ramada Defendant), Microtel, Ramada, and CorePoint Lodging and CPLG HOL (La Quinta Defendants).

contention that Plaintiff's injuries were solely the result of the unforeseeable conduct of criminal third parties.  To the contrary, Plaintiff's injuries were not only the foreseeable result of Movants' negligence, but are precisely the types of injuries that Movants were warned would occur if they failed to exercise proper care.  Years before Plaintiff was trafficked at their hotels, Movants knew or should have known of the epidemic of hotel sex trafficking and its prevalence in metro Atlanta hotels. Doc. 87 ¶ 81; *see also id.* ¶ 92 (Defendants were repeatedly warned not to turn a blind eye to sex trafficking).  Despite knowing "what signs to look for and which policies to implement in order to prevent, identify, and deter sex trafficking in their hotel[]," *id.* ¶ 94, Movants stood idle.  More than just knowledge of sex trafficking in general, Plaintiffs have alleged that sex trafficking at the Movants' hotels was open, obvious, and apparent to Movants' agents, *id.* ¶¶ 221, 241, 262.  Nevertheless, Movants refused to take remedial action "so that they could continue to profit from the sex trafficking ventures in which they participated."  *Id.* ¶ 94.

And even assuming Movants did not assist, facilitate, or conspire with the criminal actors who operated sex trafficking ventures out of their hotels as Plaintiff has alleged,[71] those perpetrators' criminal acts were nonetheless the reasonably foreseeable results of Movants' negligence and do not break the causal connection between them and Plaintiff's injuries.  The intervening criminal act of a third party

---

[71] *Id.* ¶¶ 418, 427, 443, 452, 468, 477, 612, 629, 646.

which directly causes a Plaintiff's injury does not break the causal chain between a defendant's negligence and the injury, if the intervening criminal act "was a reasonably foreseeable consequence of defendant's negligent act or omission." *FPI Atlanta, L.P. v. Seaton*, 524 S.E.2d, 529 (Ga. Ct. App. 1999) (citation omitted).[72] Knowledge of previous similar crimes can render criminal conduct foreseeable. *Id.* at 528. As Plaintiff has alleged, Movants not only had reason to anticipate criminal sex trafficking at their hotels and were aware of the conditions that would result in such crime, they affirmatively knew of such conduct at their hotels.

Further, whether criminal conduct is a foreseeable consequence of intentional or negligent conduct is a question to be answered after fully developing the factual record, not on a motion to dismiss. *Days Inns of Am., Inc. v. Matt*, 454 S.E.2d 507, 508 (Ga. 1995); *Walker v. Aderhold Props., Inc.*, 694 S.E.2d 119, 122 (Ga. Ct. App. 2010). The cases cited by Movants confirm this point as each cited decision followed the full development of the factual record through discovery and/or at trial.[73]

---

[72] *See also Ontario Sewing Mach. Co. v. Smith*, 572 S.E.2d 533, 536 (Ga. 2002) (where criminal conduct was foreseeable, causal connection is not broken).

[73] *See e.g., Avis Rent A Car Sys., LLC v. Johnson*, No. A19A0928, A19A0929, 2019 WL 5616683 at *4 (Ga. Ct. App. Oct. 31, 1999) (reviewing ***trial*** evidence); *Goldstein, Garber & Salama, LLC v. J.B.*, 797 S.E.2d 87, 90 (Ga. 2017) (same); *Brown v. All-Tech Inv. Group, Inc.*, 595 S.E. 2d 517, 523 (Ga. Ct. App. 2003) (reviewing evidence on a motion for summary judgment); *Gordon v. Starwood Hotels & Resorts Worldwide, Inc.*, 821 F. Supp. 2d 1308, 1313 (N.D. Ga. 2011) ("Plaintiff has not presented competent evidence that the criminal act committed against him . . . was reasonably foreseeable.").

Respectfully submitted this 3rd day of February, 2020.

*/s/ Tiana S. Mykkeltvedt*

John E. Floyd
Georgia Bar No. 266413
floyd@bmelaw.com
Manoj S. Varghese
Georgia Bar No. 734668
varghese@bmelaw.com
Tiana S. Mykkeltvedt
Georgia Bar No. 533512
mykketlvedt@bmelaw.com
Amanda Kay Seals
Georgia Bar No. 502720
seals@bmelaw.com
Michael R. Baumrind
Georgia Bar No. 960296
baumrind@bmelaw.com

BONDURANT, MIXSON & ELMORE, LLP
1201 West Peachtree Street, N.W., Suite 3900
Atlanta, GA  30309
(404) 881-4100 – Telephone
(404) 881-4111 – Facsimile

Jonathan S. Tonge
jtonge@atclawfirm.com
Georgia Bar No. 303999
Patrick J. McDonough
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
Trinity Hundredmark
Georgia Bar No. 140808
thundred@atclawfirm.com

ANDERSEN, TATE & CARR, P.C.
One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000

#3011368v1

Duluth, Georgia  30097
(770) 822-0900 – Telephone
(770) 822-9680 – Facsimile

*Attorneys for Plaintiff Jane Doe 1*

## <u>CERTIFICATION</u>

The undersigned counsel hereby certifies that the foregoing

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS**

**AND MOTIONS FOR JUDGMENT ON THE PLEADINGS** was prepared

using 13-point Century Schoolbook font and complies with the margin and type

requirements of this Court, per L.R. 5.1 (N.D. Ga.)

This 3rd day of February, 2020.

*/s/ Tiana S. Mykkeltvedt*

Tiana S. Mykkeltvedt

Georgia Bar No. 533512

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 3, 2020, I served a true and correct copy of the within and foregoing **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND MOTIONS FOR JUDGMENT ON THE PLEADINGS** using the Court's CM/ECF system, which will automatically email the document to all counsel of record.

This 3rd day of February, 2020.

<u>/s/ *Tiana S. Mykkeltvedt*</u>
Tiana S. Mykkeltvedt
Georgia Bar No. 533512