**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| JANE DOE 1,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>RED ROOF INNS, INC., et al.,<br><br>　　　　　Defendants. | Civil Action No.<br>1:19-cv-03840-WMR<br><br><br>JURY TRIAL DEMANDED,<br>Pursuant to Fed. R. Civ. P. 38 |

**PLAINTIFF'S RESPONSE TO CC&S DEVELOPMENT, LLC'S**
**MOTION TO DISMISS**

Defendant CC&S Development, LLC ("CC&S") owns and operates the

Microtel.  SAC, Doc. 305 ¶ 193.  CC&S created Kuzzins Buford, LLC, a

corporate entity with no offices, employees or independent operations to hold

the fee simple title to the Microtel.  *Id* ¶¶ 193, 197.  CC&S hired Essex Hotel

Management, LLC to manage the Microtel under CC&S's direction.  *Id.* ¶ 194.

"In practice CC&S owned, operated and managed the hotel," *id.* ¶ 193,

including the smallest details of the Microtel's operations.  *Id.* ¶ 194.

The Second Amended Complaint alleges that CC&S owned, operated and ran

the day-to-day operations at the Microtel and is responsible for Plaintiff's

injuries.  CC&S's creation of Kuzzins (its alter ego) and use of Essex (its agent)

to run the hotel does not insulate it from liability from its own acts and knowledge.  There is simply no basis to dismiss CC&S.[1]

## **STATEMENT OF FACTS**[2]

Plaintiff Jane Doe 1 was trafficked at Atlanta hotels from 2011 through 2016 where she was sold for commercial sex.  SAC, Doc. 305 ¶ 1.  Plaintiff's claims against Defendant CC&S Development, LLC arise out of her trafficking at the Microtel Inn & Suites located at 1840 Corporate Boulevard NE, Atlanta, Georgia 30329 ("Microtel"), *id.* ¶ 172, which, at all relevant times was owned and operated by CC&S.  *Id.* ¶ 193.

CC&S created Kuzzins, a Georgia limited liability company, *id.* ¶ 23,  to own the Microtel.  But Kuzzins has no offices, employees, or operations independent of CC&S and CC&S owns, operates and manages the Microtel.  *Id.* ¶ 193.  Through Kuzzins, CC&S hired Essex to manage the Microtel.  *Id.* ¶ 194. Through hundreds of emails CC&S directed and ratified the day-to-day operations of the Microtel including: requiring crime reports be sent directly to

---

[1] The Court has already stayed this case during the pendency of Plaintiff's appeal of the Court's April 13, 2020 orders on Motions to Dismiss.  The Court's decision to stay this and related cases was a sound one, as the resolution of Plaintiff's appeal has the potential to moot or require the reconsideration of the issues now before the Court.

[2] Unless otherwise noted, pin citations to record refer to the page number affixed in the Court's CM/ECF heading and not to the numbers appearing in document footers.

CC&S; closely monitoring security protocols, security devices, armed security and procedures; supervision of specific employees and employee pay and bonus decisions; requiring approval of remodeling and maintenance details such as the height of bathroom backsplashes and the color of furniture finishes; preapproval for purchases; and, routine maintenance such as pressure washing and landscaping. *Id.* ¶ 201. CC&S benefited financially from the operation of the Microtel, including from the room revenue generated from Plaintiff's sex trafficking. *Id.* ¶ 196.

As the owner and operator of the Microtel, CC&S had, at a minimum, constructive knowledge of crimes there, including sex trafficking. *Id.* ¶¶ 188–89. Specific facts, the truth of which must be assumed at this stage, make this inference more than plausible. Microtel employees and managers knew of and assisted the sex trafficking ventures that operated there. *Id.* ¶ 175. For example, Microtel front desk employees acted as "look outs" and called Jane Doe 1's trafficker to alert him to police presence. *Id.* And Jane Doe's 1 trafficker (and others) used the computer in the lobby to post advertisements for commercial sex—all in full view of Microtel employees. *Id.* ¶ 176.

When at the Microtel, Plaintiff's presence and physical appearance to Microtel employees was suggestive of sex trafficking and dispelled any notion of prostitution alone. Bruises and other evidence of physical beatings often

covered Plaintiff; she also appeared malnourished and sleep deprived and had poor hygiene. *Id.* ¶ 183. Her failure to make eye contact, her lack of control of any money, and close surveillance by her trafficker were all well-known signs of trafficking. *Id.* Other signs of trafficking were also inescapable to hotel staff: the excessive linens brought to her hotel room by Microtel housekeeping staff, the trash can overflowing with condoms, and a volume of cell phones that far outpaced the number of guests. *Id.* ¶ 184–86.

And trafficking at the Microtel was not sporadic; it was constant, open and obvious. *Id.* ¶ 175. For example, Plaintiff was trafficked out of the Microtel more than 20 separate times, sometimes for two weeks at a time. *Id.* ¶ 172. Other victims, including Jane Doe 2 and Jane Doe 3, were sometimes trafficked out of the Microtel with her. *Id.* ¶ 173. Buyers of commercial sex, at least 10 men per day—just for Jane Doe 1—appeared, stayed for a brief time, and then left. *Id.* ¶ 174. The overall volume of foot traffic to the Microtel far exceeded this number, given the multiple victims present. *Id.* In sum, the presence of other traffickers, multiple victims, and the sheer number of buyers of commercial sex suggested to anyone present the likelihood of trafficking, not prostitution. *Id.*

And CC&S knew or should have known of the prevalence of sex trafficking at hotels in Atlanta and of its warning signs. *Id.* ¶¶ 190–92. The

Microtel's own publicly available online reviews, and multiple arrests at the hotel, put CC&S on notice of the sex trafficking ventures operating there.  *Id.* ¶ 187–89.  Indeed, for a period while Plaintiff was trafficked, the Microtel's entire third floor was controlled by Quintavious Obie, a sex trafficker criminally convicted under the TVPRA who was sentenced to 21 years in *United States v. Obie*, 1:18-cr-0007-ODE.  *Id.* ¶¶ 177–82.  Obie trafficked seven or more victims from the Microtel third floor, and Microtel employees knew of and facilitated Obie's control.  *Id.*¶ 179.

CC&S knowingly benefitted from Plaintiff's trafficking by receiving a percentage of the revenue generated by Microtel's operation, including the rooms in which Plaintiff was trafficked.  *Id.* ¶¶ 196, 421.  CC&S participated in the sex trafficking venture by providing the location for it.  *Id.* ¶¶ 422–26.

## **PROCEDURAL HISTORY**

Plaintiff filed her original complaint on August 26, 2019 and the Amended Complaint on November 21, 2019, asserting claims arising out of sex trafficking at eight different hotel locations in the Atlanta area.  Plaintiff named both local owners and operators and the associated corporate hotel brands. Given the limited publicly available information, the complex corporate structure, and use of shell corporations within hotel groups, the Amended Complaint named around twenty-nine defendants. Doc. 87.

On February 7, 2020, the Court held a hearing on all the pending motions to dismiss.  At that hearing, the Court announced that it was dismissing Plaintiff's claims against certain corporate brand defendants.  Doc. 248.  By Order entered April 13, 2020, the Court dismissed the franchise defendants, struck portions of the Amended Complaint, and directed Plaintiff to replead her claims.  Doc. 282.  Plaintiff sought entry of a Rule 54(b) judgment, which the Court granted on May 6, 2020.  Doc. 295.  The Court stayed discovery but directed Plaintiff proceed with filing the SAC and permitted defendants to file motions for judgment on the pleadings.  Doc. 294.  Plaintiff timely filed her SAC on May 8, 2020, narrowing her claims to four hotels and fourteen defendants.

## ARGUMENT AND CITATION OF AUTHORITY

At the motion to dismiss stage, the Court must assume the truth of the complaint's factual allegations and construe the facts "in the light most favorable to the plaintiff." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 707 (11th Cir. 2016).  Still, "no part of the Twombly-Iqbal pleading standard requires a plaintiff to provide evidence for the factual allegations in a complaint before they are 'entitled to the assumption of truth' at the motion-to-dismiss stage." *Hi-Tech Pharms., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1197 (11th Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1940 (2009)).  When reviewing the complaint, the district court "must consider the complaint

in its entirety ... whether all of the facts alleged, taken collectively … not whether any individual allegation, scrutinized in isolation, meets the standard" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322-23 (2007) (post-Twombly).

## I.   Plaintiff alleged a prima facie case of personal jurisdiction over CC&S that CC&S did not rebut.

CC&S moves to dismiss the SAC for lack of personal jurisdiction.  CC&S's argument is based entirely on ignoring the well-pled allegations of the SAC. For example, without any supporting affidavit or evidence, CC&S asserts that "CC&S does not own or manage the Microtel Atlanta."  Doc. 368–1 at 7.  But the SAC alleges exactly the opposite, Doc. 305 ¶ 193, and Plaintiff's unrebutted allegations must be accepted as true.  Because Plaintiff has alleged a prima facie case of personal jurisdiction over CC&S for its ownership and operation of a hotel in Georgia, CC&S's motion should be denied.

A plaintiff seeking to obtain jurisdiction over a nonresident defendant initially need only allege sufficient facts to make out a prima facie case of jurisdiction. *Posner v. Essex Ins. Co.,* 178 F.3d 1209, 1214 (11th Cir. 1999).  If the defendant challenging jurisdiction files affidavits in support of his position, only then does the plaintiff bear the burden of submitting an affidavit supporting jurisdiction.  *Id.*; *see Madara v. Hall,* 916 F.2d 1510, 1514 (11th Cir. 1990) (holding that even when a defendant submits evidence supporting his

jurisdictional position, we still accept the facts alleged in the complaint as true, to the extent they are uncontroverted by the defendant's affidavits) (internal quotations and citations omitted).

Plaintiff alleged that, during the relevant time period, CC&S owned, operated, and directed the day-to-day activity at an Atlanta, Georgia hotel. Doc. 305 ¶¶ 193–94.  The Microtel is located at 1840 Corporate Boulevard NE, Atlanta, Georgia 30329.  *Id.* ¶ 172.  The SAC describes how CC&S travelled to Atlanta, Georgia and "personally inspected the property and directed Essex to replace specific items such as trash can lids, fix a bold on an ice machine, and dust behind vending machines."  *Id.* ¶ 201. CC&S sent hundreds of emails directing day-to-day activities of operating the Microtel hotel.  *Id.* ¶ 200.

"A federal court sitting in diversity undertakes a two-step inquiry in determining whether personal jurisdiction exists: the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution."  *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257–58 (11th Cir. 2010).  The facts of the SAC more than establish that CC&S is subject to personal jurisdiction because CC&S transacts business in Georgia under Georgia's long-arm statute.  *Am. Coll. Connection, Inc. v. Berkowitz*, 332 Ga. App. 867, 869 (2015); *see* O.C.G.A. § 9-10-91 (Georgia's long

arm statute).

Georgia courts have made clear that a nonresident defendant's physical presence in Georgia is not required for personal jurisdiction.  That's because "Georgia allows the assertion of long-arm jurisdiction over nonresident defendants based on 'business conducted through postal, telephonic, and *Internet contacts*.' *Berkowitz*, 332 Ga. App. at 871 (emphasis in original); *Aero Toy Store, LLC v. Grieves*, 631 S.E. 2d 734, 739 (Ga. Ct. App. 2006) ("Factors such as regularly doing or soliciting business, or deriving substantial revenue from goods or services, in this state may, however, also be relevant in determining whether sufficient minimum contacts exist for the purpose of supporting specific jurisdiction, where such activities relate to the suit at hand.").

CC&S's hundreds of emails, directing minute details of operating the Microtel are sufficient to establish that CC&S was transacting business in Georgia pursuant to the long-arm statute.  And that business is the very business that Plaintiff alleges caused her injury.  *See* Doc. 305 ¶ 172 (Jane Doe 1 was trafficked out of hotel rooms at the Microtel Inn & Suites in Atlanta, Georgia).  Plaintiff also alleged that CC&S derived revenue from operation of the Microtel in Georgia.  *Id.* ¶ 196.  Because CC&S purposefully availed itself of the privilege of doing business in Georgia, it also has minimum contacts

sufficient to satisfy due process.  *Diamond Crystal Brands,* 593 F.3d at 1274 (observing that Georgia has a "manifest interest in providing effective means of redress for its residents" and Georgia's interest in exercising jurisdiction would often justify "serious burdens" on a nonresident defendant.).

## II.    The Second Amended Complaint is Not a Shotgun Pleading.

While the Eleventh Circuit disapproves of shotgun pleadings and affirms dismissals on that basis, the SAC does not fit any description of a prohibited shotgun pleading recognized by the Eleventh Circuit.  In *Weiland v. Palm Beach County Sheriff's Office*, the Eleventh Circuit described four general categories of shotgun pleadings.  792 F.3d 1313, 1322–23 (11th Cir. 2015).  Not one describes Plaintiff's SAC.  Though none of these categories apply to the SAC, CC&S still seeks dismissal of the SAC as an impermissible shotgun pleading, because—it claims—the SAC includes "mass-incorporated paragraphs" and seeks to lump together the three corporate owners and managers of the Microtel.  Doc. 368–1 at 13.  CC&S is wrong on both fronts.

## A. The incorporation of other paragraphs by reference does not render the SAC a shotgun pleading.

Federal Rule of Civil Procedure 8(a)(2) requires only that a complaint provide "a short and plain statement of the claim showing" entitlement to relief. Neither detailed factual allegations nor "technical forms of pleading . . . are required."  *Crowe v. Coleman,* 113 F.3d 1536, 1539 (11th Cir. 1997).  The SAC

asserts claims arising out of trafficking at four hotels—Microtel, Suburban Extended Stay, Smyrna Red Roof Inn, and Atlanta Red Roof Inn—and its factual allegations are organized by hotel location.  For example, Part IV describes trafficking at the Microtel including specific factual allegations against CC&S.  Plaintiff incorporated *only* the facts relating to the Microtel into the SAC's Counts against CC&S, a point CC&S admits. *E.g.*, Doc. 368–1 at 13 (citing SAC, Doc. 305 ¶¶ 410 (TVPRA count incorporating Part IV); 435 (negligence count incorporating Part IV; 398, 418 (Georgia RICO counts incorporating Part IV and paragraphs specific to RICO counts).  Far from rendering it impossible to discern "which allegations of fact are intended to support which claims of relief," *id*., this means each substantive count specifically identifies the factual allegations supporting it.

In any case, CC&S is also wrong about the permissibility of pleading facts against multiple defendants.  Allegations against defendants collectively can "be fairly read to aver that all defendants are responsible for the alleged conduct."  *Kyle K. v. Chapman*, 208 F.3d 940, 944 (11th Cir. 2000).  Ample authority confirms that this remains the standard post *Twombly* and *Iqbal*. *E.g., Crespo v. Coldwell Banker Mortg.,* 599 F. App'x 868, 872 (11th Cir. 2014) (applying *Iqbal*); *FTC v. Hornbeam Special Situations, LLC,* 308 F. Supp. 3d 1280, 1288 (N.D. Ga. 2018) (rejecting argument that group pleading rule did not

apply following *Iqbal*); *see also Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.,* 917 F.3d 1249, 1275 (11th Cir. 2019) (reversing dismissal based on alleged "group pleading" because "Defendants" was permissibly defined to "mean each and every Defendant named in the caption above.")

Nor is Judge Boulee's decision, *Clifford v. Federman*, 1:18-CV-01953, to the contrary. There, the plaintiff's complaint fell squarely in the first category, incorporating the "vast majority" of preceding paragraphs into each of fifty-two counts. *Id.* at 5. Further, alleging a "diabolical" fraud, the *Clifford* plaintiff asserted claims against forty-two defendants and ignored the Court's admonition to correct the deficiency. *Id.* at 2, 5. By contrast, Plaintiff's claims against CC&S arise out its ownership, operation, and management (along with Kuzzins and Essex) of the Microtel. And unlike the *Clifford* defendants, CC&S cannot feign ignorance or confusion about Plaintiff's claims against it because all knowledge and actions of Microtel employees are imputable to CC&S.

## B. The SAC's agency allegations are sufficient at the pleadings stage to state a claim against CC&S for the acts, omissions and knowledge of Microtel employees.

CC&S seeks dismissal based on its unsupported contention that it had no relationship with Microtel employees. But CC&S's motion should be denied, because the SAC alleges that CC&S owned, operated and managed the

Microtel, and hired Essex (the company that employed Microtel staff) and that CC&S directed those Microtel employees in their day-to-day activities.  And at the pleading stage, Plaintiff's allegations must be accepted as true and all reasonable inferences made in Plaintiff's favor.  Indeed, the SAC specifically alleges facts supporting an inference that CC&S is responsible for the actions of Kuzzins and Essex as its agents and/or alter egos.  Doc. 305 ¶¶ 193–94, 200 ("Kuzzins is an alter ego of CC&S"), ("Essex is an agent of CC&S"), 201 ("CC&S exercised an ongoing and systemic right of control over Essex and Kuzzins at the Microtel, including exercising control over how Essex and Kuzzins conducted their daily business."); 428–29.

Agency allegations, like these, are sufficient at a motion to dismiss stage, as the existence of agency relationship involves fact questions ill-suited to resolution on the pleadings, particularly where facts lie in the defendants' control.  *Amin v. Mercedes-Benz USA, LLC*, 349 F. Supp. 3d 1338, 1357 (N.D. Ga. 2018); *Pizza K, Inc. v. Santagata*, 249 Ga. App. 36, 37 (2001) (a franchisor remains liable for acts of a franchisee who is "a mere agent or alter ego of the franchisor").  As the owner and party that retained liability, CC&S cannot escape liability through corporate shell games nor can it complain that it does not have "adequate notice of the claims against it."  Doc. 368–1 at 12.

Accepting as true the allegations of the SAC, CC&S managed the day-to-

day operations of the Microtel, including the employees who worked there.  Doc.
305 ¶¶ 194, 201.  In fact, CC&S directed the work on the ground at the Microtel
in Atlanta including details like managing specific employees, parking lot
maintenance, how to organize the personnel files, and safety and security
protocols.  CC&S personally inspected the hotel property in Atlanta, Georgia,
directing specifics such as instructions to replace trash can lids, fix a bolt on an
ice machine and to dust behind the vending machines.  *Id.* ¶ 201(h).  CC&S is
responsible for the actions of these Microtel employees.  *See* O.C.G.A. § 51-2-2
("[a] person shall be liable for torts committed . . . in the prosecution and within
the scope of his business").

CC&S asserts that it is not responsible for "unidentified hotel workers"
because the alleged torts arise from "purely personal motives."  Doc. 368–1 at
13.  But CC&S does not cite any paragraph of the SAC for that assertion.
Indeed, the SAC does not allege any personal benefit—and the SAC alleges that
CC&S benefited from the Microteel employees' rental of rooms in which
Plaintiff and other victims were trafficked, a job clearly in the scope of
employment for Microtel employees.  In any event, dismissal on these grounds
at the pleadings stage would be erroneous because even if a personal motive
were alleged, Plaintiff also alleged a benefit to CC&S.  "Whether the [corporate
defendant's] agents' acts or omissions were committed within the scope of their

employment is a question of fact.  To be acting within his employment, the agent first must have intended his act would have produced some benefit to the corporation or some benefit to himself and the corporation second." *United States v. Gold,* 743 F.2d 800, 822-23 (11th Cir. 1984) (emphasis added).

## III.   Plaintiff has alleged CC&S's liability under the TVPRA.[3]

Under CC&S's theory of the TVPRA, a civil plaintiff must carry the same burden of proof as if she were prosecuting a crime.  That argument fails for at least two reasons: It runs afoul of Congress's intent in creating the TVPRA's civil remedy, 18 U.S.C. § 1595, and it ignores the SAC's well-pled facts.

### A. Plaintiff's TVPRA claim is subject to a civil—rather than criminal—liability standard.

Originally passed as a criminal statute, Congress amended the TVPRA in 2003 to give victims a civil cause of action "against the perpetrator" of a violation of certain criminal provisions.  18 U.S.C. § 1595(a).  In 2008, Congress expanded the civil action by allowing victims to sue **not only** the criminal perpetrator, but also "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter[,]." *Id.*

This expansion of civil liability includes CC&S, because it (1) knowingly

---

[3] As noted above, the interpretation the TVPRA's civil cause of action is on appeal before the Eleventh Circuit.

benefits (2) from participation in a venture and it (3) knew or should have known the venture "engaged in an act in violation of this chapter." *Id.*[4] Because Congress intended § 1595(a) to be a broad remedial provision "it is possible for a defendant to be civilly liable without having violated any of the criminal portions of the TVPA." *Ricchio v. Bijal, Inc.*, 424 F. Supp. 3d 182, 194 (D. Mass. 2019).

## B. The SAC alleges that CC&S benefited from Plaintiff's trafficking.

The "knowing benefit" element is satisfied by the rental of a room. *Ricchio v. McLean*, 853 F.3d 553, 556 (1st Cir. 2017) (knowing benefit satisfied by room rental); *M.A. v. Wyndham Hotels & Resorts, Inc.,* 425 F. Supp. 3d 959, 964 (S.D. Ohio 2019) (same); *H.H. v. G6 Hosp., LLC*, No. 2:19-CV-755, 2019 WL 6682152, at *2 (S.D. Ohio 2019) (same); *A.B. v. Marriott Int'l, Inc.*, No. CV 19-5770, 2020 WL 1939678, at *15 (E.D. Pa. Apr. 22, 2020)(same).  For example, showing that the defendant had a financial stake in the success of the hotel, or even renting a single room for a short period could constitute a "benefit" within the meaning of the statute.  *Ricchio v. Bijal*, 386 F. Supp. 3d at 131 (even a *de minimis* benefit is sufficient).

The SAC easily satisfies that standard.  Specifically, it alleges that

---

[4] Although it is not a requirement under § 1595(a) that CC&S have any particularized knowledge of the Plaintiff's trafficking or knowledge of a specific instance of force, fraud, or coercion, Plaintiff has so alleged.  *See infra,* III.B.

"CC&S . . . controlled the operation of, and [was] inextricably connected to the renting of rooms at the Microtel," *id.* ¶ 195, and thereby "benefited financially from" the Microtel's operation, "including from the room revenue generated from Plaintiff's sex trafficking." *Id.* ¶ 196.  Plaintiff alleged that CC&S accepted this benefit knowing the money was exchanged to provide a venue for the sex trafficking venture that victimized Plaintiff.  *Id.* ¶ 426.  This is all the statute requires to establish a benefit.

## C. The SAC alleges that CC&S "participated in a venture" in violation of the TVPRA.

CC&S argues that the SAC does not adequately allege that CC&S "participated in a venture," but it wrongly imposes elements of a criminal violation onto the civil cause of action.  That is not the standard for civil liability, and Plaintiff has alleged facts sufficient for the applicable standard.

*First*, by the statute's express terms, contrary to CC&S's argument, the TVPRA's definition of "participation in a venture" in its criminal provisions, 18 U.S.C. § 1591(e)(4),[5] does not limit a civil cause of action under § 1595.  Section 1591's definitions apply only to that section; the definition section begins, "In this section . . . ." *Id.* § 1591(e).

*Second*, interpreting the statute's plain language differently would render

---

[5] 18 U.S.C. § 1591(e)(4) states: "The term 'participation in a venture' means knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)."

much of § 1595(a) meaningless and thereby violate the canon of statutory construction that prohibits "adopt[ing] an interpretation that would render a term meaningless." *Darrisaw v. Penn. Higher Educ. Assistance Agency*, 949 F.3d 1302, 1306 (11th Cir. 2020). Importing the definition of "participation in a venture" from § 1591—which requires that a defendant act "knowingly"—would leave Congress's addition of the words "should have known" in § 1595(a) without meaning.

While CC&S contends the standard is one of reckless disregard, Doc. 368–1 at 21, the statute's plain language dispels this argument. Reckless disregard, which denotes conscious indifference,[6] is a higher standard than "knew or should have known," as used in 18 U.S.C. § 1595(a), which denotes negligence. "[K]new or should have known in the exercise of ordinary care" is the well-established knowledge standard of negligence, also referred to as "constructive knowledge." *Hendrix v. Raybestos-Manhattan, Inc.*, 776 F.2d 1492, 1497 (11th Cir. 1985). Put differently, constructive knowledge is the "[k]nowledge that one using reasonable care or diligence should have," it is therefore the knowledge law "attribute[s] . . . to a given person."[7] The legal standard applicable to § 1595, therefore, presents a classic jury question: whether a reasonable person

---

[6] RECKLESS DISREGARD, Black's Law Dictionary (11th ed. 2019).
[7] CONSTRUCTIVE KNOWLEDGE, Black's Law Dictionary (11th ed. 2019).

in a CC&S's position, using reasonable care and diligence, should have known that it was profiting from sex trafficking.  Courts considering this standard under the TVPRA have overwhelmingly applied a negligence standard.  *M.A.*, 425 F. Supp. 3d at 966; *H.H.*, 2019 WL 6682152, at *3.

To the extent that CC&S argues the benefit it received must have been received "because of" the facilitation of sex trafficking—it was.  "CC&S participated in the sex trafficking ventures at the Microtel by providing the venue, the physical location where Plaintiff's sex trafficking was allowed to occur."  Doc. 305. ¶ 426.  And Microtel employees both knew of the trafficking ventures and helped them operate and evade police by acting as "look outs"—all of which lined Microtel's pockets in additional room rental revenue.  *Id.* ¶¶ 175 (employees), 196 (rental revenue), 426 (venue).  Plaintiff's sex traffickers chose the Microtel, paid the Microtel, from which CC&S earned revenue because, **and only because**, they were allowed to operate sex trafficking ventures there.

### D. The SAC plausibly alleges that CC&S knew or should have known of sex trafficking ventures at the Microtel.

Read in a light most favorable to Plaintiff, the SAC plausibly alleges CC&S's knowledge of the sex trafficking ventures that harmed Plaintiff.  The knowledge of Microtel employees was the knowledge of CC&S, including the employees who alerted traffickers—including Jane Doe 1's trafficker—when police were at the hotel and allowed a known sex trafficker to control the

Microtel's entire third floor.  *Id.* ¶¶ 175, 178.  Unwitting visitors unlucky enough to book a room at the Microtel observed the open and obvious crime, including prostitution and other signs of sex trafficking.  *Id.* ¶ 187.  Microtel employees (and therefore CC&S) observed the sheer volume of men—buyers— coming and going and the open use of the lobby computer to advertise for commercial sex, all indicative of sex trafficking.  *Id.* ¶¶ 174, 176.

The SAC alleges that a *sex trafficker* was convicted of *sex trafficking* after *trafficking* seven or more women at a time *for sex* from the third floor of the Microtel, which the sex trafficker controlled to such an extent that "Microtel employees only rented rooms on the third floor with [the sex trafficker's] prior permission."  Doc. 305 ¶¶ 177–79.  These allegations more than support an inference that sex trafficking is so essential to Microtel's business that its employees gave deference to Obie, and other sex traffickers operating there.

Finally, CC&S argues that "[t]he mere fact that prostitution may have been going on is insufficient" to allege knowledge of sex trafficking. Doc. 368–1 at 19.  CC&S is wrong for two reasons.  *First*, prostitution is a crime in Georgia,[8] and CC&S's knowledge of prostitution, without more, at the Microtel

---

[8] O.C.G.A. § 16-6-9 ("A person, 18 years of age or older, commits the offense of prostitution when he or she performs or offers or consents to perform a sexual act, including, but not limited to, sexual intercourse or sodomy, for money or other items of value.")

is sufficient to allege Plaintiff's claims for violation of Georgia RICO and negligence.  The SAC alleges that CC&S "kept a place of prostitution" in violation of O.C.G.A. § 16-6-10, and that CC&S "engaged in pimping" in violation of O.C.G.A. § 16-6-11(5).  Doc. 305 ¶¶ 215–18.  Both keeping a place of prostitution and pimping constitute racketeering.  *Id.* ¶¶ 216, 218.  And allegations that Microtel employees knew of and assisted in prostitution—criminal activity on its premises—are sufficient to allege CC&S's violation of its duty of care to keep its premises safe.  *Id.* ¶ 436–47.

*Second*, to the extent CC&S argues that Plaintiff must allege force, fraud, or coercion under the TVPRA to allege sex trafficking, the SAC does just that.  Implicit in CC&S's argument is the presumption that while both involve criminal commercial sex acts, "prostitution" is consensual and therefore distinguishable from "sex trafficking."[9]  But it beggars belief that CC&S's knowledge of *consensual* criminal commercial sex at the Microtel would fail to give rise to CC&S's knowledge of (or that it should have known of) *forced* criminal commercial sex there.

In any event, the SAC specifically alleges facts—known to Microtel employees and CC&S—showing that Plaintiff was subject to force, fraud, and

---

[9] As defined under Georgia law, prostitution is not limited to voluntary acts, but includes one who "performs or offers or consents to perform to a sexual act . . .. for money or other items of value." O.C.G.A. § 16-6-9.

coercion.  At the Microtel, the bruises covering Plaintiff evidenced physical beatings by her trafficker, but she was also malnourished and sleep deprived. *Id.* ¶ 183.  Plaintiff was monitored by her traffickers, *id.*, and when Microtel employees wanted to warn of police presence, they called Plaintiff's *trafficker*— not Plaintiff.  *Id.* ¶ 175.  Plaintiff failed to make eye contact with employees and lacked money and lacked control over money.  *Id.* ¶ 183.  The absence of money is particularly indicative of trafficking—even if one could presume any person would *voluntarily* engage in 10 commercial sex transactions per day, that person would have or control money, unlike Jane Doe 1.  Further, the sheer number of buyers, at least 10 per day, along with the overflowing trash can of condoms are further suggestive of force, fraud or coercion.  *Id.* ¶¶ 174, 184. These allegations all support a reasonable inference that Plaintiff was under her trafficker's control, and Microtel had—at a minimum—every reason to know it.

Whether a factfinder ultimately decides these facts are sufficient to show CC&S's constructive knowledge of sex trafficking is yet to be determined, but at the pleadings stage, Plaintiff is entitled to all reasonable inferences.  Plaintiff has alleged each element of a claim for TVPRA's civil cause of action, and CC&S's motion should be denied.

## IV.    The Amended Complaint States Claims Under Georgia RICO.

CC&S's argument that corporations cannot be held liable unless the crime is authorized by the board of directors or a managerial official, Doc. 368–1 at 23, fails because that is the standard for corporate criminal liability set forth in O.C.G.A. § 16-2-22.  It does not govern this civil RICO case.

In fact, in *Williams General Corporation v. Stone*, 632 S.E.2d 376 (Ga. 2006), the Georgia Supreme Court rejected the exact argument CC&S now makes.  After noting that it had "not previously applied O.C.G.A. § 16-2-22 or any other criminal statutes to civil suits brought by individuals," the Court confirmed that "O.C.G.A. § 16-2-22 does not pertain to civil suits brought under the Georgia civil RICO Act."  *Id.* at 378.  CC&S's argument therefore fails because it depends upon a standard which does not apply to civil RICO cases.

Additionally, although CC&S contends that Plaintiff insufficiently alleged a conspiracy, CC&S ignores that—as members of conspiracies to violate RICO— they are responsible for all acts committed in furtherance of the criminal endeavor.  *Pasha v. State*, 616 S.E. 2d 135, 138 (Ga. Ct. App. 2005). A person engages in a RICO conspiracy "if they knowingly and willfully join a conspiracy which itself contains a common plan or purpose to commit two or more predicate acts."  *Cotman v. State,* 804 S.E. 2d 672, 684 (Ga. Ct. App. 2017). There is "no requirement" that a defendant "personally commit[] the underlying

predicate offenses," only that some member of the conspiracy do so. *Pasha*, 616 S.E. 2d at 138.

Here, it is clear that Plaintiff has alleged acts of racketeering activity against CC&S. For example, a person commits the offense of trafficking an individual for sexual servitude, itself a predicate act, when the person knowingly benefits financially or receives anything of value from the sexual servitude of another. O.C.G.A § 16-5-46(c)(3). Plaintiff alleges that CC&S benefitted financially from her sexual servitude. Doc. 305 ¶¶ 209–10. Financial gain, meanwhile, is sufficient to link acts of racketeering activity into a pattern. *Overton v. State,* 671 S.E. 2d 507, 517-18 (Ga. Ct. App. 2008).

And a corporation has liability for sexual servitude if *any* of its agents knew *or should have known* that the illegal activity was occurring. O.C.G.A § 16-5-46(j). As described above, Plaintiff alleges that CC&S knew or should have known of the illegal activity and alleges specific facts supporting that actual or constructive knowledge. *See supra* III.D.

## V.     Plaintiff's Negligence Claims are Timely.

This Court should not dismiss Plaintiff's negligence claims against CC&S based on the statute of limitations because Plaintiff's claims were tolled and are therefore timely. "A dismissal for failure to state a claim on statute of limitations grounds is appropriate 'only if it is apparent from the face of the

complaint that the claim is time-barred.'" *United State ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1085 (11th Cir. 2018) (quoting *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004)).  A statute of limitation bar is an affirmative defense, which plaintiffs are not required to negate in their complaint.  *La Grasta*, 358 F.3d at 845.

CC&S insists that because the statute of limitation for a negligence claim is two years, *see* O.C.G.A. § 9-3-33, Plaintiff's negligence claims are time-barred. It fails to recognize, however, that O.C.G.A. § 9-3-99 tolled the negligence limitations period for six years because Plaintiff's claims arise out of crimes committed against her.  Plaintiff therefore had eight years to timely assert her negligence claim.  Section "9-3-99 provides for tolling as to 'any cause of action in tort' brought by a crime victim that 'arises out of the facts and circumstances relating to the commission of such alleged crime[.]'."  *Harrison v. McAfee*, 788 S.E.2d 872, 876 (Ga. Ct. App. 2016) (quoting O.C.G.A. § 9-3-99).  Similarly, Plaintiff is the "victim of [] alleged crime[s]," at CC&S's hotel and her cause of action "arises out of the facts and circumstances relating to the commission of such alleged crime[s]."  O.C.G.A. § 9-3-99.  The limitation period for her negligence claim was tolled for six years because no prosecution of those crimes has yet become final, nor has the time elapsed to pursue a prosecution for those crimes.

Respectfully submitted this 11th day of September, 2020.

/s/ *Tiana S. Mykkeltvedt*
John E. Floyd
Georgia Bar No. 266413
floyd@bmelaw.com
Manoj S. Varghese
Georgia Bar No. 734668
varghese@bmelaw.com
Tiana S. Mykkeltvedt
Georgia Bar No. 533512
mykketlvedt@bmelaw.com
Amanda Kay Seals
Georgia Bar No. 502720
seals@bmelaw.com
Michael R. Baumrind
Georgia Bar No. 960296
baumrind@bmelaw.com

BONDURANT, MIXSON & ELMORE, LLP
1201 West Peachtree Street, N.W., Suite 3900
Atlanta, GA  30309
(404) 881-4100 – Telephone
(404) 881-4111 – Facsimile

Jonathan S. Tonge
jtonge@atclawfirm.com
Georgia Bar No. 303999
Patrick J. McDonough
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
Trinity Hundredmark
Georgia Bar No. 140808
thundred@atclawfirm.com

ANDERSEN, TATE & CARR, P.C.
One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia  30097
(770) 822-0900 – Telephone
(770) 822-9680 – Facsimile

*Attorneys for Plaintiff Jane Doe 1*

## <u>CERTIFICATION</u>

The undersigned counsel hereby certifies that **PLAINTIFF'S**

**RESPONSE TO CC&S DEVELOPMENT, LLC'S MOTION TO DISMISS**

was prepared using 13-point Century Schoolbook font and complies with the

margin and type requirements of this Court, per L.R. 5.1 (N.D. Ga.).

This 11th day of September, 2020.

*/s/ Tiana S. Mykkeltvedt*
Tiana S. Mykkeltvedt
Georgia Bar No. 533512

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 11, 2020, I served a true and correct

copy of **PLAINTIFF'S RESPONSE TO CC&S DEVELOPMENT, LLC'S**

**MOTION TO DISMISS** using the Court's CM/ECF system, which will

automatically email the document to all counsel of record.

This 11th day of September, 2020.

/s/ *Tiana S. Mykkeltvedt*
Tiana S. Mykkeltvedt
Georgia Bar No. 533512